**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE AGENUS INC. SECURITIES LITIGATION | Master File No.: 1:24-cv-12299-AK<br><br>CLASS ACTION |
| This Document Relates to:<br><br>ALL ACTIONS | Leave to File Excess Pages Granted on April 7, 2025 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................................ 1

FACTUAL BACKGROUND AND SUMMARY OF ALLEGATIONS....................................... 5

    A.   Agenus's Mission and Focus on Treatment of Colorectal Cancer ................................... 5

    B.   Agenus Pursues Accelerated Approval of BOT/BAL for CRC........................................ 7

        1.   The FDA's Accelerated Approval Process........................................................... 7

        2.   BOT/BAL's "Fast Track" Designation.................................................................. 9

        3.   Agenus BOT/BAL Clinical Data ........................................................................ 10

    C.   Agenus Announces the End-of-Phase-2 Meeting Results ................................................ 11

LEGAL STANDARD...................................................................................................................... 12

ARGUMENT ................................................................................................................................... 12

I.    PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR
    OMISSION .............................................................................................................................. 12

    A.   The Alleged Misstatements About BOT/BAL's Prospects for
        Accelerated Approval, Efficacy, and Potential Are Not Actionable ............................... 13

        1.   The Challenged Statements Are Neither False Nor Misleading.................................... 14

        2.   PSLRA Safe Harbor for Forward Looking Statements ................................................ 19

        3.   The Challenged Statements Are Otherwise Non-Actionable
            Opinion Statements or Puffery ..................................................................................... 22

        4.   Confidential Witness Statements Are Irrelevant or Insufficiently Particular ............... 23

        5.   Agenus Warned that Accelerated Approval Was Not Guaranteed............................... 28

    B.   The Amended Complaint Fails to Allege Any False or Misleading Statements or
        Omissions about Agenus's Ability to Accelerate Drug Development ............................. 29

        1.   PSLRA Safe Harbor for Forward Looking Statements .**Error! Bookmark not defined.**

        2.   The Challenged Statements Regarding Agenus's Ability to Accelerate
            Drug Development Are Not Actionable......................................................................... 30

        3.   Confidential Witness Statements Are Irrelevant or Insufficiently
            Particular to Agenus's Ability to Accelerate Drug Development ............................... 32

        4.   Agenus Clearly and Repeatedly Warned that Acceleration of the
            Drug Development Process was Not Guaranteed ......................................................... 33

II.   THE AMENDED COMPLAINT DOES NOT SATISFY
    THE HEIGHTENED PLEADING REQUIREMENT FOR SCIENTER............................ 33

    A.   The Complaint Fails to Allege Facts Supporting a "Strong"
        Inference of Scienter, Relying Instead on a Theory of "Fraud by Hindsight" ................ 34

        1.   The Individual Defendants' Purported "High-Level Positions Within Agenus".......... 34

2.   "Core Operations" Theory ........................................................................... 35

B.   The Confidential Witness Allegations Fail to Plead that
Defendants Knew or Recklessly Ignored Facts Contradicting
Their Public Statements ................................................................................... 36

C.   The Sole Theory Advanced as Possible Motives to Defraud Investors Fails as a
Matter of Law .................................................................................................. 37

D.   Inferences of Non-Culpable Intent Outweigh Plaintiff's Implausible Theory ................. 38

III.   PLAINTIFF'S LOSS CAUSATION THEORY FAILS TO LINK THE ALLEGED
FALSE AND MISLEADING STATEMENTS WITH ANY LOSS .................................. 39

IV.   PLAINTIFF'S CONTROL PERSON CLAIMS MUST BE DISMISSED .......................... 40

APPENDIX A ......................................................................................................... 1

APPENDIX B ......................................................................................................... 1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A123 Sys., Inc. Sec. Litig.*,
  930 F. Supp. 2d 278 (D. Mass. 2013) ....................................................................................26

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)......................................................................................12, 28, 33

*Angelos v. Tokai Pharm., Inc.*,
  494 F. Supp. 3d 39 (D. Mass. 2020) .....................................................................................37

*In re Apellis Pharms., Inc. Sec. Litig.*,
  No. 1:24-cv-11470, 2025 WL 836491 (D. Mass. Mar. 17, 2025) ...........................................18

*In re Biogen Inc. Sec. Litig.*,
  193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017).............................28, 35

*In re Biogen Inc. Sec. Litig.*,
  857 F.3d 34 (1st Cir. 2017)......................................................................................24, 32, 36

*In re Bos. Sci. Corp. Sec. Litig.*,
  686 F.3d 21 (1st Cir. 2012)...............................................................................................14, 34

*In re Bos. Sci. Corp. Sec. Litig.*,
  No. 10-cv-10593, 2011 WL 4381889 (D. Mass. Sept. 19, 2011)...........................................38

*Brennan v. Zafgen, Inc.*,
  199 F. Supp. 3d 444 (D. Mass. 2016), *aff'd*, 853 F.3d 606 (1st Cir. 2017)............................34

*Brennan v. Zafgen, Inc.*,
  853 F.3d 606 (1st Cir. 2017)................................................................................................37

*Celano v. Fulcrum Therapeutics*,
  No. 1:23-cv-11125, 2025 WL 928783 (D. Mass. Mar. 27, 2025) ....................................19, 26

*City of Bristol Pension Fund v. Vertex Pharm. Inc.*,
  12 F. Supp. 3d 225 (D. Mass. 2014) .........................................................................16, 19, 23

*Cody v. Conformis, Inc.*,
  199 F. Supp. 3d 409 (D. Mass. 2016) ..............................................................22, 27, 28, 31

*Corban v. Sarepta Therapeutics, Inc.*,
  868 F.3d 31 (1st Cir. 2017).................................................................................................18, 38

*Corban v. Sarepta Therapeutics, Inc.*,
No. 14-cv-10201, 2015 WL 1505693 (D. Mass. Mar. 31, 2015) .......................................5, 17

*Davison v. Ventrus Biosciences, Inc.*,
No. 13-cv-3119, 2014 WL 1805242 (S.D.N.Y. May 5, 2014) .........................................16, 32

*In re Fin. Oversight & Mgmt. Bd. For P.R.*,
54 F.4th 42 (1st Cir. 2022)..............................................................................................29, 35

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015)...................................................................................................40

*In re Galileo Corp. S'holders Litig.*,
127 F. Supp. 2d 251 (D. Mass. 2001) .....................................................................................35

*Ganem v. InVivo Therapeutics Holdings Corp.*,
845 F.3d 447 (1st Cir. 2017)...................................................................................................12

*Gregory v. ProNAi Therapeutics*,
297 F. Supp. 3d 372, 413 (S.D.N.Y. 2018)........................................................................16, 31

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014)......................................................................................................20

*Harrington v. Tetraphase Pharm., Inc.*,
No. 16-cv-10133-LTS, 2017 WL 1946305 (D. Mass. May 9, 2017) ..........................21, 22, 30

*Hill v. Gozani*,
638 F.3d 40 (1st Cir. 2011)................................................................................................14, 30

*Isham v. Perini Corp.*,
665 F. Supp. 2d 28 (D. Mass. 2009) .......................................................................................36

*Kader v. Sarepta Therapeutics*,
887 F.3d  48 (1st Cir. 2018).....................................................................................................33

*Karth v. Keryx Biopharmaceuticals, Inc.*,
6 F.4th 123 (1st Cir. 2021).......................................................................................................31

*Leavitt v. Alnylam Pharm., Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020) ...........................................................................20, 21, 39

*Leung v. bluebird bio, Inc.*,
599 F. Supp. 3d 49, 66 (D. Mass. 2020) ...................................................................35, 38, 40

*In re Lernout & Hauspie Secs. Litig.*,
286 B.R. 33 (D. Mass. 2002) ...................................................................................................40

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*,
838 F.3d 76 (1st Cir. 2016)..................................................................................15, 40

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)........................................................................................................13

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
716 F.3d 229 (1st Cir. 2013)...........................................................................................40

*Mehta v. Ocular Therapeutix, Inc.*,
955 F.3d 194 (1st Cir. 2020)...........................................................................................40

*Metzler Asset Mgmt. GmbH v. Kingsley*,
928 F.3d 151 (1st Cir. 2019)...........................................................................................36

*Meyer v. Biopure Corp.*,
221 F. Supp. 2d 195 (D. Mass. 2002) .......................................................................16, 20

*Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008).............................................................................................39

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008)....................................................................................9, 26, 36

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ...........................................................................................40

*Paice v. Aldeyra Therapeutics, Inc.*,
No. 23-cv-11737, 2025 WL 815065 (D. Mass. Mar. 14, 2025) ..................................15, 21, 39

*Pizzuto v. Homology Meds., Inc.*,
No. 1:23-CV-10858-AK, 2024 WL 1436025 (D. Mass. Mar. 31, 2024) ........................ *passim*

*Ponsa-Rabell v. Santander Secs. LLC*,
35 F.4th 26 (1st Cir. 2022)........................................................................................13, 30

*Premca Extra Income Fund LP v. iRobot Corp.*,
No. 24-cv-11158, 2025 WL 307247 (D. Mass. Jan. 27, 2025)........................................32

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*
638 F. Supp. 2d 120, 128 (D. Mass. 2009) .....................................................................36

*Quinones v. Frequency Therapeutics, Inc.*,
665 F. Supp. 3d 156 (D. Mass. 2023), *aff'd*, 106 F.4th 177 (1st Cir. 2024)..................12

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ..........................................................................................38

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014) ...............................................................29, 33

*In re Smith & Wesson Holding Corp.*,
    669 F.3d 68 (1st Cir. 2012) ...................................................................................34

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ........................................................................... *passim*

*Thant v. Karyopharm Therapeutics, Inc.*,
    43 F.4th 214 (1st Cir. 2022) ...................................................................................22

*Whitehead v. Inotek Pharms. Corp.*,
    No. 17-CV-10025-LTS, 2018 WL 4732774 (D. Mass. June 27, 2018) ...................................18

*Yan v. ReWalk Robotics Ltd.*,
    973 F.3d 22 (1st Cir. 2020) ...................................................................................23

## Statutes

15 U.S.C. § 78t(a) ...........................................................................................................40

15 U.S.C. § 78u-4(b) ................................................................................................12, 39

15 U.S.C. §§ 78u-5(i)(1)(B), (D) ...................................................................................19

21 U.S.C. § 356(b)(1) ..................................................................................................9, 10

21 U.S.C. § 356(c) ........................................................................................................8, 17

## Other Authorities

21 C.F.R. § 312.80 ...........................................................................................................7

21 C.F.R. §§ 314.500, 510 ..............................................................................................8

*Care*, National Cancer Institute, NIH,
    https://www.cancer.gov/publications/dictionaries/cancer-terms/def/standard-
    of-care ................................................................................................................6

*FDA*, PatientGateway (Aug. 28, 2024), https://gateway.lungevity.org/how-do-
    drugs-get-approved-and-fast-tracked-fda ..................................................................9

Fed. R. Civ. P. 9(b) ..........................................................................................................1

Fed. R. Civ. P.12(b)(6).....................................................................................................1

Defendants Garo H. Armen, Christine M. Klaskin, Steven J. O'Day, Todd Yancey (together, the "Individual Defendants"), and Agenus Inc. ("Agenus" or the "Company") submit this Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("AC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## PRELIMINARY STATEMENT

Plaintiff claims that the Defendants committed securities fraud because they failed to predict how the U.S. Food & Drug Administration ("FDA") would react to clinical trial data that Agenus submitted in 2024 for its promising cancer treatment in preparation for a potential Accelerated Approval application. But that comes nowhere close to "fraud" under any definition of that word, including the controlling standard for pleading a violation of the securities laws.

Agenus is an immunotherapy company. Its main drug candidate, and the focus of this lawsuit, is a combination treatment known as BOT/BAL. Agenus has been developing BOT/BAL for the potential treatment of an especially deadly form of colorectal cancer ("CRC") involving microsatellite stable tumors ("MSS"). Current prospects for a patient diagnosed with MSS CRC are grim because existing treatment options are largely ineffective.

Agenus's BOT/BAL treatment offers meaningful hope for the treatment of this deadly disease. In early trials, BOT/BAL shrunk the MSS CRC tumors of roughly 23% of MSS CRC patients, as compared to 1–5% of the patients treated without BOT/BAL. In addition, while only 25% of patients being treated under the existing standard of care survive after 12 months of treatment, early trials showed that 63% of patients treated with BOT/BAL survived for at least 12 months. In other words, MSS CRC patients treated with BOT/BAL survived longer than 12 months at a rate *2.5 times* higher than the patients not treated with BOT/BAL.

BOT/BAL has not yet been approved by the FDA and, accordingly, is not yet commercially

-1-

available.  The traditional route to FDA approval typically involves numerous rounds of clinical trials over many years—a longer period than patients currently diagnosed with MSS CRC are predicted to live.  Federal law, however, provides an accelerated pathway for certain promising drugs that address critical and unmet needs, known as "Accelerated Approval."  Broadly speaking, the purpose of the Accelerated Approval program is to make therapies for serious conditions available more quickly.  Under the Accelerated Approval pathway, the FDA may approve a drug to treat a serious or life-threatening condition, such as cancer, based on a surrogate or intermediate endpoint that is "reasonably likely" to predict clinical benefit.  In addition, for drugs intended to treat life-threatening and severely debilitating diseases, the FDA exercises broad flexibility in applying its evidentiary approval standards, especially where there is no satisfactory alternative therapy.  Accordingly, the FDA has significant discretion to approve promising treatments for serious conditions that address an unmet medical need, with no set blueprint for approval.

On April 17, 2023, recognizing BOT/BAL's potential, the FDA granted it "Fast Track" status to facilitate more frequent and robust discussions on the development program, including the path to potential Accelerated Approval.  Agenus disclosed this development and its plan to seek Accelerated Approval based on forthcoming preliminary clinical trial data.  Notwithstanding BOT/BAL's Fast Track designation, the FDA later discouraged Agenus from pursuing Accelerated Approval during an End-of-Phase-2 ("EOP2") meeting in July 2024, indicating that the agency, at that time, believed it was unclear whether patients' "objective response rate" to BOT/BAL treatment would translate to an overall survival benefit.  When Agenus promptly shared this news with investors, its stock price fell.  This interaction between Agenus and the FDA, however, is far from the end of BOT/BAL's story, its prospects to treat MSS CRC, or even its prospects for Accelerated Approval, which involves an iterative process.  To the contrary, the

Company continues to pursue BOT/BAL's clinical development and approval.

Plaintiff nevertheless seizes on the Company's prompt disclosure of the FDA's EOP2 meeting feedback and the subsequent stock price decline to allege securities fraud.  But none of Defendants' accurate descriptions to the market regarding the BOT/BAL trial data or the Company's plans to seek Accelerated Approval were misleading, and Plaintiff's claims suffer from several other dispositive shortcomings.

To begin with, none of the challenged statements are materially false, misleading, or otherwise actionable.  Plaintiff claims that Defendants' statements about a planned application for Accelerated Approval were misleading because Defendants did not also separately disclose an alleged lack of sufficient data for such approval.  But Plaintiff's allegations are fundamentally at odds with the iterative and unpredictable nature of the Accelerated Approval process, the very purpose of which exists to make much-needed drugs provisionally available sooner and with more flexible criteria than the traditional approval process, and pending further ongoing evaluation once approved to confirm the anticipated clinical benefit.  Given that there is no set blueprint to obtain Accelerated Approval, Defendants cannot have committed fraud by failing to accurately handicap its odds, which no Defendant *ventured to attempt in any event* (instead warning investors repeatedly that the FDA might disagree with the Company's views of the data).  Federal securities laws do not require clairvoyance, and under well-established case law, accurate statements about a company's trial data and plans for regulatory approval are not rendered misleading based on subsequent adverse regulatory decisions.

Plaintiff's claim that Agenus misled the market about BOT/BAL's efficacy is even further afield.  Plaintiff makes no allegation that Agenus disclosed incorrect data or that Defendants' expressed optimism about the data was insincere.  Nor does the AC allege any facts suggesting

that BOT/BAL is ineffective. To the contrary, the FDA has yet to reach any ultimate conclusion about its efficacy, and Plaintiff unsurprisingly offers no facts that would permit this Court to reach any such conclusion *before* the FDA. Plaintiff's third category of allegedly misleading statements—which involve Agenus's ability to accelerate its manufacturing capabilities—are similarly unaccompanied by facts to support the requisite showing of falsity, have no relation to the FDA's feedback on BOT/BAL, and are yet to manifest themselves one way or another. Indeed, not only does Plaintiff fail to allege any false and misleading statements, but all the challenged statements are protected as forward-looking statements, opinions, and/or corporate "puffery" under well- and long-established federal securities law precedent.

Separately, Plaintiff fails to plead any facts that would explain *why* Defendants would knowingly lie to investors about BOT/BAL's prospects, let alone support an inference of scienter that is more compelling than the non-fraudulent inference that Defendants genuinely believed (and continue to believe) in BOT/BAL's prospects to address a dire medical need with no approved viable treatment alternatives. This shortcoming independently requires dismissal under the PSLRA and the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Plaintiff's citation to statements collected from 9 supposed former Agenus employees do nothing to overcome these dispositive flaws. Most of these confidential witness statements simply reflect irrelevant differences of opinion or personality clashes with a former employer and are irrelevant to the claimed securities fraud. And the limited confidential witness statements that bear upon Agenus's trial data or prospects with the FDA are both conclusory and contrary to the authority governing the Accelerated Approval process.

For each of these (and other) independently dispositive reasons, the Court should dismiss

-4-

the AC with prejudice for failure to state a claim under the stringent requirements of the PSLRA.

**FACTUAL BACKGROUND AND SUMMARY OF ALLEGATIONS[1]**

### A.    Agenus's Mission and Focus on Treatment of Colorectal Cancer

Agenus is a clinical-stage biotechnology company specializing in developing therapies to activate the body's immune system against cancer and infections.  AC ¶¶ 4, 65; Ex. 1 (2022 10-K) at 1.  Immuno-oncology therapies are designed to strengthen the body's immune system's ability to detect and fight the multiplication of cancer cells.  AC ¶ 49.  Agenus has focused on developing therapies to treat CRC, which is the most common gastrointestinal cancer and the third leading cause of cancer-related death in humans.  AC ¶ 46.

Agenus's BOT/BAL combination therapy is designed as a much-needed treatment option for CRC patients, particularly those with MSS CRC tumors.  AC ¶¶ 4, 52.  MSS CRC tumors affect approximately 80–85% of all CRC patients, present a higher risk of recurrence, and are especially lethal as compared to other types of CRC.  AC ¶ 4.  Patients with MSS CRC have few treatment options.  AC ¶ 46.  Existing immunotherapies generally do not work on MSS tumors because these tumors do not trigger a strong immune response.  AC ¶ 52.[2]

Clinical data from Agenus's Phase 1b study of BOT/BAL showed promising results against pre-determined "endpoints"[3] as compared to the currently accepted treatment practices and

---

[1] Allegations in the AC are assumed to be true.  *See Tellabs, Inc.*, 551 U.S. at 322.  Appendix B includes a list of all Exhibit cites, each of which refers to the exhibits attached to the Declaration of Daniel V. McCaughey.  A defendant's "public [SEC] filings . . . are clearly [documents] of which the court may take judicial notice."  *Corban v. Sarepta Therapeutics, Inc.*, No. 14-cv-10201, 2015 WL 1505693, at *5 n.4 (D. Mass. Mar. 31, 2015).  In ruling on a motion to dismiss under Rule 12(b)(6) "courts must consider the complaint in its entirety, as well as . . . in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 322.

[2] *See also* Ex. 2 (Ibrahim Halil Sahin, et al., *Immunotherapy for Microsatellite Stable Colorectal Cancers: Challenges and Novel Therapeutic Avenues*, 42 Am. Soc'y of Clinical Oncology Ed. Book 242 (July 2022), https://ascopubs.org/doi/10.1200/EDBK_349811 ("[C]linical trials have not shown any substantial clinical benefits of immune checkpoint inhibitor therapy for patients with microsatellite stable colorectal cancer.")).

[3] Clinical trials for cancer treatments employ certain "endpoints," or results that are measured at specified timepoints during a study to evaluate whether a given treatment appears to be safe or effective.  AC ¶ 55.  For example, "overall

interventions (known as the "standard of care") for MSS CRC.[4]  For example, patients showed a

23% overall response rate, measured by the shrinking or disappearance of their tumors, when

studies of comparable patient populations reported response rates in the range of 1–5% when

treated under the standard of care.  Ex. 3 (Jan. 23, 2023 Press Release).  Further, patients showed

a 12-month overall survival of 63%, compared to the approximately 25% overall survival for

standard of care.  *Id.*; AC ¶ 74.  In other words, the tumors of patients treated with BOT/BAL

shrunk or disappeared at four times the rate as the tumors of patients treated with the standard of

care.  And, critically, patients treated with BOT/BAL survived for 12 months *at more than double

the rate* of the patients treated with the standard of care.

Clinicians and key opinion leaders ("KOLs") were understandably optimistic about the

BOT/BAL clinical trial data and the therapy's potential.  One such clinician stated, "available

[MSS CRC] treatments have reported single digit responses rates," and "[t]he 23% response rate

demonstrated by botensilimab plus balstilimab [BOT/BAL] in this study supports rapid

development of this combination in MSS CRC."  Ex. 3 (Jan. 23, 2023 Press Release) (quoting

Anthony El-Khoueiry, MD, Program Director and Associate Director for Clinical Research at the

USC Norris Comprehensive Cancer Center, Keck Medicine of USC, and the Principal

Investigator).  Another clinician commented, that "[t]he new survival data underscore the potential

of the [BOT/BAL] combination as an important treatment option for patients with non-MSI-H

colorectal cancer. . . . and *continues to show deep and durable responses* with 69% of objective

responses still ongoing at the data cutoff.  Ex. 4 (June 30, 2023 Press Release) (quoting Dr. Andrea

---

response rate," or "ORR," is the percentage of patients whose tumors shrink or disappear following treatment.  AC ¶ 57.  "Overall survival," or "OS," is an endpoint that measures the average length of time patients are alive after the start of treatment.  AC ¶ 56.

[4] *See Standard of Care*, National Cancer Institute, NIH, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/standard-of-care. The current standard of care for CRC primarily involves chemotherapy.

Bullock, Assistant Professor of Medicine, Harvard Medical School, and study investigator) (emphasis added).

In recognition of this promising data, Agenus prioritized "advanc[ing] this combination in global randomized trials with the intent to bring this important treatment to patients expeditiously."[5] Ex. 3 (Jan. 23, 2023 Press Release).

### B.    Agenus Pursues Accelerated Approval of BOT/BAL for CRC

#### 1.    The FDA's Accelerated Approval Process

The FDA's regulations call for it to exercise its "broadest flexibility" when applying the evidentiary approval standards to drugs for life-threatening and severely debilitating diseases, especially where there is no satisfactory alternative therapy. *See* 21 C.F.R. § 312.80; Ex. 5 (U.S. Food & Drug Admin., Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products: Draft Guidance for Industry at 14–15 (Dec. 2019)).  This approach reflects the FDA's recognition that "physicians and patients are generally willing to accept greater risks or side effects from products that treat life-threatening and severely-debilitating illnesses" and also that "the benefits of the drug need to be evaluated in light of the severity of the disease being treated." 21 C.F.R. § 312.80; *see also* Ex. 5, U.S. Food & Drug Admin., Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products: Draft Guidance for Industry at 15 (Dec. 2019).

Further, the FDA provides a pathway to approval known as "Accelerated Approval" for products "that treat serious conditions, including cancer, and fill an unmet need."  AC ¶ 53; *see also* U.S. Food & Drug Admin., *Accelerated Approval Program*, https://www.fda.gov/drugs/nda-and-bla-approvals/accelerated-approval-program (last updated Dec. 24, 2024).  The Accelerated

---

[5] In parallel to its pursuit of Accelerated Approval, Agenus also started a compassionate use program for BOT/BAL to provide access to the treatment to CRC patients lacking other promising options.  AC ¶ 75.

Approval process adds additional flexibility for the FDA to approve a product for "a serious or life-threatening disease or condition, including a fast track product." In contrast to traditional FDA approval, which requires either "endpoints that *directly measure* clinical benefit or surrogate endpoints *shown* to predict clinical benefit," accelerated approval can be based on "surrogate endpoints that are ***reasonably likely*** to predict clinical benefit." Ex. 5 (U.S. Food & Drug Admin., Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products: Draft Guidance for Industry at 15 (emphases added) (Dec. 2019)); *see also* 21 U.S.C. § 356(c)(1)(A).

Neither federal law nor the FDA defines the precise threshold when "surrogate endpoints . . . are *reasonably likely* to predict clinical benefits," or what specific trial design and endpoints can support Accelerated Approval. Instead, Accelerated Approval is granted on a case-specific basis and has been used extensively for drugs treating cancers where an effect on tumor growth can be assessed rapidly, but demonstrating an effect on survival or other endpoint would need longer and sometimes larger trials. Consistent with the guidance described above, the point of the more relaxed "reasonably likely" standard is to provide the FDA additional flexibility to make lifesaving drugs available at an earlier stage, while their efficacy continues to be tested at the same time. *See* AC ¶ 62. Moreover, neither the statute, FDA regulations, nor FDA guidance on Accelerated Approval proscribe the *phase* of clinical investigation that can support Accelerated Approval. FDA guidance does *not* indicate that Phase 2 data is a prerequisite for consideration of an Accelerated Approval application. *See* 21 U.S.C. § 356(c); 21 C.F.R. §§ 314.500, 510; Ex. 6 (Expedited Program for Serious Conditions – Accelerated Approval of Drugs and Biologics: Draft Guidance for Industry (Dec. 2024)); Ex. 7 (U.S. Food & Drug Admin., Clinical Trial Considerations to Support Accelerated Approval of Oncology Therapeutics: Draft Guidance for

-8-

Industry at 1–2 (Mar. 2023)).[6]  Rather, *any* study design providing substantial evidence of an effect on the surrogate or intermediate endpoint can support Accelerated Approval.

Investors and market analysts know full well that it is impossible to predict how the FDA will interpret clinical trial data or respond to an application for Accelerated Approval, which is a particularly judgment-laden process.  *See, e.g.*, *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 48 (1st Cir. 2008) ("[T]rading in shares of [pharmaceutical] companies whose financial fortunes may turn on the outcome of such experimental drug trials inherently carries more risk than some other investment.  This is true even when the FDA has given fast-track approval to a new drug.").  These risks pervade the Accelerated Approval process—and were risks that Agenus repeatedly reminded investors about.[7]

### 2.     BOT/BAL's "Fast Track" Designation

In April 2023, the FDA granted BOT/BAL "Fast Track" designation.  AC ¶ 75; Ex. 9 (Apr. 17, 2023 Press Release).  To qualify for Fast Track designation, a product must be intended for the treatment of a serious or life-threatening disease or condition and demonstrate the potential to address unmet medical needs for such a disease or condition.  21 U.S.C. § 356(b)(1).  Fast Track designation opens the door to more frequent communication with the FDA to discuss the drug's development plan, including "study design" and the "extent of safety data required to support approval," as well as meetings, as appropriate, "to discuss accelerated approval."  Ex. 10 (U.S. Food & Admin., Guidance for Industry Expedited Programs for Serious Conditions – Drugs and

---

[6] The graphic included in AC paragraph 60 to support the allegation that the FDA's Accelerated Approval Program allows for drugs "to be sold on the market after Phase 2 trials" appears to come from a website with resources for patients with lung cancer.  *See* J. Kunde, *How Do Drugs Get Approved (and Fast-Tracked) by the FDA*, PatientGateway (Aug. 28, 2024), https://gateway.lungevity.org/how-do-drugs-get-approved-and-fast-tracked-fda.

[7] *See, e.g.*, Ex. 8 (2023 10-K) at 19 ("While we intend to submit our first botensilimab/balstilimab BLA in refractory MSS CRC in 2024 subject to feedback from the FDA. The FDA may disagree that our data and development program are sufficient to support BLA filing or approval."); Ex. 1 (2022 10-K) at 15 ("The regulatory approval process for our product candidates is uncertain and will be lengthy, and may evolve even after we have engaged with relevant regulatory authorities and selected a regulatory pathway.").

Biologics (May 2014), https://www.fda.gov/media/86377/download).  Following a Fast Track designation, the FDA is required to "take such actions as are appropriate to expedite the development and review of the application for approval of such product."  *See* 21 U.S.C. § 356(b)(3).  In announcing the designation, Agenus noted that it would be "working with the FDA and all key stakeholders to rapidly advance the [BOT/BAL] combination in colorectal cancer as well as other solid tumor indications."  *See* Ex. 9 (Apr. 17, 2023 Press Release).

### 3.    *Agenus BOT/BAL Clinical Data*

Throughout 2023 and into 2024 Agenus reported consistently positive study results for BOT/BAL, including:

- On April 17, 2023, Agenus reported that it had recently presented "positive results from its ongoing [BOT/BAL] trials" and that "[t]he combination therapy showed an [ORR] of 23% and a 12-month [OS] rate of 63%, which compares to the very limited activity of 1–2% [ORR] and a ~25% 12-month survival rate reported for the standard of care." Ex. 9 (Apr. 17, 2023 Press Release).

- On June 30, 2023, Agenus shared new data from its Phase 1b trial that well exceeded expectations for patient recovery.  AC ¶ 77; Ex. 4 (June 30, 2023 Press Release).  As one study investigator noted, in general, "only a quarter of [CRC] patients survive beyond one year with standard of care therapy."  Ex. 4 (June 30, 2023 Press Release).  In comparison, patients in the Phase 1b trial "had a 12-month overall survival (OS) estimate of 74%."  *Id.*

- On August 8, 2023, Agenus reported additional BOT/BAL data that "demonstrated median overall survival (mOS) of 20.9 months and a 23% overall response rate (ORR), both surpassing data reported for standard of care . . . ."  Ex. 11 (August 8, 2023 Press Release).

- During a May 7, 2024 earnings call, Agenus reported that its expanded Phase 1b cohort matured and "confirmed [the] overall response rate in all patients [was] 23% with a median overall survival of 21.2 month, a 12-month overall survival estimate of 71% and an 18-month overall survival estimate of 62%."  Ex. 12 (May 7, 2024 Earnings Call at 5).

Agenus's CEO, Defendant Armen, expressed optimism regarding this data, though never went so far as to make any predictions about FDA approval.  Instead, he cautioned that "[o]f course, we cannot make a definitive statement until the outcome of the FDA meeting."  Ex. 12

(May 7, 2024 Earnings Call at 8).

      **C.**      **Agenus Announces the End-of-Phase-2 Meeting Results**

Agenus presented BOT/BAL data from its ongoing clinical trials to the FDA in July 2024 as part of an EOP2 meeting.  AC ¶ 89; Ex. 13 (May 16, 2024 Press Release).  Following that meeting, Agenus reported that the FDA had signaled agreement on Agenus's intended dosing level—75 mg—for its planned Phase 3 trial.  Agenus also reported, however, that the FDA advised Agenus against submitting an application for Accelerated Approval for BOT/BAL "based on [the FDA's] view that objective response rates may not translate to survival benefit."  AC ¶ 198; Ex. 14 (July 18, 2024 Press Release).  While not the result Agenus had hoped for, this news did not end Agenus's ongoing efforts to obtain approval of BOT/BAL, as the press release also made clear. *See* Ex. 14 (July 18, 2024 Press Release) ("Based on the high level of enthusiasm from significant numbers of global clinical experts and the promising clinical activity we have seen in the Phase 1 and 2 studies, our commitment to seek all possible pathways to make BOT/BAL available to patients is unwavering. This includes exploring opportunities to partner in the U.S. to accomplish a successful Phase 3 trial.").[8]

In the same release, Agenus again indicated that topline interim data from the ongoing Phase 2 trial were showing trends consistent with the Phase 1 study with similar dosage levels. AC ¶ 199; Ex. 14 (July 18, 2024 Press Release).  Specifically, the Phase 2 topline interim data of dosage levels of 75 mg showed an ORR of 19.4% and a six-month survival rate of 90%.  Ex. 14 (July 18, 2024 Press Release).  Agenus also disclosed data from the Phase 2 study for patients treated at a 150-mg dose of BOT/BAL, which yielded an ORR of 8.2%.  AC ¶ 199.  Agenus's

---

[8] The Company has developed a framework for "registration-enabling trials" based on its Phase 1 and 2 data for BOT/BAL, *see* Ex. 15 (2024 10-K), at 4, and has plans to incorporate the 75-mg dose of BOT/BAL in its Phase 3 trials. *See* Ex. 16 (Jan. 22, 2025 Press Release).

stock price dropped following the press release.  AC ¶ 200.

## LEGAL STANDARD

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, Plaintiff must allege six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the sale or purchase of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 454 (1st Cir. 2017).  The PSLRA and Rule 9(b) impose a "notably strict and rigorous" pleading standard, requiring a securities fraud plaintiff to plead each element "with particularity."  *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 n.7 (1st Cir. 2008) (citations omitted).

## ARGUMENT

### I.    PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION

To plead the first element of securities fraud, a plaintiff must show that "defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."  *Ganem*, 845 F.3d at 454 (citation omitted).  Rule 9(b) requires Plaintiff to allege facts demonstrating "how and why these specific statements were misleading at the time they were made."  *Quinones v. Frequency Therapeutics, Inc.*, 665 F. Supp. 3d 156, 170 (D. Mass. 2023), *aff'd*, 106 F.4th 177 (1st Cir. 2024).  That is, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  *ACA Fin. Guar.*, 512 F.3d at 58; 15 U.S.C. § 78u-4(b)(1).  Material omissions are actionable "only if the omission renders affirmative statements made misleading."  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024).  Thus, when claiming an actionable omission, "a plaintiff must first identify a statement made by defendants, show how the omission rendered that

statement misleading, and finally establish that there was a duty to disclose the omitted information." *Ponsa-Rabell v. Santander Secs. LLC*, 35 F.4th 26, 34 (1st Cir. 2022). The AC falls short of these requirements.

The AC claims that Defendants supposedly intentionally misled investors in 32 statements (listed in **Appendix A**) during the purported class period on topics that fall into three overlapping categories: (1) the likelihood that the FDA would approve an application for Accelerated Approval for BOT/BAL; (2) BOT/BAL's efficacy; and (3) Agenus's capacity to accelerate the treatment development process. AC ¶ 3; *see Pizzuto v. Homology Meds.*, No. 1:23-CV-10858-AK, 2024 WL 1436025, at *7 (D. Mass. Mar. 31, 2024) (evaluating challenged statements categorically). None, however, can support Plaintiff's claims.

### A.    The Alleged Misstatements About BOT/BAL's Prospects for Accelerated Approval, Efficacy, and Potential Are Not Actionable[9]

Plaintiff asserts that Agenus misled investors as to "the likelihood that BOT/BAL would be approved by the FDA as part of the Agency's 'Accelerated Approval Program'" because the Defendants supposedly did not disclose that Agenus "lacked the data necessary to obtain Accelerated Approval of BOT/BAL" and "exaggerated the effectiveness and potential of BOT/BAL." AC ¶¶ 3, 92, 166. But the statements Plaintiff cites in support fall short of this mark. None of the challenged statements were false or misleading, not least because the FDA has significant discretion in determining what sort of clinical trial data is required for Accelerated Approval. The statements also fall within the PSLRA's safe-harbor for forward-looking statements or otherwise qualify as opinions or corporate puffery, and involved risks about which Agenus frequently warned investors.

---

[9] Plaintiff's first two categories of allegedly misleading statements—those regarding (i) the FDA Accelerated Approval process and (ii) the efficacy of BOT/BAL—are interrelated, and Defendants address them together for the sake of efficiency.

### 1.   *The Challenged Statements Are Neither False Nor Misleading*

A company must ensure that, when it speaks, "it [does] not omit any facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *Hill v. Gozani*, 638 F.3d 40, 57 (1st Cir. 2011) (quoting 17 C.F.R. § 240.10b-5).  This obligation does not require a company to "reveal all other[]" facts "that would be interesting," *id.* (citation omitted), or "all material information." *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 27 (1st Cir. 2012) (citation omitted).  Instead, companies may publish "partial data" and "'cast [their] trial results in a positive light'" without being misleading.  *Homology Meds.*, 2024 WL 1436025, at *9 (quoting *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015)).  The AC does not identify *any* statements alleged to be affirmatively false, nor does it include any factual allegations that would render misleading any of Defendants' statements about Agenus's planned application for Accelerated Approval, or its summaries of BOT/BAL clinical trial data.

The AC repeatedly asserts that these statements by Defendants were misleading because they supposedly failed to disclose that a portion of the BOT/BAL studies (*i.e.*, Phase 1) was not "powered appropriately" (whatever that means) to capture survival or durability data, that the data accordingly did not "demonstrat[e] a survival benefit" sufficient to support an application for Accelerated Approval, and that Agenus employees had debated these points internally prior to the July 2024 FDA meeting.[10]  These allegations are wholly conclusory—including because they fail to state particularized facts as required by the PSLRA regarding any specific shortcomings or deficiencies with the data that Defendants reported to investors, which included the number of

---

[10] *See, e.g.*, AC ¶¶ 135, 137, 139, 141, 143, 145, 147, 149, 151, 153, 155, 157, 159, 161, 163, 165, 168, 170, 172, 174, 176, 178, and 180.

patients currently enrolled in the BOT/BAL clinical trials and the actual clinical trial results observed regarding response rates and survivability. *See Paice v. Aldeyra Therapeutics, Inc.*, No. 23-cv-11737, 2025 WL 815065, at *10 (D. Mass. Mar. 14, 2025) (finding no misleading statement when plaintiff "assert[ed] the . . . data [included in a New Drug Application] was insufficient, [but did] not explain why or how"). The AC's claims that Defendants' statements were misleading are also based on over-generalizations of non-particularized statements from peripheral "confidential witnesses," which must be disregarded at the pleadings stage, as discussed further below. But even taken on their face, none of Plaintiff's characterizations about the Phase 1 BOT/BAL trial data being not "powered appropriately" (without explaining how or why, or challenging the accuracy of the actual data Agenus disclosed to the public) suggests something misleading about Defendants' statements that they planned to pursue Accelerated Approval, or their statements reporting the actual data. The same goes for Plaintiff's generalized assertion that the data did not show a sufficient "survival benefit" (without explaining how or why, especially given the FDA's judgment-laden evaluation). Agenus *did* pursue Accelerated Approval, just as it had said it planned to do, and it disclosed the data on survival benefits for investors to see for themselves. Plaintiff's hindsight criticisms about the adequacy of the data in no way render those statements misleading, as required to state a claim.

### (a)     Planned Accelerated Approval Application.

Plaintiff's challenge to statements in which Defendants indicated the Company's *plan* to seek Accelerated Approval of BOT/BAL, and that seeking such approval was a priority, is a non-starter. *See, e.g.*, Stmt. 1; Ex. 1 (stating that the Company designed "multiple clinical programs . . . to support regulatory pathways for accelerated approval"); Stmt. 2; Ex. 17 (stating that achieving

clinical milestones "will set the foundation for a *potential* regulatory filing" (emphasis added)).[11] The AC does not plead any fact suggesting that such statements—that Agenus was *planning on* an application and *expecting to* engage with the FDA on that application—did not accurately reflect the Company's plan. *See Meyer*, 221 F. Supp. 2d at 203 (disclosing a company's plans or objectives falls within the PSLRA's safe harbor for forward-looking statements).

Instead, the AC's allegations show the opposite: Agenus planned to and, in fact, did seek Accelerated Approval. As in *Gregory v. ProNAi Therapeutics Inc.*, the AC fails "to identify any untrue or misleading aspect[] of the[] essentially factual statements." *See* 297 F. Supp. 3d 372, 413 (S.D.N.Y. 2018) (dismissing as non-actionable statements about defendants' planned drug development processes where defendant in fact had those plans). Courts routinely determine that statements about seeking FDA approval or "accelerating the development of" a product are nonactionable. *See, e.g.*, *id.*; *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014) (dismissing as non-actionable a company's optimistic plans for drug development because "a reasonable investor would [] know the challenges of obtaining FDA approval"). Here, the AC "is devoid of any facts demonstrating that [Agenus] did not intend to" submit an application for Accelerated Approval at the time of the challenged statements. *Davison v. Ventrus Biosciences, Inc.*, No. 13-cv-3119, 2014 WL 1805242, at *9 (S.D.N.Y. May 5, 2014).

### (b)     Clinical Trial Data To Be Included In Accelerated Approval Application.

Next, Plaintiff's conclusory allegations that statements describing the BOT/BAL clinical trial data were misleading ignore both the statements and the regulatory context. As a threshold

---

[11] Stmt. 3; Ex. 18 ("[W]e expect to expedite regulatory approval."); Stmt. 11; Ex. 19 ("Agenus plans to submit a Biologics License Application . . . and plans to present detailed Phase 2 efficacy results . . . ."); Stmt. 12; Ex. 20 ("With the promising results we have seen . . . we plan to engage with the FDA in the second half of 2024."); *see also* App. A.

matter, the FDA applies broad flexibility and context-dependent judgment in applying its evidentiary approval standards to drugs for life-threatening and severely debilitating diseases, especially where there is no satisfactory alternative therapy.  Moreover, the Accelerated Approval process also employs a judgment-laden standard and case-by-case FDA determination of whether data for a so-called "surrogate endpoint" is "reasonably likely" to predict clinical benefit.  21 U.S.C. § 356(c)(1)(A).  Given this framework, statements about Agenus's planned application for Accelerated Approval are not misleading for omitting to predict whether the available BOT/BAL clinical data was sufficient to support such an application.

Similarly, Defendants' statements about their view of the data could not be misleading for failing to identify shortcomings that the FDA might perceive in the data when there is no FDA directive on the quantum or nature of necessary data to meet the evidentiary standard for Accelerated Approval in the first place.  *See, e.g.*, Stmt. 9; Ex. 21 (Q4 2023 Call) (indicating that the Company planned to submit "a compelling package [of clinical data] to present to the FDA"); Stmt. 6; Ex. 22 (Q3 2023 Call) ("I think we have a very, very robust set of data to present to the agencies for their review"); Stmt. 11; Ex. 19 (noting "we think" that clinical trial data "are supported with safety, efficacy and clinical pharmacology to discuss with an accelerated pathway given the unmet need in this setting"); *see also Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at *6 (permitting companies to "cast [their] trial results in a positive light").[12]  This is particularly true given that the statements include no view as to how the FDA would view BOT/BAL data; the

---

[12] Stmt. 10; Ex. 21 (Q4 2023 Call) ("[O]bviously, we'll have response rate, duration of response, PFS and preliminary survival in these patients as they mature over the course of the year . . . . So obviously, it's a composite endpoint.  But to Garo's point, clearly, response and duration of response is what drives and prolonged stable disease drive the survival curve."); Stmt. 14; Ex. 12 ("[W]hat I can say is with the Phase 1 and the Phase 2 trial, we have 2 active doses and a significant number of patients on the combination of BOT/BAL . . . that we think are supported with safety, efficacy and clinical pharmacology to discuss with an accelerated pathway given the unmet need in this setting."); Stmt. 15; Ex. 12 ("[T]he FDA has guidance that is based on historical precedents on the minimum follow.  But we have had significant input from our regulatory advisers on what that minimum should be . . . .").

FDA's potential view of the BOT/BAL data was "simply not the subject of the statement[s]." *Whitehead v. Inotek Pharms. Corp.*, No. 17-CV-10025-LTS, 2018 WL 4732774, at \*6 (D. Mass. June 27, 2018). Moreover, Plaintiff's suggestion that the data was somehow incomplete (without explaining how or why) does not render Defendants' contrary view misleading as "a challenge to the methodology of [clinical] trials is not sufficient to state a misleading omissions claim." *In re Apellis Pharms., Inc. Sec. Litig.*, No. 1:24-cv-11470, 2025 WL 836491, at \*8 (D. Mass. Mar. 17, 2025).

What's more, nowhere does the AC allege that the FDA advised Agenus that it was skeptical of Agenus's data or that its data was insufficient to continue to pursue Accelerated Approval. *See Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 39 (1st Cir. 2017) (affirming dismissal of securities fraud claim when no allegation "suggest[ed] that the [defendant] knew [when making the challenged statements] that its efforts would suffer a setback at that time"). And contrary to Plaintiff's characterization, the AC does not plead any *particularized facts* to indicate that "Defendants had been advised by multiple executives" that the Company's data was insufficient or that the Company was "disregarding" FDA requirements. At most, the AC pleads that a single, unnamed "VP" (CW6) suggested that Agenus's studies "were not powered appropriately," AC ¶ 98, but it does not indicate that the VP or any other purported executive advised that the Company's data was insufficient, or why or how it was insufficient. And another VP's purported suggestion on one occasion that "[t]he FDA doesn't do that. It's not going to happen" is too vague and insufficient to support a conclusion that Defendants' planned regulatory approach was doomed to fail, and thus the statements were known to be false at the time they were made. In fact, FDA guidance makes clear that no set blueprint for Accelerated Approval exists, so one VP's conclusion is insufficient to render Defendants' optimism misleading.

-18-

Further, while Plaintiff claims that "Defendants materially exaggerated the effectiveness and potential of BOT/BAL," AC ¶ 166, nowhere does the AC contain any allegation suggesting that the BOT/BAL clinical trial data that Defendants disclosed was false. *See City of Bristol Pension Fund*, 12 F. Supp. 3d at 238 ("[I]t is not illegal for a company to paint a positive or optimistic picture when disclosing information to investors," so long as it is not misleading investors). Indeed, despite the AC's repeated conclusory allegation that certain statements about BOT/BAL's safety and efficacy were misleading, there are no specific allegations that indicate the clinical trial data were presented inaccurately or otherwise showed anything other than the results that Defendants shared. *See Celano v. Fulcrum Therapeutics*, No. 1:23-cv-11125, 2025 WL 928783, at *9 (D. Mass. Mar. 27, 2025) (noting that the lack of specific allegations "undercuts Plaintiffs' repeated, and conclusory, statement that [the drug] did not meet FDA requirements").

Finally, the FDA's stated reason for discouraging an application for Accelerated Approval in no way renders Defendants' prior description of the data misleading. In its July 18, 2024 press release, the Company indicated that the FDA was of the "view" that "objective response rates" reflected in the data "may not translate to a survival benefit." Ex. 14 (July 18, 2024 Press Release). Contrary to deeming the data not "appropriately powered," the FDA simply reached a different judgment when trying to predict the drug's ultimate impact on survival on the basis of the existing data. The FDA's independent judgment about the likelihood of future events has no bearing on whether Agenus's prior descriptions of the underlying data were misleading.

### 2. *PSLRA Safe Harbor for Forward Looking Statements*

Defendants' statements regarding the Company's plan to engage with the FDA and to submit an application for Accelerated Approval supported by BOT/BAL clinical data were not only accurate but are inactionable under the PSLRA safe harbor for forward looking statements—full stop. 15 U.S.C. §§ 78u-5(i)(1)(B), (D) (immunizing "plans and objectives . . . for future

-19-

operations" as well as "statement[s] of the assumptions underlying or relating to those plans and objectives"); *Leavitt v. Alnylam Pharm., Inc.*, 451 F. Supp. 3d 176, 186 (D. Mass. 2020) (statements "anticipat[ing] a hoped-for future event, FDA approval," fit within the safe harbor); *see also Meyer v. Biopure Corp.*, 221 F. Supp. 2d 195, 203 (D. Mass. 2002) (statements concerning plan to file an application with the FDA "clearly" fall under the PSLRA's forward-looking statement definition). Under the PSLRA safe harbor, a statement about what might happen in the future is insulated from liability if: (1) the statement is identified as a forward-looking statement and (2) is accompanied by meaningful cautionary language. *See In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 45 (1st Cir. 2014). Here, each of the challenged statements were made in press releases, earnings calls, and SEC filings, each of which expressly contained a disclaimer about the inclusion of forward-looking statements and were accompanied by detailed cautionary language.

*First*, Defendants' statements about the forthcoming FDA approval process were expressly identified as forward-looking statements and, in any event, were self-evidently forward-looking because they "expressed belief and not certainty" about future events. *See In re Genzyme*, 754 F.3d at 45 (forward-looking statements about FDA approval "are not actionable Section 10(b) transgressions"); *see also Alnylam Pharm.*, 451 F. Supp. 3d at 186 ("[S]tatements about FDA approval are classically forward-looking – they address what defendants expected to occur in the future."). For example, many challenged statements were included in press releases containing the disclaimer that the release included forward-looking "statements regarding therapeutic benefits and efficacy" and "safety profile" of Agenus's therapeutic candidates as well as "statements regarding [Agenus's] future plans, including research, clinical, regulatory, and commercialization plans." *See, e.g.*, Ex. 3 (Jan. 23, 2023 Press Release) at 2; *see also* App. A.

Defendants' statements regarding BOT/BAL's efficacy and potential were also

characterized as forward-looking.  Plaintiff challenges statements regarding BOT/BAL's efficacy and potential on grounds that those statements purportedly "misled investors as to the likelihood that BOT/BAL could be successfully submitted to the FDA for Accelerated Approval."  That is, Plaintiff challenges the statements on grounds that they misled investors as to a future event so, by Plaintiff's own allegations, these statements were relevant precisely because of their forward-looking implications.  *See Aldeyra Therapeutics*, 2025 WL 815065, at \*13 ("Defendants' alleged statements discussing the timeline of program studies, the timeline for NDA submission, the contents of its [chemistry, manufacturing and control] package, and the approval prospects for its NDAs are forward-looking.").  The safe harbor "does not require that [] statements are made in the future tense."  *See id.* at \*13.

*Second*, the challenged forward-looking statements were accompanied by meaningful cautionary language.  *Cf. Harrington v. Tetraphase Pharm., Inc.*, No. 16-cv-10133-LTS, 2017 WL 1946305, at \*10 (D. Mass. May 9, 2017) ("Tetraphase's cautionary statements identified risks that were present throughout the class period and did not omit any major risk factors.").  Agenus's SEC filings expressly warned that Agenus "*may fail to obtain regulatory approval of our product candidates*" and that "[a]lthough we have engaged with the FDA on our regulatory programs and protocols, *there is no guarantee* that our BLA submissions, if any, will be approved."  *See* Form Ex. 1 (2022 10-K) at 12–13, 18 (emphases added); *Alnylam Pharm.*, 451 F. Supp. 3d at 186 (exempting forward-looking statements where the defendant's SEC filings included risk disclosures).  The same goes for each press release and earnings call cited in the AC.[13]  Such

___

[13] *See, e.g.*, Ex. 17 (March 14, 2023 Earnings Call) ("[T]his call will include forward-looking statements […] regarding our clinical development, regulatory and commercial plans […]. These statements are subject to risks and uncertainties, and we refer you to our SEC filings for more details on these risks."); Ex. 21 (April 12, 2024 Press Release) ("This press release contains forward-looking statements that are made pursuant to the safe harbor provisions of the federal securities laws, including statements regarding [] its botensilimab and balstilimab programs [and]

warnings "identify specific risk factors including the clinical trial results and the possibility of the FDA not approving the drug." *Tetraphase*, 2017 WL 1946305, at \*10 (holding that "cautionary statements in press releases and conference calls were sufficient to invoke the PSLRA's safe harbor protection for any forward-looking statements contained therein").

### 3.    The Challenged Statements Are Otherwise Non-Actionable Opinion Statements or Puffery

The challenged statements are also inactionable because they are sincere opinions or puffery. "[A] sincere statement of pure opinion is not an 'untrue statement of material fact.'" *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 419 (D. Mass. 2016). Nor are "upbeat statements of optimism and puffing about [a] company's prospects" untrue statements of fact. *Thant v. Karyopharm Therapeutics, Inc.*, 43 F.4th 214, 223 (1st Cir. 2022) (citation omitted).

The AC points to certain statements where Defendants express an opinion about the Company's drug product and clinical trial data, including how they hoped it would be interpreted by the FDA. *See, e.g.*, Stmt. 5; Ex. 22 (Q3 2023 Call) ("But our look at the data both in the second [cohort] and in our Phase II studies indicate that we should have a sustainable response rate, perhaps even an improving response rate as we disclose and analyze these data for regulatory and beyond purposes."); Stmt. 6; Ex. 22 (Q3 2023 Call) ("So I certainly expect that we'd be able to demonstrate a point estimates for response, durability of response for patients with stable disease or better and that is trending toward a survival benefit.").[14] Such "[i]nterpretations of company

---

expected regulatory timelines and filings[.]"); Ex. 9 (Apr. 17, 2023 Press Release) ("This press release contains forward-looking statements […] including statements relating to our technologies, therapeutic candidates, and capabilities, […] therapeutic benefit and efficacy, mechanism of action, potency, durability, and safety and tolerability […] both alone and in combination with each other and/or other agents[.]").

[14] *See, e.g.*, Stmt. 7; Ex. 22 (Q3 2023 Call) ("[T]here are regulatory and other questions about do overall response rates translate to longer-term benefit. We know they do. We need to demonstrate that with numbers[.]"); Stmt. 17; Ex. 3 ("This data highlight the deep and durable responses achieved with botensilimab and balstilimab."); Stmt. 18; Ex. 23 (Mar. 14, 2023 Press Release) (noting a "growing body of data demonstrating robust, consistent, and durable efficacy signals"); Stmt. 19; Ex. 4 ("The new data show substantial survival benefits and long-lasting responses.");

data are non-actionable opinions unless Plaintiff can demonstrate that 'Defendants did not subjectively believe them, that self-embedded facts within the opinion were untrue, or that material facts related to Defendants' inquiry into or knowledge concerning the opinion were omitted." *Homology Meds.*, 2024 WL 1436025 at \*9 (quoting *Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at \*11). Plaintiff points to no facts from which this Court could infer that Defendants did not believe their expressed opinions or that any Defendant omitted material facts related to the opinions.

Many of the other challenged statements represent obvious puffery. Plaintiff points to several statements in which Defendants generally express optimism about BOT/BAL. *See, e.g.*, Stmt. 4; Ex. 22 (Q3 2023 Call) ("[T]he positive trends and lasting responses in our studie*s strengthen our conviction in BOT/BAL potential*."); Stmt. 6; Ex. 22 (Q3 2023 Call) ("I think *we have a very, very robust set of data* to present to the agencies for their review.").[15] Courts have repeatedly considered such statements non-actionable puffery. *See, e.g.*, *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 32 (1st Cir. 2020) (dismissing as nonactionable puffery claims of "compelling clinical data" and "breakthrough product"); *City of Bristol Pension Fund*, 12 F. Supp. 3d at 238 (D. Mass. 2014) ("highly optimistic view" that company's therapy, "if approved, could total . . . billions of dollars of sales" qualified as puffery.).

> **4.    *Confidential Witness Statements Are Irrelevant or Insufficiently***

---

Stmt. 23; Ex. 12 ("[The drug combination] has demonstrated deep and durable responses across a wide variety of poorly immunogenic or IO refractory solid tumors.").

[15] *See also* Stmt. 8; Ex. 21 (Q4 2023 Call) ("BOT/BAL therapy has undergone *rigorous* testing in over 900 patients, *demonstrating promising activity* in cancers that represent unmet medical needs, notably colon cancer . . . ."); Stmt. 16; Ex. 13 ("The results from our Phase 1 and Phase 2 studies *contribute valuable insights* into the potential of this therapy for managing a specific and challenging subgroup of colorectal cancer.") (emphases added); Stmt. 20; Ex. 24 (Q1 2023 Call) ("[B]otensilimab has made *significant strides* in eliciting responses, offering *renewed hope* for those who have failed all other available treatments . . . we are witnessing *unprecedented responses*."); Stmt. 21; Ex. 11 ("Botensilimab . . . continues to display *remarkable clinical activity* . . . demonstrating *great potential* to revolutionize the role of immunotherapy in cancer treatment . . . ."); Stmt. 22; Ex. 25 (Oct. 22, 2023 Press Release) ("BOT's versatility, alone, in combination with BAL, or in combination with other standard of care therapies, in early and late-stage solid tumors, positions Agenus to *transform cancer care*, *offering immense promise* to patients.").

*Particular*

The alleged confidential witness ("CW") statements quoted in the AC are either insufficiently particular or irrelevant to the accuracy of statements regarding Agenus's plans to seek Accelerated Approval and BOT/BAL's efficacy. CW statements should be disregarded if they are "insufficiently particular, do not make misleading the defendants' public disclosures, and do not speak with specificity as to why the defendants' alleged misstatements were untrue or misleading." *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017). While the AC includes a large number of CW statements, they all fall short of this standard.

*Irrelevant CW Statements.* The majority of Plaintiff's CW statements are wholly irrelevant to whether Defendants made any misleading statements or omissions regarding Agenus's ability to obtain Accelerated Approval and BOT/BAL's efficacy. For example, CW1 alleged "donor and supplier issues," AC ¶ 120, and CW9 maintained that Agenus was "notoriously late in paying vendors for services," *id.* ¶ 116, but neither statement—even if true— bear in any way on the efficacy of BOT/BAL or the likelihood of Accelerated Approval.[16]

*Insufficiently Particular CW Statements.* The AC is replete with CWs offering non-specific, post hoc critiques of the Company's submission of BOT/BAL data to the FDA, but none of these allegations include any particularized facts providing specific reasons that the challenged statements were misleading. Most notably, CW6 allegedly was told by the Company's VP of Biostatistics and Data Management that "the Company's initial (i.e. Phase 1) studies were not

---

[16] *See e.g.*, *id.* ¶ 106 (CW4 statement that "Defendant Armen would fire or lay off high-ranking employees at Agenus who raised concerns about BOT/BAL's drug trials."); ¶ 116 (recalling that at one point, Defendant Armen, the CEO of a company, stated "we need to get the stock price up"); ¶ 110 (noting instances of vendors "sending samples to the wrong places because of accountability and communications issues); ¶ 115 (calling the work environment "disruptive" because "constant staff turnover and layoffs made difficult for the Company to operate"); ¶ 108 (characterizing Agenus as a "poorly run organization"); ¶ 106 (contending that "it was like hell for" an employee who was later laid off); ¶ 112 (recounting that Defendant Armen "rejected [their proposed] timeline [for Phase 2] and insisted it be done in 6 months," then laid them off and replaced them with a vendor); ¶ 115 (noting "pressure to complete all this work in impossibly shortened timeframes").

powered appropriately to capture survival or durability data." AC ¶ 95.  And while the AC repeats this comment over a dozen times,[17] it alleges no facts—from CW6 or anyone else—explaining what that phrase actually means, what perceived gaps could have existed in the data, how or why any such shortcoming rendered the actual data reported by Agenus on overall survival inaccurate or misleading, or why they rendered the Accelerated Approval application "doomed to fail."

Instead, the AC resorts to pure speculation such as the vague and generic allegation from CW3 that "it was 'impossible' for Agenus's executives not to know about 'the gaps' in the BOT/BAL research data, because '[t]hey had to know . . . they just did." AC ¶ 10.  But nowhere does the AC allege how this low-level employee—a "Quality Assurance Document Control Specialist" employed at Agenus for just 13 months—had any insight into Agenus's executives' knowledge about clinical trial data or the FDA regulatory review process.  To the contrary, the allegations suggest that CW3 believes Accelerated Approval could never be granted without Phase 3 data, a notion inconsistent with "accelerated" approval and contrary to the AC itself. AC ¶¶ 98–99; *see also id.* ¶ 60. Moreover, the allegation includes no specifics about what the supposed "gaps" were or how Agenus's executives "had to know" them.  And CW6's additional allegation that "an Agenus director in pre-clinical development . . . express[ed] frustration [to CW6] with how the regulatory process for BOT/BAL was being managed" and that "Defendants refused to acknowledge [those] concerns" similarly contains no specifics about that director's "concerns" or when, how, or to whom they were shared.  AC ¶ 96.  Finally, CW6's assertion that at a single "safety meeting in spring 2023" regarding "ramp[ing] up a Phase 3 study," there was a statement made that "the FDA doesn't do that.  It's not going to happen.  You can't do it that way," includes

---

[17] *See, e.g.*, AC ¶¶ 95, 134, 137, 139, 141, 143, 147, 151, 155, 157, 161, 165, 168, 170, 172, 174, 176, 178, 180, 182, 194.

no specificity as to what the FDA "doesn't do" or why Agenus could not "do it that way." AC ¶ 98, *see also id.* ¶ 99. "Vague assertions [by CWs] that the Company was not meeting its goals . . . do not make [the Company's] reporting of its actual clinical results plausibly false or misleading." *Fulcrum Therapeutics*, 2025 WL 928783, at \*10; *see also In re A123 Sys., Inc. Sec. Litig.*, 930 F. Supp. 2d 278, 286 (D. Mass. 2013) ("[S]tatement that an unnamed person in no specified position of authority 'made suggestions' . . . that [managers] may or may not have heard (or paid attention to) is a meager fount for even a whiff of a fraudulent scheme, much less a particularization of its details.").[18]

Other CW statements that do purport to relate to seeking Accelerated Approval or BOT/BAL's efficacy constitute nothing more than the CWs' own opinions. *N.J. Carpenters Pension & Annuity Funds*, 537 F.3d at 52 n.18 ("Plaintiffs also allege that 'in CS 3's opinion,' many of the problems … "were the result of executives … being excessively aggressive in getting" the drug to the market. [] As with any bald assertion, this gets plaintiffs nowhere."). For example, CW3 alleged that "it was not appropriate to describe BOT/BAL as providing 'unprecedented responses'" because "we needed the data to say a lot more than 'It's exciting and there is potential.'" AC ¶ 100. Similarly, CW4 alleged that "Defendant Armen's statements to investors appeared 'over the top,' including about the impact BOT/BAL could have on cancer treatments." AC ¶ 104. And CW7 allegedly disagreed with Defendant Armen's *private* statement that "we save lives," because "some clinical trial patients relapsed after BOT/BAL treatments." AC ¶ 105.[19] CW7 apparently insisted that "the Company share only accurate, balanced, and scientifically

---

[18] *See also* AC ¶ 110 (CW6—Associate Director of Clinical Development employed at Agenus for 15 months—statement that they saw "new indications being added to BOT/BAL Phase 1 studies without any rhyme or reason."); ¶ 115 (calling enrollment for Phase 1 "incredibly rushed").

[19] *See also* AC ¶ 104 (CW4 statement that Armen was asked to "tone down" his language about BOT/BAL; ¶ 105 (CW 7 statement that Armen "didn't understand the field"); *id.* ("the Company's claims of 'unprecedented survival' were improper, because while some patients with tumors showed longer survival benefits, the numbers were small, inconsistent and didn't meet statistical limitations.").

supported information," but does not point to a single piece of data that was inaccurate or mischaracterized. The AC attempts to cast these differences of opinion about BOT/BAL's promise as evidence of "misleading public statements about BOT/BAL," AC ¶ 105, but the AC fails to allege with any particularly how or why the CWs opinions were right and, more importantly, fails to allege particularized facts reflecting that Defendant Armen *knew* his opinions were wrong.

Still other CWs allege that Defendant Armen was too confident in the BOT/BAL data and its potential to support an application for Accelerated Approval.[20] Putting aside that the Company warned investors that its "timelines [were] aggressive," Ex. 8 (2023 Form 10-K) at 18, these CW statements do not show that any Defendant knew that BOT/BAL was less effective than portrayed publicly. To the contrary, they reflect that the Defendants' statements represented their genuine opinions based on their analysis—the very type of opinion that is protected under the federal securities laws. *Cody*, 199 F. Supp. 3d at 419 ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact.'" (citation omitted)). Any assertion by CWs that they held (or now hold, with the benefit of hindsight) a different opinion does not show that Defendants' opinions were not sincerely held. Such allegations are irrelevant.

Finally, CW5 alleges that "the FDA had found that the Phase 2 results presented at the EOP2 meeting were not strong enough, and that Agenus did not have enough data on the survival benefit of the drug." AC ¶ 125; *see also id.* ¶ 112 (CW 8 arguing that "Defendant Armen's arbitrary desire to accelerate Phase 2 clinical trials for BOT/BAL was an utter failure"). The allegation supports only a "fraud by hindsight" theory of securities fraud, *i.e.*, that because the

---

[20] *See, e.g.*, AC ¶ 93 (CW7, alleges that in response to expressions of doubt about the data needed to support an Accelerated Approval application, "Armen retorted, . . . 'we're going to submit with what we have because this is a breakthrough and they should not deny it.'"); ¶ 102 (CW4 alleging Dr. Armen was "overconfident about how FDA was reviewing data" to the point "it was almost delusional."); ¶ 103 (CW9 explaining "that Defendant Armen's confidence in the drug was based on one or two patients in 2022 showing a strong response to the treatment.").

FDA came to a different subjective judgment about BOT/BAL's potential future efficacy, Agenus should have predicted that outcome. *See ACA Fin. Guar.*, 512 F.3d at 62 (1st Cir. 2008) (rejecting "fraud by hindsight" argument premised on "simply contrast[ing] a defendant's past optimism with less favorable actual results."). Critically, CW5's statement does not suggest Agenus had any basis to know in advance that the FDA would reach this conclusion.

None of these CW statements indicate that the Defendants knew that the FDA would discourage Agenus from seeking Accelerated Approval or that the Defendants' interpretation of the BOT/BAL data was incorrect. To the contrary, the statements reflect the Defendants' opinions based on data available to them at the time—*i.e.*, the very type of opinion that is protected under the laws governing securities fraud. *Cody*, 199 F. Supp. 3d at 419; *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 14, 27, 43 (D. Mass. 2016) (statements regarding "terrific product that is going to perform very well in the market" amounted to non-actionable puffery), *aff'd*, 857 F.3d 34 (1st Cir. 2017); *Homology Meds.*, 2024 WL 1436025, at \*9.

### 5. *Agenus Warned that Accelerated Approval Was Not Guaranteed*

Plaintiff's allegations are further undermined by the Company's risk disclosures in its annual Form 10-K reports, which were referenced in its Form 10-Q reports. For example:

- "[W]e intend to submit our first botensilimab/balstilimab BLA in refractory MSS CRC in 2024 subject to feedback from the FDA. ***The FDA may disagree that our data and development program are sufficient to support BLA filing or approval***. For example, prior to the availability of the Phase 2 data FDA noted that data from our development program do not appear to conclusively favor one dosage of botensilimab over the other. We believe that our Phase 2 data will inform dose selection and we intend to discuss those data with the FDA in an upcoming meeting to determine whether it may be appropriate to pursue BLA approval of both doses. ***The FDA may disagree with our assessment*** and recommend that additional clinical studies be undertaken in support of dose selection." Ex. 8 (2023 Form 10-K) at 19 (emphasis added).

- "We may seek to utilize, among other strategies, FDA's accelerated approval program for our product candidates given the limited alternatives for treatments for certain rare diseases . . . , ***but the FDA may not agree with our plans***." 2023 Form

10-K Part I, Item 1A (emphasis added)); Ex. 1 (2022 10-K), Part I, Item 1A (same).

- "Our timelines are aggressive and subject to various factors outside of our control, including regulatory review and approval. Although we have engaged with the FDA on our regulatory programs and protocols, *there is no guarantee that our BLA submissions, if any, will be approved*, or that we will be able to successfully commercialize these assets." Ex. 8 (2023 Form 10-K) at 18 (emphasis added).

Prior disclosures of risk defeat a claim for material omissions. *See Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 520 (D. Mass. 2014); *see also In re Fin. Oversight & Mgmt. Bd. For P.R.*, 54 F.4th 42, 56 (1st Cir. 2022) ("It is not a material omission to fail to point out information of which the market is already aware."). The Company's SEC filings repeatedly warned investors that Accelerated Approval was not guaranteed. Accordingly, Plaintiff cannot maintain a securities fraud claim based on a purported failure to disclose this risk.

### B. The Amended Complaint Fails to Allege Any False or Misleading Statements or Omissions about Agenus's Ability to Accelerate Drug Development

Plaintiff alleges that a separate category of statements "materially exaggerated Agenus's ability to produce or obtain approval of its treatment candidates, including BOT/BAL." AC ¶ 181. Under this theory, Plaintiff challenges certain statements as "false and misleading because Defendants knew, but did not disclose, that the Company routinely failed to pay vendors and suppliers, was forced to shut down manufacturing during the Class period . . . , and failed to maintain accelerated timelines in connection with seeking Accelerated Approval of BOT/BAL." *Id*. These allegations make little sense given their disconnect from the substance of BOT/BAL's prospects for Accelerated Approval—the AC does not allege facts explaining how they affected that process. They also fail because (1) the challenged statements are forward-looking statements protected by the PSLRA's safe harbor, (2) are not false or misleading, and (3) Agenus frequently warned of the risks that Plaintiff complains materialized.

#### 1. PSLRA Safe Harbor for Forward Looking Statements

-29-

Like those discussed above, Defendants' statements in this category also qualify for the PSLRA's safe harbor for forward-looking language accompanied by cautionary statements. *See* Stmt. 24; Ex. 1 (2022 10-K) at 3 ("We believe that these fully integrated capabilities enable us to produce novel candidates on timelines that are shorter than the industry standard"); Ex. 8 (2023 10-K) at 3 ("We believe these integrated capabilities enable us to develop and, if approved, commercialize novel candidates on accelerated timelines compared to industry standards"); *Hill*, 638 F.3d at 54 (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). Each of the challenged statements regarding accelerated drug development come from the Company's SEC filings, which contained robust forward looking statement disclosures. *See, e.g.*, Stmt. 24; Ex. 1 (2022 10-K); Stmt. 27; Ex. 26 (Q1 2023 10-Q); Ex. 27 (Q2 2023 10-Q); Ex. 28 (Q3 2023 10-Q). The statements are thus protected under the PSLRA's safe harbor. *See Tetraphase Pharm., Inc.*, 2017 WL 1946305, at *10.

### 2.    *The Challenged Statements Regarding Agenus's Ability to Accelerate Drug Development Are Not Actionable*

Plaintiff does not allege facts showing that any of Defendants' statements about Agenus's ability to accelerate drug development (Statements 24–32) were affirmatively false when made. To the extent that Plaintiff claims that these representations omit facts, Plaintiff has failed to "show how the [purported] omission[s] render that statement[s] misleading and . . . establish that there was a duty to disclose the omitted information." *See Ponsa-Rabell*, 35 F.4th at 34. Nowhere does the AC include allegations to support a conclusion that Agenus actually lacked necessary staff or plans to accelerate developments or that any purported failure to pay vendors resulted in a failure— or even risk of a failure—to accelerate developments. Nor does the AC plead sufficient facts for the Court to infer that Defendants knew about these purported deficiencies. *See Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 138 (1st Cir. 2021) ("[C]ompanies [need not] be

-30-

omniscient, even if the company looks foolish in hindsight for not properly predicting whatever harm befell it.").

Rather than false and misleading, the challenged statements regarding Agenus's ability to accelerate the drug development process are inactionable statements of opinion. As previously noted, "a sincere statement of pure opinion is not an 'untrue statement of material fact.'" *Cody*, 199 F. Supp. 3d at 419. Several statements explicitly contain the phrase "we believe" before the representation in question.[21] Such statements clearly represent the Company's own opinions. *See Cody*, 199 F. Supp. 3d at 419 (concluding that a statement was an opinion because "'we believe' was used, and a reasonable investor would understand that") (quoting *Omnicare*, 575 U.S. at 186).

Other statements use different language clearly indicating the Company's opinion of future plans, and Plaintiff fails to demonstrate how such plans or opinions were not sincerely held. *See, e.g.*, Stmt. 25; Ex. 1 ("Our lead program, botensilimab (AGEN1181), is advancing in multiple clinical programs which we have designed to support regulatory pathways for accelerated development with botensilimab as a monotherapy and in combination with balstilimab.").[22] Such opinions are only actionable "if they [were] not honestly believed and lack a reasonable basis." *Homology Meds.*, 2024 WL 1436025, at *9) (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014)); *see also ProNAi Therapeutics Inc.*, 297 F. Supp. 3d at 413

---

[21] *See, e.g.*, Stmt. 24; Ex. 1 ("We believe our fully integrated, end-to-end capabilities . . . will uniquely position us to produce novel therapies on accelerated timelines."); Stmt. 27; Ex. 26 (Q1 2023 10-Q) ("We believe that these fully integrated capabilities enable us to produce novel candidates on timelines that are shorter than the industry standard."); Ex. 27 (Q2 2023 10-Q) (same); Ex. 28 (Q3 2023 10-Q) (same); Stmt. 28; Ex. 8 ("We believe our fully integrated, end-to-end capabilities . . . will uniquely position us to produce potential novel therapies on accelerated timelines."); Stmt. 30; Ex. 29 (Q1 2024 10-Q) ("We believe . . . .").

[22] Plaintiff also claims that the Defendants' Sarbanes-Oxley Act certifications to the Company's 2022 and 2023 Forms 10-K, Stmts. 31 and 32, were false or misleading because the forms themselves contained omissions. Yet for the same reasons that the statements within the forms are not false or misleading, neither are the certifications to those statements. *See Premca Extra Income Fund LP v. iRobot Corp.*, No. 24-cv-11158, 2025 WL 307247, at *25 (D. Mass. Jan. 27, 2025) (rejecting claims relating to Sarbanes-Oxley Act certifications for the "same reasons" as the 10-K statements, that there were "insufficient allegations that the statements […] were knowingly false or misleading when signed.").

(dismissing as non-actionable statements about defendants' planned drug development processes where defendant in fact had those plans); *Davison*, 2014 WL 1805242, at *9 (same).

### 3.    Confidential Witness Statements Are Irrelevant or Insufficiently Particular to Agenus's Ability to Accelerate Drug Development

*Irrelevant.*  Most CW statements are irrelevant to Agenus's ability to accelerate the drug development process.  The AC makes no alleged connection between purported vendor disputes or Defendants' opinion of the FDA and the claim that the Company was unable to develop drugs needed to submit an application for Accelerated Approval.  Nor does the AC contain any allegation that Defendants made any disclosure at all regarding timeliness of the Company's payments to vendors.  For example, CW1, stated that "Agenus had had to halt manufacturing concerning clinical trials because of the donor and supplier issues, and that he was left with 'nothing to do' because of the stoppage."  AC ¶ 120.  But the statement that one Quality Assurance Document Control Specialist had "nothing to do" "do[es] not speak with specificity as to why the defendants' alleged misstatements were untrue or misleading."  *In re Biogen Inc.*, 857 F.3d at 41.[23]

*Insufficiently Particular.*  The CW witness statements that purport to relate to the drug development timeline also fail to show that Defendants' analysis of the data and prospects for development—*i.e.*, Defendants' opinions—were not reasonably believed or lacked reasonable basis.  *See Homology Meds.*, 2024 WL 1436025, at *9.  Nor can the Court reasonably draw these inferences from these limited allegations.  *See also* AC ¶ 120 (CW1 recalling that "the Company was having issues receiving orders . . . and supplies from vendors because the Company was behind on payments"); ¶ 121 ("CW3 . . . described how vendors refused to work with Agenus

---

[23] *See also, e.g.*, AC ¶ 113 ("According to CW4, Defendant Armen was 'antagonistic' to the FDA."; "CW9 described how Armen's animosity toward the regulatory agency was notorious"; "constantly making comments about how the FDA is corrupt."); ¶ 119 (CW6 describing how "Agenus was heading toward a drug shortage problem and that Phase 3 trials of BOT/BAL were not going to happen because botensilimab takes a year and eight months to manufacture, and the timeline for submission to the FDA was a year."); ¶ 109 (CW8 statement that "Defendant Armen came up 'with his own ridiculous plans that didn't make sense and weren't grounded in reality.'").

because they were not paid."); ¶ 121 ("CW4 also described hearing [] that vendors were not being paid.").

### 4. Agenus Clearly and Repeatedly Warned that Acceleration of the Development Process was Not Guaranteed

Plaintiff cannot credibly claim that Agenus misled investors about its ability to accelerate the development process for BOT/BAL given the risks the Company affirmatively disclosed in its annual Form 10-K reports—the very same source as the challenged statements—and referenced in its Form 10-Q reports. *See, e.g.*, Ex. 8 (2023 Form 10-K), Part I, Item 1A ("Manufacturing challenges could result in having insufficient quantities of our drug candidates or drugs or such quantities at an acceptable cost"); *id.* at 18 ("If the botensilimab programs (including combination therapies with botensilimab) encounter safety, efficacy, supply or manufacturing problems, developmental delays, regulatory or commercialization issues or other programs, our development plans and business may be significantly harmed."); Ex. 1 (2022 10-K), Part I, Item 1A (same). The Company's SEC filings repeatedly warned investors that acceleration of the development process was not guaranteed. *See Simon*, 37 F. Supp. 3d at 520 (finding that prior disclosures of risk in SEC filings, including Form 10-Ks, suffice to defeat a claim for material omissions).

## II. THE AMENDED COMPLAINT DOES NOT SATISFY THE HEIGHTENED PLEADING REQUIREMENT FOR SCIENTER

The AC also should be dismissed for the independent, separate reason that Plaintiff fails to adequately allege that any Defendant intentionally or recklessly misled the market. *ACA Fin. Guar. Corp.*, 512 F.3d at 65. To satisfy the PSLRA's stringent pleading requirements, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Sarepta Therapeutics*, 887 F.3d at 57 (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

To plead scienter, Plaintiff must allege that each Defendant acted with either a "conscious[]

inten[t] to defraud" or "a high degree of recklessness." *Id.* (citation omitted). Only "a highly unreasonable omission" that involves "an extreme departure from the standards of ordinary care" and "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it" can amount to a high degree of recklessness. *In re Smith & Wesson Holding Corp.*, 669 F.3d 68, 77 (1st Cir. 2012) (citation omitted). Complaints meeting this pleading standard "often contain[] clear allegations of admissions, internal records or witnessed discussions suggesting that . . . the defendant officers were aware that they were withholding vital information or at least were warned by others that this was so." *In re Boston Sci. Corp.*, 686 F.3d at 31. Supreme Court precedent also requires that Plaintiff's theory of scienter be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Where non-culpable inferences are more persuasive than Plaintiff's theory of the case, Plaintiff's allegations must be dismissed. *Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 470–71 (D. Mass. 2016), *aff'd*, 853 F.3d 606 (1st Cir. 2017).

> **A. The Complaint Fails to Allege Facts Supporting a "Strong" Inference of Scienter, Relying Instead on a Theory of "Fraud by Hindsight"**
>
> **1. *The Individual Defendants' Purported "High-Level Positions Within Agenus"***

Plaintiff nowhere alleges facts—let alone "admissions, internal records, or witnessed discussions" suggesting in any way—that the Defendants knew or should have known that the FDA would discourage the Company from seeking Accelerated Approval. *See In re Bos. Sci. Corp.*, 686 F.3d at 31. Instead, Plaintiff asks the Court to (somehow) infer that they *must* have been able to predict the FDA's judgment given their positions at Agenus. *See* AC ¶¶ 205–08. Courts in this District have long held that conclusory allegations that executives "knew or must have known," like those present here, are not enough. *See In re Galileo Corp. S'holders Litig.*,

127 F. Supp. 2d 251, 261 (D. Mass. 2001) (holding that scienter is not "pleaded sufficiently by an allegation that a defendant 'must have had knowledge of the facts'" (citation omitted)). Defendants' senior positions and access to corporate insider information does not move the needle. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 54 F.4th at 55–56 (refusing to infer scienter from allegations based on the nature of defendants' roles as "too broad and speculative"); *In re Biogen Inc.*, 193 F. Supp. 3d at 51 (noting that absent a "smoking gun email" or similar "plus factor," courts refuse to infer scienter from the broad assertions that senior executives must have known about certain facts).

### 2.    *"Core Operations" Theory*

Plaintiff fares no better under a "core operations" theory, which requires that he plead "facts . . . so apparent that their knowledge may be attributed to the company and its officers." *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 66 (D. Mass. 2022). To pass muster, such allegations must be supported by substantial evidence of intent or recklessness or a "plus factor." *Homology Meds.*, 2024 WL 1436025, at *18; *In re Biogen Sec. Litig.*, 193 F. Supp. 3d 5, 51 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017). There is no doubt that BOT/BAL was central to Agenus's success. According to Plaintiff, however, the fact that Agenus prioritized BOT/BAL's clinical development supports an inference that Defendants O'Day and Armen "were apprised of, had access to, or had actual knowledge of all material information related to Agenus and the BOT/BAL combination treatment." AC ¶¶ 209–12. But general commentary about business priorities is insufficient for the proposition that this knowledge could be attributed to the Defendants. *See Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 165 (1st Cir. 2019). There is simply no allegation that anyone at Agenus knew or could have known how the FDA would view Agenus's BOT/BAL clinical data. And Defendants' prioritization of developing BOT/BAL only supports the opposite inference that they genuinely believed in its prospects for approval. *See*

*Homology Meds.*, 2024 WL 1436025, at \*17.[24]

### B.      The Confidential Witness Allegations Fail to Plead that Defendants Knew or Recklessly Ignored Facts Contradicting Their Public Statements.

Without other support for scienter, Plaintiff resorts to statements attributed to lower-level employees who once worked at Agenus.  AC ¶¶ 37–45.  To give rise to a cogent and compelling inference of scienter, allegations based on confidential witnesses must be pled with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *N.J. Carpenters Pension & Annuity Funds*, 537 F.3d at 45, 51.  The confidential witness must offer "specific descriptions" indicating that high-level company officials knew or recklessly disregarded that disclosures and other public statements were materially false or misleading.  *In re Biogen*, 857 F.3d at 43–44.

As described in detail above, *see supra* Section I.A.3, none of the alleged CW statements are sufficiently particularized to support a conclusion that any challenged statement was false, let alone that any Defendant knew any such statement was false.  If anything, the CW statements undermine any inference of scienter by supporting the conclusion that Defendants sincerely believed in BOT/BAL's promise and in the prospect for Accelerated Approval.  For example, CW7 alleges that Dr. Armen "insisted on moving forward" with a potential Accelerated Approval submission because BOT/BAL was "a breakthrough and [the FDA] should not deny it."  AC ¶ 102.  Another CW, CW4, alleged that Dr. Armen "was 'overconfident about how FDA was reviewing data.'"  AC ¶ 103.  The sincere belief of Defendants in their statements is the opposite of knowing that the FDA would disagree in its evaluation of that same data.  And differences of opinion do not amount to knowledge of falsity.  *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,

---

[24] Because Plaintiff has failed to establish scienter with respect to the Individual Defendants, he has also failed to plead corporate scienter as to Agenus because "the scienter of corporate entities is ascertained through the mental state of their management."  *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 36 (D. Mass. 2009) (citation and alterations omitted).

638 F. Supp. 2d 120, 128 (D. Mass. 2009) ("Plaintiff must provide more than 'tales from the trenches' from a score of former [] employees.").

### C.     The Sole Theory Advanced as Possible Motives to Defraud Investors Fails as a Matter of Law

Nor do Plaintiff's "motive" allegations save his claims.  Sufficient motive allegations entail "concrete benefits that could be realized by the misstatement, and the likely prospect of achieving such benefits."  *Angelos v. Tokai Pharm., Inc.*, 494 F. Supp. 3d 39, 59 (D. Mass. 2020) (citation omitted).  In fact, the AC contains no allegation that any of the Defendants sold any shares during the Class Period.  To the contrary, Defendant Armen elected to receive his compensation during most of the Class Period was company stock, not cash.  Ex. 8 (2023 10-K) at 74 ("Our CEO, Dr. Garo Armen has elected to receive his base salary and any potential bonus payments in stock rather than cash.").  Defendants were (and remain) fully invested—both literally and figuratively—in the prospects for BOT/BAL's success, defeating any inference that they misled the public out of any improper motive, and fully consistent with the opposite inference that they fully believed what they said to the market.  By contrast, Plaintiff's theory of scienter rests on the nonsensical notion that Defendant Armen and the other Individual Defendants were acting to tank their own financial position.  *See Brennan v. Zafgen, Inc.*, 853 F.3d 606, 615–16 (1st Cir. 2017) (rejecting inference of "fraudulent intent simply because the defendants' compensation structure rewards the achievement of corporate goals"); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (indicating that "it is common for executive compensation to be based partly on the executive's success in achieving key corporate goals" and that it is insufficient to "conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes").

Plaintiff instead resorts to allegations that Defendants made the false statements and

-37-

overstated BOT/BAL's prospects to garner "much needed capital" because the company was "hemorrhaging money." AC ¶¶ 13, 72, 203. Courts in this Circuit have repeatedly and consistently rejected identical allegations as insufficient to infer scienter. "[T]he usual concern by executives to improve financial results' does not support an inference of scienter," including allegations that "the very survival of the company w[as] on the line." *Sarepta Therapeutics*, 868 F.3d at 41. In fact, all corporations—not just those in the biotech industry—"would be motivated to raise capital, make a profit, avoid bankruptcy, or finance the successful launch of a promising product." *Homology Meds.*, 2024 WL 1436025, at \*18. The AC acknowledges that the Company held \$76 million of cash at the end of 2023 and allege no facts "suggesting that such capital was insufficient for continued operations, much less that [the Company] would shutter its doors unless it padded earnings by deceiving investors." *Sarepta Therapeutics, Inc.*, 868 F.3d at 42.

Plaintiff also points to Agenus's stock offerings in 2023 and 2024 as indicia of scienter, but this too is insufficient. AC ¶ 203. "[T]he existence of a public offering during the period of alleged misrepresentations cannot itself lead to an inference of scienter." *See In re Bos. Sci. Corp. Sec. Litig.*, No. 10-cv-10593, 2011 WL 4381889, at \*15 (D. Mass. Sept. 19, 2011).

### D.    Inferences of Non-Culpable Intent Outweigh Plaintiff's Implausible Theory

After weighing all competing inferences rationally drawn from the facts as alleged, the comparative analysis falls short of *Tellabs*'s standard. 551 U.S. at 324. The more cogent inference is that Defendants, having full faith in BOT/BAL's potential, communicated optimism about the clinical data available to them at the time, all the while realizing—and disclosing—that Accelerated Approval was not guaranteed. *See* Ex. 1 (2022 10-K) ("We may seek to utilize . . . FDA's accelerated approval program . . . but the FDA may not agree with our plans."); Ex. 8 (2023 10-K) (same); *bluebird*, 599 F. Supp. 3d at 67 (finding that "[d]efendants' repeated disclaimers about the possibility that FDA would require additional studies or data collection" weakens

-38-

inference of scienter). That the Defendants could not accurately predict the future is far from securities fraud. *See Alnylam Pharm.*, 451 F. Supp. 3d at 184 (finding inference that defendants believed their interpretation of data and did not anticipate that the FDA would hold a different view to be more compelling than inference of fraud); *see also Aldeyra Therapeutics*, 2025 WL 815065, at *10 (finding inference of defendants' optimism in trial data and "approval prospects" more compelling than inference of fraud). After balancing "plausible, nonculpable explanations for the defendant's conduct" against conclusory allegations that defendants "must have known" the statements were allegedly misleading, *Tellabs*, 551 U.S. at 324, the Court should find that the AC falls well short of pleading a strong, cogent inference of scienter. Plaintiff's allegations at most amount to asserting "the fact that something turned out badly must mean defendant knew earlier that it would turn out badly," which is the inactionable "classic fraud by hindsight case." *Miss. Pub. Emps. Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008).

## III. PLAINTIFF'S LOSS CAUSATION THEORY FAILS TO LINK THE ALLEGED FALSE AND MISLEADING STATEMENTS WITH ANY LOSS

Securities fraud plaintiffs must demonstrate a causal link between a corrective disclosure and a decline in stock price. 15 U.S.C. § 78u-4(b)(4). According to Plaintiff, the July 18, 2024 press release acted as a "corrective disclosure" to statements made regarding the Accelerated Approval for BOT/BAL and the Phase 2 results. AC ¶¶ 27, 198. However, nothing in this press release revealed a "truth" to the market that was previously concealed or constituted a corrective disclosure. *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237–38 (1st Cir. 2013).

The July 18, 2024 press release simply disclosed the results of a meeting with the FDA and the latest BOT/BAL clinical trial data. Such a disclosure can hardly be considered "corrective" because (i) Agenus had not previously said *anything* about the FDA's potential feedback on Accelerated Approval, and (ii) information in the press release about BOT/BAL's trial results and

future potential were consistent with Defendants' prior statements. *See* AC ¶¶ 81, 82, 142, 144, 150; *bluebird*, 599 F. Supp. 3d at 70 (dismissing claim after plaintiff remained honest about potential FDA response to data); *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) (no loss causation where disclosure "did not correct or revise patient data"). The press release also does not contain any information remotely relevant to Agenus's ability to accelerate the development of its treatment candidates. As such, Plaintiff cannot plausibly attribute any loss stemming from the press release to any of the three categories of allegedly false and misleading statements.

Instead, the July 18, 2024 press release merely amounts to nothing more than "bad news" leading to a stock drop—an event well-known to biotech investors. *Cf. Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*, 838 F.3d 76, 81–82 (1st Cir. 2016).

## IV.    PLAINTIFF'S CONTROL PERSON CLAIMS MUST BE DISMISSED

Section 20(a) of the Exchange Act holds individuals jointly and severally liable for their respective controlled entities' securities law violations. 15 U.S.C. § 78t(a). Thus, allegations under Section 20(a) are "derivative of [] claim[s] alleging an underlying securities law violation." *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 211 (1st Cir. 2020). Because the AC fails to allege a primary violation of Section 10(b) of the Securities Exchange Act, the Section 20(a) claim for control person liability must also be dismissed. *See Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015). As the Section 20(a) claim must be dismissed, Plaintiff relatedly cannot hold Defendants liable under a respondeat superior theory. *See In re Lernout & Hauspie Secs. Litig.*, 286 B.R. 33, 44 (D. Mass. 2002).

## CONCLUSION

For the reasons stated herein, the AC should be dismissed in its entirety with prejudice.

-40-

Dated:  April 8, 2025

Respectfully submitted,

*/s/ Daniel V. McCaughey*
Daniel V. McCaughey
(BBO #662037)
James R. Drabick
(BBO #667460)
**ROPES & GRAY LLP**
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Daniel.McCaughey@ropesgray.com
James.Drabick@ropesgray.com

Chimso O. Okoji (*pro hac vice* application
pending)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel: (202) 508-4600
Fax: (202) 508-4650
Chimso.Okoji@ropesgray.com

Anne E. Conroy (*pro hac vice* application
pending)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000
Fax: (212) 596-9090
Anne.Conroy@ropesgray.com

*Counsel for Defendants Agenus Inc., Garo
H. Armen, Christine M. Klaskin, Steven J.
O'Day, and Todd Yancey*

-41-

## **CERTIFICATE OF SERVICE**

I hereby certify that the above document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on April 8, 2025.

/s/ Daniel V. McCaughey
Daniel V. McCaughey

# APPENDIX A

## *STATEMENTS CHALLENGED IN PLAINTIFF'S AMENDED COMPLAINT ("AC")*

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| (1) Agenus Lacked Data Necessary to Obtain Accelerated Approval of BOT/BAL and (2) Defendants Had Been Misrepresenting BOT/BAL's Efficacy and Potential | | | | | | | |
| 1. | 1 | "[O]ur lead program, botensilimab (AGEN1181), is advancing in multiple clinical programs which we have designed to support regulatory pathways for accelerated development with botensilimab as a monotherapy and in combination with balstilimab." | ¶ 134 | Form 10-K 2022 (March 14, 2023) | Section I.A.1 | Section I.A.2 | Section I.A.3 |
| 2. | 17 | Garo Armen: "Looking ahead, to 2023, we anticipate achieving important clinical milestones. On top of a year that has already demonstrated very impressive outcomes. That will set the foundation for a potential regulatory filing or potential botensilimab plus balstilimab within a period of time that will be in the best interest of patients based on robust data that can be justified." | ¶ 136 | March 14, 2023 Earnings Call | | | |
| 3. | 18 | Garo Armen: "By zeroing in on BOT/BAL, we expect to expedite regulatory approval and availability for healthcare providers and patients in need. Our decision to streamline operations reflects our commitment to the success of these programs while optimizing shareholder value." | ¶ 138 | August 23, 2023 Press Release | | | |
| 4. | 22 | Garo Armen: "With very limited options to treat patients with advanced colorectal cancer, the positive trends and lasting responses in our studies strengthen our conviction in BOT/BAL potential. Our top priority is obtaining BOT/BAL's approval in MSS CRC in order to allow patients access to this important IO treatment, offering them new | ¶ 140 | Q3 2023 Investor Call (November 7, 2023) | | | |

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | hope, which does not exist today." | | | | | |
| 5. | 22 | Garo Armen: "[W]e have clearly disclosed the data on the first 70 patients, not because the rest of the data isn't satisfactory, but the rest of the data needs to be cleaned up and we need a little bit of work to do. But our look at the data both in the second [cohort] and in our Phase II studies indicate that we should have a sustainable response rate, perhaps even an improving response rate as we disclose and analyze these data for regulatory and beyond purposes." | ¶ 142 | Q3 2023 Investor Call (November 7, 2023) | | | |
| 6. | 22 | Todd Yancey: "We are obviously seeing that responses for patients and that response can be stable [disease] or better is translating to not only durable response but very substantial overall survival. So I certainly expect that we'd be able to demonstrate a point estimates for response, durability of response for patients with stable disease or better and that is trending toward a survival benefit." "[T]he time of submission is not a moment in time that's frozen because we will be required to provide updates on safety and efficacy during agency review. 0[A]nd that will allow time for additional maturation of the data set . . . So I think we have a very, very robust set of data to present to the agencies for their review." | ¶ 144 | Q3 2023 Investor Call (November 7, 2023) | | | |
| 7. | 22 | Garo Armen: "of course, there are regulatory and other questions about do overall response rates translate to longer-term benefit. We know they do. We need to demonstrate that with numbers, but with CTLA-4 binding antibodies and ours is a | ¶ 146 | Q3 2023 Investor Call (November 7, 2023) | | | |

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | multifunctional broad functioning molecule that binds the CTLA-4 as one of its five different activities, not just the center stage activity, but one of five different activities." | | | | | |
| 8. | 21 | "In 2023, Agenus reached crucial milestones, particularly with our BOT/BAL program, a cornerstone of our operational focus. BOT/BAL therapy has undergone rigorous testing in over 900 patients, demonstrating promising activity in cancers that represent ~~significant~~[25] unmet medical needs, notably colon cancer, where we are poised for potential first approval. As we stand on the threshold of a clinical and a critical phase in our regulatory journey, our focus is squarely on advancing activities for a potential Accelerated Approval filing. Our immediate efforts are directed towards ensuring that our development strategies align seamlessly with the FDA's rigorous standards. In 2024, our primary objective is to pursue a global regulatory strategy for BOT/BAL in our fast track indication." | ¶ 148 | March 14, 2024 Earnings Call | | | |
| 9. | 21 | Defendant Armen: "[D]esigned to address the project optimist questions. And so the question was for us, if we go to the agency and ask them a question in an abstract form. What is this? What is that? The answer is likely to be, well, when you have the data, come back to us, present it to us, and we'll give you an intelligent answer. And so in order to for us to be able to get to that point, we made a strategic decision, Colleen, that we would wait until all the data mature to the point where we | ¶ 150 | March 14, 2024 Earnings Call | | | |

[25] This word does not appear in the actual quote.

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | had a compelling package with to present to the FDA. So that's the reason why we are waiting until the data matures, which will begin somewhat before the middle of this year." | | | | | |
| 10. | 21 | Steven O'Day: "yes, I mean, obviously, we'll have response rate, duration of response, PFS and preliminary survival in these patients as they mature over the course of the year from their last -- from when they were accrued. So obviously, it's a composite endpoint. But to Garo's point, clearly, response and duration of response is what drives and prolonged stable disease drive the survival curve." | ¶ 152 | March 14, 2024 Earnings Call | | | |
| 11. | 19 | "Pending planned meetings with the FDA, Agenus plans to submit a Biologics License Application (BLA) for BOT/BAL in refractory MSS CRC later this year and plans to present detailed Phase 2 efficacy results, including response durability and updated Phase 1 survival data, at a major medical conference in the second half of 2024. This growing body of clinical evidence underscores the significant potential of BOT/BAL to transform the treatment landscape for difficult-to-treat solid tumors. | ¶ 154 | April 12, 2024 Press Release | | | |
| 12. | 20 | "The BOT/BAL combination has consistently demonstrated deep and durable responses in 'cold' solid tumors, especially in our advanced studies of relapsed/refractory MSS CRC. With the promising results we have seen, and additional data from our ongoing Phase 2 study, we plan to engage with the FDA in the second half of 2024. Pending the outcomes of these discussions, we aim to commence the submission of a Biologics License Application | ¶ 156 | May 7, 2024 Press Release | | | |

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | under the Accelerated Approval provision for BOT/BAL in refractory MSS CRC NLM." | | | | | |
| 13. | 12 | Garo Armen: "First of all, as you may know, for the last almost 6 months, we have been intensively involved in pulling together the data from all the trials including tracking the maturity of the data, as Steven alluded to, to see how we can make a compelling package in an upcoming meeting with the FDA. And our conviction based on the data from all 3 cohorts, including the Phase 2 randomized study as well as the durability and maturity of the data is stronger today than it's ever before that we will maybe take compelling case. Of course, we cannot make a definitive statement until the outcome of the FDA meeting and we need to get their concordance on our ambition. But we are in an optimal state of preparedness with where we are right now and more developments and the progress on this will be coming forward in the next several weeks." | ¶ 158 | Q1 2024 Earnings Call (May 7, 2024) | | | |
| 14. | 12 | Steven O'Day: "we're not going to get into the absolute specific numbers but we can -- what I can say is with the Phase 1 and the Phase 2 trial, we have 2 active doses and a significant number of patients on the combination of BOT/BAL in both the Phase 1 and the Phase 2 randomized trial that we think are supported with safety, efficacy and clinical pharmacology to discuss with an accelerated pathway given the unmet need in this setting." | ¶ 160 | Q1 2024 Earnings Call (May 7, 2024) | | | |
| 15. | 12 | Garo Armen: "[T]he FDA has guidance that is based on historical precedents on the minimum follow. But we have had significant input from our regulatory advisers on what that | ¶ 162 | Q1 2024 Earnings Call (May 7, 2024) | | | |

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | minimum should be. Of course, ideally, we can wait 5 years but we're not going to do that. But the minimum enrollment in the Phase 2 ended in October 2023. And based on that, you can sort of extrapolate what the follow-up period will be between now and the potential FDA meeting." | | | | | |
| 16. | 13 | Steven O'Day: "Our upcoming End of Phase 2 meeting with the FDA represents a significant milestone in the ongoing development of BOT/BAL for patients diagnosed with metastatic MSS CRC who do not have active liver metastases . . . . The results from our Phase 1 and Phase 2 studies contribute valuable insights into the potential of this therapy for managing a specific and challenging subgroup of colorectal cancer. We remain dedicated to further exploring innovative immunotherapeutic strategies." | ¶ 164 | May 16, 2024 Press Release | | | |
| 17. | 3 | Steven O'Day: "This data highlight the deep and durable responses achieved with botensilimab and balstilimab in advanced MSS CRC, underscoring remarkable benefit for these patients who have failed standard of care or other investigative therapies. With over 300 patients enrolled to date, botensilimab alone and in combination with balstilimab have demonstrated durable clinical responses across nine cold and treatment-resistant cancers … Our top priority is to advance this combination in global randomized trials with the intent to bring this important treatment to patients expeditiously." | ¶ 167 | January 23, 2023 Press Release | | | |
| 18. | 23 | Garo Armen: "With the growing body of data demonstrating robust, | ¶ 169 | March 14, 2023 Press Release | | | |

-6-

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | consistent, and durable efficacy signals from a trial of over 300 patients across nine metastatic, late-line cancers, we are expediting the expansion of our botensilimab/balstilimab development program in MSS CRC and other priority indications." | | | | | |
| 19. | 4 | "The new data show substantial survival benefits and long-lasting responses for patients with non-MSI-H (microsatellite stable or non-microsatellite instability-high) metastatic colorectal cancer previously resistant to chemotherapy and/or immunotherapy." | ¶ 171 | June 30, 2023 Press Release | | | |
| 20. | 24 | Garo Armen: "In a diverse patient population of nearly 400 individuals, across nine solid tumor types, all of them had exhausted prior treatment options botensilimab has made significant strides in eliciting responses, offering renewed hope for those who have failed all other available treatments . . . . This is truly an impressive accomplishment considering the patient population involved. Notably many of these responses have proven to be durable responses. This is a critical factor in evaluating a treatment potential to transform patient's lives in a meaningful way … Even in hot tumors that have failed standard-of-care, including immunotherapy, of course, with or without chemotherapy, we are witnessing unprecedented responses." | ¶ 173 | Q1 2023 Earnings Call (May 9, 2023) | | | |
| 21. | 11 | Garo Armen: "Botensilimab, alone or in combination with balstilimab, continues to display remarkable clinical activity . . . demonstrating great potential to revolutionize the role of immunotherapy in cancer treatment . . . . [o]ur data has demonstrated an | ¶ 175 | August 8, 2023 Press Release | | | |

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | unprecedented survival benefit over what has been reported for standard of care" | | | | | |
| 22. | 25 | Steven O'Day: "[N]ew and updated data underscore BOT's broad effectiveness across several advanced solid tumors, demonstrating its potential beyond first-generation immunotherapies and current treatments . . . . BOT's versatility, alone, in combination with BAL, or in combination with other standard of care therapies, in early and late-stage solid tumors, positions Agenus to transform cancer care, offering immense promise to patients." | ¶ 177 | October 22, 2023 Press Release | | | |
| 23. | 12 | Steven O'Day: "Botensilimab in combination with Balstilimab has demonstrated deep and durable responses across a wide variety of poorly immunogenic or IO refractory solid tumors." | ¶ 179 | Q1 2024 Earnings Call (May 7, 2024) | | | |
| **(3) Agenus Lacked the Ability to Accelerate the Development of Its Treatment Candidates** | | | | | | | |
| 24. | 1 | "[D]elivering innovation with speed is critical for our future success, as drug development timelines in oncology shorten while product obsolescence rates climb. We believe our fully integrated, end-to-end capabilities from our artificial intelligence-powered VISION platform for novel target discovery, antibody generation, and cell line development to our cGMP manufacturing and clinical development and operations capabilities, together with a comprehensive and complementary portfolio will uniquely position us to produce novel therapies on accelerated timelines."<br>"In addition to a diverse pipeline, we have assembled fully integrated end-to-end capabilities including novel target discovery, antibody generation, cell line | ¶ 182 | Form 10-K 2022 (March 16, 2023) | Section I.B.2 | Section I.B.1 | Section I.B.2 |

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | development and cGMP manufacturing. We believe that these fully integrated capabilities enable us to produce novel candidates on timelines that are shorter than the industry standard." | | | | | |
| 25. | 1 | "[W]e are pursuing clinical trials designed to strengthen the efficacy and safety signals demonstrated to date and that may support a potential filing for full approval and/or accelerated approval based on the magnitude of benefit demonstrated." "Our lead program, botensilimab (AGEN1181), is advancing in multiple clinical programs which we have designed to support regulatory pathways for accelerated development with botensilimab as a monotherapy and in combination with balstilimab." | ¶ 183 | Form 10-K 2022 (March 16, 2023) | | | |
| 26. | 1 | "We intend to utilize an accelerated approval approach for our product candidates given the limited alternatives for cancer treatments, but the FDA may not agree with our plans." | ¶ 185 | Form 10-K 2022 (March 16, 2023) | | | |
| 27. | 26 - 28 | "In addition to a diverse pipeline, we have assembled fully integrated end-to-end capabilities including novel target discovery, antibody generation, cell line development and current good manufacturing practice ("cGMP") clinical manufacturing. We believe that these fully integrated capabilities enable us to produce novel candidates on timelines that are shorter than the industry standard." | ¶ 187 | Forms 10-Q (May 9, 2023; August 8, 2023; November 9, 2023) | | | |
| 28. | 8 | "[w]e believe our fully integrated, end-to-end capabilities for novel target discovery, antibody generation, and cell line development to our cGMP manufacturing and | ¶ 189 | Form 10-K 2023 (March 14, 2024) | | | |

-9-

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | clinical development and operations capabilities, together with a comprehensive and complementary portfolio will uniquely position us to produce potential novel therapies on accelerated timelines." | | | | | |
| 29. | 8 | The Company "intend[s] to utilize an accelerated approval approach for our product candidates given the limited alternatives for cancer treatments, but the FDA may not agree with our plans." | ¶ 191 | Form 10-K 2023 (March 14, 2024) | | | |
| 30. | 29 | "In addition to our diverse pipeline, we have established fully integrated capabilities encompassing novel target discovery, antibody generation, cell line development, and good manufacturing practice (cGMP) manufacturing. We believe these integrated capabilities enable us to develop and, if approved, commercialize novel candidates on accelerated timelines compared to industry standards." | ¶ 193 | Form 10-Q (May 7, 2024) | | | |
| 31. | n/a | Defendants Armen and Klaskin certified that they had "reviewed the annual report on Form 10-K of Agenus Inc. [and] . . . [b]ased on my knowledge [the] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that each of the 2022 and 2023 10-Ks "fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act" and "fairly presents, in all material respects, the financial condition and results of operations" of Agenus. | ¶ 195 | 10-K Sarbanes-Oxley Act Certifications (March 16, 2023; March 14, 2024) | | | |
| 32. | 26–29 | Defendants Armen and Klaskin certified that "[t]he [Q3 2021 | ¶ 197 | 10-Q Sarbanes-Oxley Act | | | |

-11-

| Stmt. | Ex. | Alleged Material Misstatements or Omissions of Material Facts Statement | AC Cite | Source | Not False or Misleading | Forward Looking | Opinion and/or Puffery |
|---|---|---|---|---|---|---|---|
| | | 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)" and "fairly present[], in all material respects, the financial condition and results of operations" of Agenus. | | Certifications (May 9, 2023; August 8, 2023; November 9, 2023; May 7, 2024) | | | |

**APPENDIX B**

| Exhibit | Description | Short Cite |
|---|---|---|
| 1 | Agenus Inc., Annual Report (Form 10-K) (Mar. 16, 2023) | 2022 10-K |
| 2 | Ibrahim Halil Sahin, et al., *Immunotherapy for Microsatellite Stable Colorectal Cancers: Challenges and Novel Therapeutic Avenues*, in 42 Am. Soc'y of Clinical Oncology Ed. Book, https://ascopubs.org/doi/10.1200/EDBK_349811 | n/a |
| 3 | Press Release, Agenus Inc., Agenus Presents Clinical Data Demonstrating Durable Responses of Botensilimab/Balstilimab Combination in Metastatic Microsatellite Stable Colorectal Cancer at ASCO GI (Jan. 23, 2023) | Jan. 23, 2023 Press Release |
| 4 | Press Release, Agenus Inc., ESMO GI Data: Agenus' Botensilimab/Balstilimab Combination Achieves Unprecedented Survival in Advanced Colorectal Cancer (June 30, 2023) | June 30, 2023 Press Release |
| 5 | U.S. Food & Drug Admin*., Demonstrating Substantial Evidence of Effectiveness for Human Drug and Biological Products,* https://www.fda.gov/media/133660/download (Dec. 2019) | n/a |
| 6 | U.S. Food & Drug Admin., *Expedited Program for Serious Conditions – Accelerated Approval of Drugs and Biologics*, https://www.fda.gov/media/184120/download (Dec. 2024) | n/a |
| 7 | U.S. Food & Drug Admin., *Clinical Trial Considerations to Support Accelerated Approval of Oncology Therapeutics*, https://www.fda.gov/media/166431/download (Mar. 2023) | n/a |
| 8 | Agenus Inc., Annual Report (Form 10-K) (Mar. 14, 2024) | 2023 10-K |
| 9 | Press Release, Agenus Inc., Agenus Receives Fast Track Designation for Botensilimab and Balstilimab in Colorectal Cancer (Apr. 17, 2023) | Apr. 17, 2023 Press Release |
| 10 | U.S. Food & Drug Admin., *Guidance for Industry: Expedited Program for Serious Conditions - Accelerated Approval of Drugs and Biologics* (May 2014), https://www.fda.gov/media/86377/download | n/a |
| 11 | Press Release, Agenus Inc., Agenus Reports Second Quarter 2023 Results (Aug. 8, 2023) | Aug. 8, 2023 Press Release |
| 12 | Q1 2024 Earnings Call Transcript (May 7, 2024) | Q1 2024 Call |
| 13 | Press Release, Agenus Inc., FDA Grants Agenus Type B End-of-Phase 2 Meeting to Discuss BOT/BAL Therapy for Relapsed or Refractory Metastatic Colorectal Cancer (May 16, 2024) | May 16, 2024 Press Release |
| 14 | Press Release, Agenus Inc., Agenus Announces End-of-Phase-2 Meeting Outcomes and Topline Interim Phase 2 Data for BOT/BAL in MSS Colorectal Cancer (July 18, 2024) | July 18, 2024 Press Release |
| 15 | Agenus Inc., Annual Report (Form 10-K) (Mar. 17, 2025) | 2024 10-K |
| 16 | Press Release, Agenus Inc., Agenus Presents Data at ASCO GI Demonstrating Impact of BOT/BAL in Colorectal Cancer Across Neoadjuvant and Advanced Disease (Jan. 22, 2025) | Jan. 22, 2025 Press Release |

-2-

| Exhibit | Description | Short Cite |
|---|---|---|
| 17 | Q4 2022 Earnings Call Transcript (Mar. 14, 2024) | Q4 2022 Call |
| 18 | Press Release, Agenus Inc., Agenus Prioritizes Resources to Accelerate Registration and Commercialization of BOT/BAL Program in Multiple Cancers (Aug. 23, 2023) | Aug. 23, 2023 Press Release |
| 19 | Press Release, Agenus Inc., Agenus Announces Updated Phase 1 Data and Progress on BOT/BAL Development in Metastatic MSS Colorectal Cancer (Apr. 12, 2024) | Apr. 12, 2024 Press Release |
| 20 | Press Release, Agenus Inc., Agenus Reports First Quarter 2024 Results (May 7, 2024) | May 7, 2024 Press Release |
| 21 | Q4 2023 Earnings Call Transcript | Q4 2023 Call |
| 22 | Q3 2023 Earnings Call Transcript (Nov. 7, 2023) | Q3 2023 Call |
| 23 | Press Release, Agenus Inc., Agenus Reports First Quarter and Full Year 2022 Financial Results and Outlines 2023 Objectives Mar. 14, 2023) | Mar. 14, 2023 Press Release |
| 24 | Q1 2023 Earnings Call Transcript (May 9, 2023) | Q1 2023 Call |
| 25 | Press Release, Agenus, Inc., Agenus Unveils New and Updated Botensilimab Data in Colorectal, Pancreatic, Lung, Melanoma, and Sarcoma (Oct. 22, 2023) | Oct. 22, 2023 Press Release |
| 26 | Agenus Inc., Quarterly Report (Form 10-Q) (May 9, 2023) | Q1 2023 10-Q |
| 27 | Agenus Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2023) | Q2 2023 10-Q |
| 28 | Agenus Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2023) | Q3 2023 10-Q |
| 29 | Agenus Inc., Quarterly Report (Form 10-Q) (May 7, 2024) | Q1 2024 10-Q |