**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE AGENUS INC. SECURITIES LITIGATION | Case No. 1:24-cv-12299-AK |
| | Leave to file excess pages granted on April 7, 2025 (ECF No. 23) |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ........................................................................1

II. STATEMENT OF FACTS ...........................................................................3

  A. Background of Agenus and BOT/BAL..................................................3

  B. Colorectal Cancer and Immunotherapy Treatments ..............................4

  C. Defendants Seek Accelerated Approval of BOT/BAL............................4

  D. Defendants Tout Agenus's Ability to Obtain Accelerated Approval of BOT/BAL ........................................................................................5

  E. CWs Describe the Truth About BOT/BAL and Defendants' Statements................7

    1. Agenus's Accelerated Approval Application was Doomed ........................8

    2. BOT/BAL Trials Did Not Show Sufficient Durability or Survival Data ........................................................................................9

    3. The Company Had No Capabilities for Facilitating Accelerated Approval ........................................................................................10

  F. Investors Learn the Truth........................................................................11

III. LEGAL STANDARD................................................................................12

IV. ARGUMENT.............................................................................................13

  A. This Court Should Strike Or Decline To Notice Exhibits 2, 5, 6, 7, 10, 15 & 16. ..................................................................................13

  B. Plaintiff States a Section 10(B) Claim .................................................15

    1. The AC Adequately Alleges Misstatements and Omissions of Material Fact .........................................................................15

      a. Defendants misrepresented that Agenus had data necessary for BOT/BAL to obtain accelerated approval...............................16

      b. Defendants misrepresented BOT/BAL's efficacy. ........................22

      c. Defendants misrepresented Agenus's ability to produce drug candidates on shortened timelines. .......................................26

      d. Defendants' misleading SOX certifications are actionable. ..........29

2.     The ACAC's Allegations Support a Strong Inference of Scienter ............30

a.     Defendants' knowledge of or access to information contradicting their public statements supports a strong scienter inference. .....................................................................30

b.     Defendants evaded direct questions from analysts. .......................32

c.     Defendants' Positions and Extensive Discussion of Accelerated Approval and BOT/BAL Supports a Scienter Inference. .................................................................................33

d.     Defendants' firing, laying off, or reassigning employees expressing concerns regarding misstatements supports scienter. ........................................................................34

e.     Defendants' SOX certifications support an inference of scienter. ...........................................................................34

f.     Defendants' motive to commit the fraud. .....................................34

g.     BOT/BOL's importance to Agenus bolsters a scienter inference.........................................................................36

h.     The ACAC alleges Agenus's corporate scienter ..........................37

i.     A holistic analysis supports an inference of Defendants' scienter. ...........................................................................37

3.     The ACAC Alleges Loss Causation ..........................................................38

C.     Plaintiff States a Section 20(a) Claim..................................................................40

D.     Plaintiff Respectfully Requests an Opportunity to Amend...................................40

V.     CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guaranty Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008)..................................................................................................36

*Alaska v. Ryder Sys., Inc.*,
603 F. Supp. 3d 1229 (S.D. Fla. 2022) ...............................................................................30

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)......................................................................................15, 30, 32

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp. 3d 852 (S.D. Cal. 2024)..................................................................................40

*Blue v. Doral Fin. Corp.*,
123 F. Supp. 3d 236 (D.P.R. 2015)............................................................................22, 26, 31

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) ..........................................................................21, 28

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016), *amended on denial of reconsideration*,
2016 WL 3959164 (S.D. Tex. July 22, 2016)................................................................23, 34

*City of Bristol Pension Fund v. Vertex Pharm. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014) ............................................................................18, 24

*City of Ft. Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*,
683 F. Supp. 3d 120 (D. Mass. 2023) ..................................................................................20

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*,
No. 22-CV-10321-ADB, 2024 WL 1258149 (D. Mass. Mar. 25, 2024)..............................32

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014) ...............................................................22, 23, 30, 34

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)............................................................................................ *passim*

*Corban v. Sarepta Therapeutics, Inc.*
2015 WL 1505693 (D. Mass. Mar. 31, 2015)......................................................................24

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017)..............................................................................................19, 36

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................................34, 36

*Dahhan v. OvaScience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018) .........................................................................20, 23, 25

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018).............................................................................20, 31

*Gargiulo v. Isolagen, Inc.*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007) ...................................................................................20

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)..................................................................................................30

*Guerra v. Teradyne Inc.*,
  2004 WL 1467065 (D. Mass. Jan. 16, 2004)..........................................................................40

*In re Amylin Pharms., Inc. Sec. Litig.*,
  2003 WL 21500525 (S.D. Cal. May 1, 2003)....................................................................16, 17

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)........................................................................33

*In re AppHarvest Sec. Litig.*,
  684 F. Supp. 3d 201 (S.D.N.Y. 2023)....................................................................................31

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................................32

*In re Bos. Sci. Corp. Sec. Litig.*,
  646 F. Supp. 3d 249 (D. Mass. 2022) ...............................................................................19, 38

*In re Bos. Sci. Corp. Sec. Litig.*,
  686 F.3d 21 (1st Cir. 2012).....................................................................................................35

*In re Bos. Sci. Corp. Sec. Litig.*,
  No. CIV.A. 10-10593-DPW, 2011 WL 4381889 (D. Mass. Sept. 19, 2011),
  aff'd, 686 F.3d 21 (1st Cir. 2012)..........................................................................................35

*In re Brooks Automation, Inc. Sec. Litig.*,
  2007 WL 4754051 (D. Mass. Nov. 6, 2007) ..........................................................................40

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002).......................................................................................... *passim*

*In re Credit Suisse–AOL Sec. Litig.*,
  465 F.Supp.2d 34 (D. Mass. 2006) ...................................................................................38, 39

*In re Eletrobras Sec. Litig.*,
 245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................................................................34

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
 469 F. Supp. 2d 88 (S.D.N.Y. 2006)......................................................................21

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
 705 F. Supp. 2d 86 (D. Mass. 2010) ......................................................................38

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
 54 F.4th 42 (1st Cir. 2022).....................................................................................22

*In re Flowers Foods, Inc. Sec. Litig.*,
 2018 WL 1558558 (M.D. Ga. Mar. 23, 2018).......................................................32

*In re Henry Schein, Inc. Sec. Litig.*,
 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ......................................................24

*In re Immune Response Sec. Litig.*,
 375 F. Supp. 2d 983 (S.D. Cal. 2005)....................................................................23

*In re Lucent Techs., Inc. Sec. Litig.*,
 217 F. Supp. 2d 529 (D.N.J. 2002) ........................................................................25

*In re Merck & Co. Sec., Derivative & ERISA Litig.*,
 2015 WL 2250472 (D.N.J. May 13, 2015).............................................................19

*In re Nektar Therapeutics Sec. Litig.*,
 34 F.4th 828 (9th Cir. 2022) ..................................................................................40

*In re Network Equipment Techs., Inc. Litig.*,
 762 F. Supp. 1359 (N.D. Cal. 1991) ......................................................................14

*In re Northpoint Communications Group, Inc. Sec. Litig.*,
 221 F. Supp. 2d 1090 (N.D. Cal. 2002) .................................................................14

*In re OSI Pharms., Inc. Sec. Litig.*,
 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007)........................................................23

*In re Salix Pharms., Ltd.*,
 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..........................................................21

*In re Sepracor, Inc. Sec. Litig.*,
 308 F. Supp. 2d 20 (D. Mass. 2004) ...............................................................18, 19

*In re Signet Jewelers Ltd. Sec. Litig.*,
 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................32

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009) ................................................................20, 25

*In re StockerYale*,
  453 F. Supp. 2d 345 (D.N.H. 2006) ..........................................................................30

*In re Stone & Webster Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) .....................................................................................12

*In re Sunbeam Sec. Litig.*,
  89 F. Supp. 2d 1326 (S.D. Fla. 1999) .......................................................................31

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010), *on reconsideration in part*, 824 F.
  Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons,
  Inc.*, 719 F.3d 1190 (10th Cir. 2013) .......................................................................35

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..........................................................................................34

*In re Virtu Fin., Inc. Sec. Litig.*,
  2025 WL 847824 (E.D.N.Y. Mar. 17, 2025)..............................................................28

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)...........................................................................21, 23, 32

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022).......................................................................31

*Leavitt v. Alnylam Pharms., Inc.*,
  525 F. Supp. 3d 259 (D. Mass. 2021) .......................................................................13

*Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49 (D. Mass. 2022)................................13, 14, 24, 40

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...................................................................................24

*Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.*
  838 F.3d 76 (1st Cir. 2016).........................................................................................40

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) ........................................................................31

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
  36 F.3d 170 (1st Cir. 1994)............................................................................15, 18, 24

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .....................................................................................38

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
  716 F.3d 229 (1st Cir. 2013).................................................................................40

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)..............................................................................................12, 15

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)...........................................................................16, 17, 26

*N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury
  Sys., Inc.*,
  2025 WL 564194 (D. Mass. Feb. 20, 2025) ............................................................20

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) .............................................................................26

*New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
  537 F.3d 35 (1st Cir. 2008)................................................................................21, 28

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) .............................................................................31, 33

*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022) ............................................................................16, 17, 34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................15, 19

*Paice v. Aldeyra Therapeutics, Inc.*,
  2025 WL 815065 (D. Mass. Mar. 14, 2025)............................................................37

*Pardi v. Tricida, Inc.*,
  2022 WL 3018144 (N.D. Cal. July 29, 2022)......................................................22, 26

*Pizzuto v. Homology Medicines, Inc.*,
  2024 WL 1436025 (D. Mass. Mar. 31, 2024)...........................................13, 19, 24, 36

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020).......................................................30, 34

*Ret. Sys. v. Bos. Sci. Corp.*,
  523 F.3d 75 (1st Cir. 2008)...................................................................................25

*Roeder v. Alpha Indus., Inc.*,
  814 F.2d 22 (1st Cir. 1987).....................................................................................15

*Roman-Oliveras v. P.R. Elec. Power Auth.*,
  655 F.3d 43 (1st Cir. 2011).....................................................................................12

*Sharma v. Rent the Runway, Inc.*,
    751 F. Supp. 3d 82 (E.D.N.Y. 2024) ..................................................................................20

*Shash v. Biogen Inc.*,
    627 F. Supp. 3d 84 (D. Mass. 2022), *aff'd in part, rev'd in part on other
    grounds and remanded*, 84 F.4th 1 (1st Cir. 2023)......................................................14, 21, 28

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013)..................................................................................22, 26

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499, 518 (D. Mass. 2014), *aff'd sub nom. Fire & Police
    Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015)...........................22

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) ..................................................................................37

*Sloman v. Presstek, Inc.*,
    2007 WL 2740047 (D.N.H. Sept. 18, 2007) ..........................................................................32

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) ..........................................................................29, 38, 39

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................30, 34, 37

*. Thant v. Karyopharm Therpeutics Inc.*
    43 F.4th 214 (1st Cir. 2022). aff'd, 868 F.3d 31 (1st Cir. 2017)...........................................24

*Tung v. Dycom Indus., Inc.*,
    454 F. Supp. 3d 1244 (S.D. Fla. 2020) ..................................................................................24

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    2013 WL 5376023 (D. Mass. Sept. 24, 2013) ..................................................................19, 39

*WNAC, LLC v. Verizon Corp. Servs. Grp., Inc.*,
    2024 WL 778794 (D. Mass. Feb. 26, 2024) ..................................................................20, 39

**Statutes**

15 U.S.C. § 78u-4 ..................................................................................15

15 U.S.C. § 78u-5(c)..................................................................................15

21 U.S.C. § 356(c)(1)(A) ..................................................................................14

Private Securities Litigation Reform Act of 1995 ..................................................15, 28

**Rules**

Fed. R. Civ. P. 9 .........................................................................................................................15

Fed. R. Civ. P. 12 .......................................................................................................................12

**Other Authorities**

21 C.F.R. § 312.80 .....................................................................................................................14

17 C.R.F. § 240.10b-5 ................................................................................................................15

Plaintiff Byron Olsen respectfully submits this opposition to the motion to dismiss (Dkt. 26 ("Motion" or "Mot.")) his Amended Class Action Complaint, filed February 7, 2025 (Doc. No. 19 (the "ACAC")) by Defendants Agenus Inc. ("Agenus" or the "Company"), Garo Armen ("Armen"), Christine Klaskin ("Klaskin"), Steven J. O'Day ("O'Day") and Todd Yancey ("Yancey").[1]

## I.    PRELIMINARY STATEMENT

Plaintiff brings this securities fraud class action on behalf of investors in Agenus securities between January 23, 2023 and July 17, 2024, inclusive (the "Class Period"), to recover losses from numerous false and misleading statements by Defendants in connection with the Company's failed attempt to obtain accelerated FDA approval ("Accelerated Approval") of an experimental cancer combination immunotherapy using "botensilimab" and "balstilimab" ("BOT/BAL").

Specifically, Defendants assured investors, among other things, that "the durability and maturity of the data is *stronger today than it's ever before*" (¶158); the treatment is "*supported with safety, efficacy and clinical pharmacology [sufficient] to discuss with an accelerated pathway*" (¶160); "*we'd be able to demonstrate a point estimates for response, durability of response… and that is trending toward a survival benefit*" , and "*we have had significant input from our regulatory advisers on what that minimum [follow-up on Phase 2 trials] should be*" (¶162). These misrepresentations prevented investors from adequately assessing the risk that the FDA would deny Accelerated Approval, misled investors as to whether BOT/BAL's trial data showed durability (*i.e.*, the percentage of cancer patients who experience a partial or complete response to treatment that lasts for at least six months) and overall survival (*i.e.*, length of time from diagnosis or treatment that a patient remains alive); and misrepresented the Company's ability to develop or produce treatments, including BOT/BAL, on an accelerated timeline.

---

[1] All capitalized terms have the meaning set forth in the ACAC. Unless otherwise noted, all internal citations are omitted, and emphasis is added.

In addition, Defendants did not make these misrepresentations in a vacuum. Desperate for financing, Defendants caused Agenus to participate in multiple at the market stock offerings ("ATM Offerings") while the Company's share price was inflated by their misrepresentations, reaping $149.8 million in capital, barely enough to complete Phase 2 trials.

Plaintiff learned the truth via ***nine former employees*** who participated his counsel's investigation as confidential witnesses ("CWs"). These CWs related how, unbeknownst to investors, Agenus lacked the data necessary to obtain Accelerated Approval of BOT/BAL, and that Defendants knew it. Agenus's Phase 1 trials were not powered to demonstrate durability or overall survival, including because they used too small a sample size and too short a trial period and were conducted on heavily pretreated subjects. Indeed, multiple executives at Agenus, including the Company's FDA submission team, confronted Defendants with the fact that their data was insufficient, but Armen, Agenus's CEO, retorted, "***who cares about FDA, they can't stop us***." The CWs further described how Defendants were warned repeatedly about misrepresenting the "unprecedented" BOT/BAL trial results and the quality of durability and overall survival data, but Defendants ignored that advice and ***fired the C-suite executives who raised red flags***. Finally, the CWs revealed that Agenus could not accelerate development because the Company's plans were made up out of whole cloth and Armen routinely failed to pay vendors, resulting in manufacturing stoppages.

In an attempt to evade liability, Defendants ask the Court to dismiss the ACAC because their statements were (i) legitimate expressions of optimism, (ii) puffery, (iii) opinions, (iv) protected forward-looking statements, or (v) not false and misleading; (vi) not made with scienter; or (vii) not a cause of Plaintiff's losses. None of these arguments have merit.

*First*, Defendants' statements were patently false and misleading because they failed to disclose, among other things, that Defendants lacked trial data showing BOT/BAL's effectiveness

and were relying on the assumption that any immunotherapy clinical trial that "shows significant overall response rates *always* translates to survival benefit," had submitted incomplete Phase 2 data to the FDA and were hoping the agency would violate its own rules and consider it, and were ignoring overwhelming negative feedback from executives. *Second*, investors clearly understood that Accelerated Approval was pivotal to Agenus's future , and thus Defendants' assurances of sufficient of trial data and preparedness for Accelerated Approval were material, *not* puffery. *Third*, statements about alignment with the FDA, sufficient durability and survival rates, and ability to accelerate drug development were factual, not opinion. *Fourth*, even if certain statements are considered forward-looking, they are actionable because they were accompanied by insufficient, boilerplate risk warnings. *Fifth*, Defendants' knowledge or reckless disregard of the truth and motive to raise capital in specific secondary offerings raises a strong inference of scienter. *Sixth*, the FDA's denial of Accelerated Approval, for exactly the reasons raised by Agenus executives and its FDA submission team, was the materialization of a concealed risk that caused Plaintiff and the Class's losses..

## II.    STATEMENT OF FACTS

### A.    Background of Agenus and BOT/BAL

Agenus is a clinical-stage biotechnology company that develops immunotherapy cancer treatments domestically and internationally, including checkpoint blockers "balstilimab" and "botensilimab." ¶65. Prior to the Class Period, balstilimab was "on its way to FDA approval" for ovarian cancer when the FDA approved a competitor's drug and forced Agenus to "voluntarily" withdraw balstilimab. ¶66. This enraged Defendants, and Armen made a series of vituperative public statements accusing the FDA of never intending to give balstilimab a "full and fair review" and improperly giving "special consideration" to the competitor's treatment. ¶¶67-70. Having been beaten to the punch Defendants turned to developing an immunotherapy treatment for colorectal cancer ("CRC") that combined botensilimab and balstilimab ("BOT/BAL"). ¶¶68, 71.

3

### B.    Colorectal Cancer and Immunotherapy Treatments

CRC is the most common gastrointestinal cancer and the third leading cause of cancer-related death in humans. ¶46. Its tumors are either microsatellite instable ("MSI") or microsatellite stable ("MSS"). ¶47. While a normal cell uses a process called mismatch repair ("MMR") to repair mutations that can happen when DNA divides and copies itself, if a cell's MMR is malfunctioning, errors will accumulate and the DNA will become unstable, *i.e.*, MSI. *Id.* MSI tumors are identified as microsatellite instability high ("MSI-H") or mismatch repair deficient ("dMMR"). ¶47. MSI tumors, or "hot" tumors, trigger a strong immune response. ¶47. MSS tumors, or "cold" tumors, do not normally trigger a strong immune response and have a higher risk of recurrence. ¶48. Eighty-85% of CRC patients have MSS tumors, which generally do not respond to "immunotherapy," a type of cancer treatment that seeks to enhance the body's immune system by helping it recognize and attack cancer cells. ¶¶48-49. Immunotherapy targets specific cancer cells rather than healthy ones, and thus is less toxic than treatments like chemotherapy. ¶51. Since immunotherapies generally do not work on MSS tumors, there is a significant need in for patients with MSS CRC. ¶52. Defendants thus positioned BOT/BAL as an immunotherapy candidate for MSS CRC. ¶¶74-91.

### C.    Defendants Seek Accelerated Approval of BOT/BAL

The FDA's Accelerated Approval Program allows for marketing of drugs that treat serious conditions fill an unmet need after Phase 2 clinical trials[2] based on less rigorous "endpoints."[3] ¶53. If the FDA grants Accelerated Approval, sponsors must conduct Phase 3 confirmatory trials, and if

---

[2] There are four phases of clinical trials: Phase 1, testing safety and dosage of a drug on a smaller group of participants; Phase 2, testing efficacy and side effects on up to several hundred participants for up to two years; Phase 3, testing efficacy and monitoring adverse reactions on up to 3,000 participants for one to four years; and Phase 4, testing safety and efficacy on several thousand volunteers after the FDA approves the drug. ¶54.

[3] Clinical trials for cancer treatments employ unique "endpoints," which are results that are measured at certain points during and/or at completion of a study to evaluate drug efficacy and safety. ¶55. Overall survival, or the average time patients survive from the start of treatment compared a control group, is considered the "gold standard" for a cancer drug's clinical benefits. ¶56. Duration of response is the time that a tumor continues to respond to treatment without the cancer growing or spreading, a demonstrates the drug's durability, *i.e.*, a meaningful delay in disease progression. ¶58.

those trials do not confirm the predicted effects, the FDA can immediately withdraw the drug from the market. ¶62. In the years leading up to the Class Period the FDA repeatedly withdrew oncology drugs it had granted Accelerated Approval. ¶63.

Defendants focused on obtaining Accelerated Approval for BOT/BAL because they knew investors worried that the Company could again lose out to a competitor. *See* ¶72. Accelerated Approval also was essential to Agenus's bottom line because the Company was quickly running out of capital and could not afford Phase 3 trials. *Id.* Agenus's $307 million in cash as of December 31, 2021, had fallen to $193 million by December 31, 2022 and to $76 million by December 31, 2023. *Id.* In fact, Agenus lacked funds to complete even Phase 2 testing, so it engaged in seriatim secondary public offerings ("ATM Offerings") to raise capital, selling 84.4 million Agenus common shares during calendar year 2023 and 24.0 million shares between January 1, 2024 and March 8, 2024 for proceeds totaling $149.8 million. *See* ¶72; McCaughey Decl. Ex. 8 at 76 (ECF No. 27-9).

**D.       Defendants Tout Agenus's Ability to Obtain Accelerated Approval of BOT/BAL**

Throughout the Class Period, Defendants sought to attract investors—including participants in the ATM Offerings—by consistently (and misleadingly) touting that Agenus could obtain Accelerated Approval from the FDA for BOT/BAL because its clinical trials were tailored to the FDA's criteria, trial data supported durability and overall survival endpoints, and Agenus's internal processes, technology, and expertise were designed to obtain drug approval on faster timelines. ¶73.

For example, Defendants consistently assured investors that trial data demonstrated "durable clinical responses" (¶168, *see* ¶179), "robust, consistent, and durable efficacy signals"(¶169); "Unprecedented Survival" and "substantial survival benefits and long-lasting responses" (¶171); "responses [that] have proven to be durable responses… a critical factor in evaluating a treatment" (¶173); and an "unprecedented survival benefit" (¶175). Defendants similarly touted Agenus's purported capabilities for shortening development timelines. ¶¶182-193.

On April 17, 2023, the FDA granted Agenus a "Fast Track Designation" for BOT/BAL for metastatic CRC patients with MSS tumors and certain other traits.[4] ¶75. Defendants were ecstatic, quickly issued a press release assuring investors that "we will be working with the FDA and all key stakeholders to rapidly advance [BOT/BAL]," and ramped up their touts of BOT/BAL and Accelerated Approval. ¶¶76-77. Four months later, on August 23, Defendants went "all-in" on BOT/BAL and announced that Agenus would cease all other preclinical and clinical programs and lay off 25% of its workforce to cut costs and focus on BOT/BAL. ¶78. On October 10, 2023, the Company announced that it had "completed enrollment" in a randomized Phase 2 BOT/BAL trial, even though at least two subjects were not fully onboarded until the following month, which meant that six-month data for these patients could not be presented to the FDA until after July 2024. ¶79.

Defendants' promotion of Accelerated Approval then shifted into overdrive. On November 7, 2023, during a call with analysts and investors, Armen touted "the positive trends and lasting responses" in BOT/BAL's Phase 1 trials. ¶80. Recognizing that *Phase 2* data was essential to Accelerated Approval, an analyst asked when Agenus would release that data. Armen refused to provide data, but nevertheless assured attendees that trials "*indicate that we should have a sustainable response rate, perhaps even an improving response rate*." ¶81. When an analyst followed up, Yancey, Agenus's Senior Global Clinical Development, Medical Affairs, and Commercial Advisor ("SGDA"), responded, "I certainly expect that we'd be able to demonstrate a point estimates for response, durability of response for patients with stable disease or better and that is trending toward a survival benefit." ¶82. Armen then touted that trial data could demonstrate sufficient overall survival for approval, stating, "of course, there are regulatory and other questions about do overall response rates translate to longer-term benefit. *We know they do*." ¶83.

---

[4] Specifically, the FDA fast-tracked BOT/BAL for patients with metastatic CRC with MSS tumors with no active liver involvement who had been "heavily pretreated [and] are resistant or intolerant to a fluoropyrimidine, oxaliplatin, and irinotecan, and who have also received a VEGF inhibitor, an EGFR inhibitor and/or a BRAF inhibitor, if indicated." ¶75.

Defendants' touts of BOT/BAL in the face of analyst skepticism continued in 2024. On a March 14, 2024 call, an analyst asked, "why not disclose at least some indication of the top line results, I guess, in May, given the six months follow-up by that point? Why wait till after you meet with the FDA?" ¶84. Armen withheld the data, stating "It's strictly regulatory courtesy." *Id.* Analysts' questions did not abate, however, and on the ensuing earnings call, an analyst asked, "could you confirm how many patients you've treated with BOT/BAL at the recommended Phase 2 dose…And your confidence, I guess, that you have enough efficacy data to support an accelerated approval?" O'Day refused to provide data, but still assured investors that "we have 2 active doses and a significant number of patients on the combination of BOT/BAL in both the Phase 1 and the Phase 2 randomized trial that we think are supported with safety, efficacy and clinical pharmacology to discuss with an accelerated pathway given the unmet need in this setting." ¶85. After a second analyst followed up, Armen again refused to provide data, but assured call attendees, "***we're not trying to be cute here, it is just a courtesy call***." ¶87. Defendants' touts of BOT/BAL culminated on May 16, 2024, when they announced that they would present data to the FDA at an "end of Phase 2" meeting ("EOP2 meeting") in July 2024. ¶89. In the announcement release, O'Day touted, "***The results from our Phase 1 and Phase 2 studies contribute valuable insights into the potential of this therapy for managing a specific and challenging subgroup of colorectal cancer***." *Id.*

### E.    CWs Describe the Truth About BOT/BAL and Defendants' Statements

As described by nine former employees who spoke to Plaintiff as ("CWs")[5] Defendants' statements were false and misleading because Defendants knew they lacked data for Accelerated Approval, had misrepresented durability and overall survival, and knew Agenus had no process for shortening the timeline for novel drug candidates. ¶82.

---

[5] CWs are referred to in the masculine to protect their identity.

### 1.    Agenus's Accelerated Approval Application was Doomed

It was clear even prior to the start of the Class Period that BOT/BAL's trials would not be sufficient to obtain Accelerated Approval. In November 2022, James Song, Agenus's Vice President of Biostatistics and Data Management, told CW6, who managed BOT/BAL's Phase 1 and Phase 2 trials (¶42), that Phase 1 studies were not powered appropriately to capture survival or durability data, *i.e.*, the data essential to Accelerated Approval. ¶95. This was corroborated by CW3, an Agenus Senior Director, Field Medical Science Liaisons with 18 years' experience in the pharmaceutical industry, who said that Agenus's Phase 1 drug trials did not include enough patients to make any affirmative statements about a new therapy, and only showed signals about a drug, and that while Phase 2 data provided more efficacy insight, it still did not provide declarative insights into survivability rates. ¶99. This was also because BOT/BAL study participants were "heavily pre-treated with a lot of different things including patients who had already done immunotherapy," and thus it was difficult to determine whether a positive response was from BOT/BAL. *Id.* CW3 stated that these weaknesses were why his team never spoke about survival rates in the field. ¶100.

CW7 stated that Agenus's own FDA submission team shared CW3's view and had advised Armen against aggressively pursuing FDA approval because the Company needed more time on trials. ¶102 According to CW7, other executives repeatedly confronted Armen about how BOT/BAL's data was so small that it was not possible to obtain Accelerated Approval, but that Armen responded, "***who cares about FDA, they can't stop us***." *Id.* Further, CW6 learned in 2022 and 2023 from David Savitsky, the Agenus pre-clinical development director who helped create BOT/BAL, that (i) the Company was moving too fast with trials, (ii) upper-level management at Agenus was inexperienced and making decisions that would ruin BOT/BAL's chances of approval, and (iii) he was certain the FDA would reject it. ¶96. According to CW6, Defendants refused to acknowledge Savitsky's concerns and in March 2023 excluded him BOT/BAL development. ¶96.

8

In addition, CW6 described how, during a weekly safety meeting in Spring 2023, Joseph Grossman, Agenus's then-Senior Medical Director of Clinical Development, who reported directly to O'Day, shared the Company's plans for winding down Phase 2 trials and ramping up Phase 3. ¶98. According to CW6, Dawn Colburn, Agenus's Vice President of Clinical Science, confronted Grossman and stated, "the FDA doesn't do that. It's not going to happen. You can't do it that way." *Id.* CW6 had never heard Colburn speak so strongly in a meeting and believed that Colburn expressed her feelings directly to Armen. *Id.* CW6 further stated that Grossman was responsible for reporting the meeting results, including comments like Colburn's, to O'Day, and that Colburn was laid off shortly thereafter in May 2023. *Id.*

### 2. BOT/BAL Trials Did Not Show Sufficient Durability or Survival Data

The CWs also confirmed that Defendants' touts of trial data were misleading. For example, CW3, CW6, and CW7 stated that BOT/BAL's trials did not have data mature enough to characterize durability or overall survival and thus, according to CW3, the results were not "unprecedented." ¶¶99-100. In fact, CW7, Agenus's Senior Vice President for Global Medical Affairs and Product Strategy, repeatedly insisted to Armen, to whom he reported, in one-on-one conversations and during weekly clinical update meetings, that the Company share only accurate, balanced, and scientifically supported information, but was ignored. ¶105. CW7 stated that when he confronted Armen personally, Armen responded, "we save lives," which was misleading given that clinical trial patients had relapsed. ¶105. CW7 further stated that claims of "unprecedented survival" were improper, only a statistically insignificant number of patients showed survival benefits. ¶105.

CW7's descriptions were corroborated by CW4, Agenus's Clinical Trial Medical Monitor and Head of Medical Communications, who related that Agenus employees had asked Armen to "tone down" his language because it was not scientific, including Chief Legal Officer Robin Abrams ("CLO") and the Chief of Patient Advocacy ("CPA"), who told Armen that he could not use sales

9

language to describe BOT/BAL. ¶¶104, 107. In fact, CW9, Agenus's Vice President of Research Computing and Data Science, who had reported to Armen, said Armen's glowing descriptions of BOT/BAL were based on one or two patients in 2022 and lacked substantial clinical evidence. ¶103.

To reduce pushback, Armen fired or laid off executives who disagreed with him, including, CW4 and CW7 said, the CLO, Chief Business Officer ("CBO") Julie Desander, and Chief Communications Officer ("CCO") Stephanie Fagan, in March 2024. ¶¶106-07. In addition, CW9 stated that Agenus's data science team and IT team, which CW9 led, were laid off or resigned after they tried to focus on facts. ¶103. CW8 corroborated this, saying that Armen "didn't listen to [the] management team and when you disagreed with him you were let go. Then rinse and repeat." ¶108.

### 3.    The Company Had No Capabilities for Facilitating Accelerated Approval

The CWs further related how Agenus lacked any "integrated, end-to-end capabilities" to produce novel drug candidates on shorter timelines. CW8, who reported directly to Armen (¶44), said Armen ignored precedential trial timelines and the Company's capabilities and insisted on a six-month enrollment schedule for a Phase 2 BOT/BAL trial, then laid off CW8 when he objected (¶112). As CW8 expected, Agenus did not meet deadlines, enrollment was not completed until two weeks later than even CW8 projected (¶112), and the FDA ultimately did not consider data from at least two trial participants (¶124). CW2, who worked on Phase 1 trials and prepared data for BOT/BAL's Accelerated Approval application (¶38), corroborated CW8's account of impossible timeframes, which CW2 learned from his supervisor were set solely to impress investors (¶115).

Armen's took other entirely ad hoc actions that were not pursuant to any "fully integrated, end-to-end capabilities." CW6 and CW8 said Armen interfered with BOT/BAL Phase 1 trials by continuously adding new trial indications—without even *consulting* Agenus's medical team—and regardless of whether the indications put the trials out of compliance. ¶109-10. These actions prevented the Company from developing BOT/BAL on an accelerated timeline and increased the

likelihood that the FDA would reject Agenus's data because the FDA would only accept data concerning approximately four indicators. ¶111. CW2 and CW6 also described how Defendants added so many patients to Phase 1 trials that it interfered with those studies. ¶¶110, 115. Moreover, CW2 and CW8 both described how high attrition (directly caused by Armen, according to CW8) meant that Agenus lacked staff to apply for Accelerated Approval. ¶¶114-15.

Likewise, Armen's practice of withholding vendor payments also precluded the Company shortening approval timeframes. ¶116. CW9 learned of these practices on the day he was hired and recalled Armen contemplating finding ways to not pay people. *Id.* Similarly, CW6 was told in May 2023 by Agenus project manager Linh Mach that the Company was heading toward a drug shortage problem and that Phase 3 trials of BOT/BAL were not going to happen. ¶119. In addition, CW1 recalled that on or about March 11, 2024, he and Sara Ashworth King, a Quality Assurance Doc Control Manager, were pulled out of a meeting by Krishnaveni Gottam, the Company's good manufacturing practices quality assurance operations site head, who told them that the Company was experiencing problems receiving orders of donor blood and supplies from vendors because Agenus was behind on payments. ¶¶120-21. According to CW1, Agenus ultimately had to halt manufacturing concerning clinical trials because of the donor and supplier issues. *Id.* CW3 and C4 corroborated these accounts of unpaid vendors refusing to work with Agenus. ¶121.

### F.    Investors Learn the Truth

The truth emerged and the risks concealed by Defendants' false and misleading statements materialized on July 18, 2024, when Defendants announced that the FDA had advised against Accelerated Approval of BOT/BAL ("EOP2 Release"). ¶198. Indeed, according to CW5, Agenus's Global Head of Regulatory, who personally attended the EOP2 Meeting, the FDA had reacted *exactly* as CW3, CW7, Colburn, Savritsky, and the FDA Submission Team expected. Specifically, the FDA found that the Phase 2 results presented at the EOP2 meeting were not strong enough, and

11

that Agenus did not have enough data on the drug's overall survival. ¶125. CW5 attributed this, at least in part, to the FDA's reluctance to grant Accelerated Approval based on objective response rates in early clinical trials after it had recently withdrawn other treatments. *Id.*

Investors were stunned by the EOP2 Release, which disclosed for the first time that larger doses of BOT/BAL were less effective than smaller doses, without any new or greater adverse effects, which cast serious doubt on the treatment's long-term effectiveness. ¶¶124, 199. The release also revealed that the data Defendants presented was not complete, as two class members had not participated in the clinical trial long enough for the FDA to credit their data. ¶199.

On this news, Agenus's stock price fell $10.43 per share, or 58.83%, to close at $7.30 per share on July 18, 2024. On an August 8, 2024 earnings call, Armen admitted that, rather than present evidence of a survival benefit, Agenus assumed that any trial "that binds to CTLA-4 and shows significant overall response rates ***always translates to survival benefit***." ¶130. Armen also disclosed, for the first time, that Defendants had hoped that the FDA would consider post-submission data at the EOP2 Meeting, even though "the FDA has very strict rules on not considering data post-submission," *i.e.*, Defendants had disregarded FDA rules. This action followed. *See* ECF No. 1.

### III.    LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011). On a Rule 12(b)(6) motion, a court must "read the Complaint in the manner most favorable to the plaintiff, drawing reasonable inferences in the plaintiff's favor." *In re Stone & Webster Inc., Sec. Litig.*, 414 F.3d 187, 200 (1st Cir. 2005). The issue is not whether it is likely plaintiff will prove the facts alleged but whether those facts, accepted as true, state a plausible claim. *Roman-Oliveras v. P.R. Elec. Power Auth.*, 655 F.3d 43, 50 (1st Cir. 2011).

## IV.     ARGUMENT

### A.     This Court Should Strike Or Decline To Notice Exhibits 2, 5, 6, 7, 10, 15 & 16.

Defendants appear to suggest that the Court can (and thus should) take judicial notice of 29 exhibits attached to a declaration in further support of the Motion.[6] *See* Mot. at 5 at n.1. Plaintiff takes no position regarding Exhibits 1, 8, and 26-29, which are copies of Agenus's Class Period SEC filings, or Exhibits 3-4, 9, 11, 12-14, 17-25, which are document quoted or cited in the ACAC. These exhibits, however, may not be considered "to prove the truth of any matters asserted therein." *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025, at \*1 (D. Mass. Mar. 31, 2024).

Plaintiff objects to judicially noticing or incorporating by reference Exhibits 2, 5, 6, 7, 10, or 16. Defendants do not assert any grounds for noticing these documents or incorporated by reference. Nevertheless, These exhibits are neither referenced nor relied on in the ACAC, and thus are not incorporated by reference. *See id.* at \*2 (no incorporation of documents not mentioned in complaint).

Further, Exhibit 2, a pre-class period article discussing immunotherapies' ineffectiveness for MSS tumors, should not be noticed because the ACAC alleges this and thus the article is not "essential to evaluating" the ACAC's sufficiency. *See Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 58 (D. Mass. 2022). Likewise, Exhibits 15 and 16 should not be noticed "Post-Class Period materials are not properly before the Court at the motion to dismiss stage." *Pizzuto*, 2024 WL 1436025, at \*1. Indeed, post-Class Period plans for Phase 3 trials are irrelevant to whether Defendants made knowing or reckless misrepresentations in the Class Period. *See* Mot. at 11 n.8.

Finally, although the Court has the discretion to judicially notice FDA documents "may, in its discretion, take judicial notice of FDA documents," *see Leavitt v. Alnylam Pharms., Inc.*, 525 F. Supp. 3d 259, 266 n.1 (D. Mass. 2021), the Court should not judicially notice Exhibits 5-7 and 10, which contain FDA guidance regarding the Accelerated Approval process and demonstrating

---

[6] "Exhibits" refers to exhibits to the declaration of Daniel McCaughey filed with the Motion. *See* ECF No. 27.

"substantial evidence of effectiveness" in drug products. For example, the contents of Exhibits 5 and 10 are 5 and 10 years old, respectively, and thus are subject to dispute because it is not clear whether this guidance was intact or superseded during the Class Period. *See* McCaughey Decl. at 2-3. Further, the Motion states that Exhibit 5 is duplicative of 21 C.F.R. § 312.80 and 21 U.S.C. § 356(c)(1)(A), which are judicially noticeable (*see* Mot. at 8, 17), and thus it is not necessary for the Court to notice that exhibit. *See Leung*, 599 F. Supp. 3d at 58.

Further, judicial notice of these exhibits is not appropriate because Defendants ask this Court to "review them for notice of disputed facts." *In re Northpoint Communications Group, Inc. Sec. Litig.*, 221 F. Supp. 2d 1090, 1095 (N.D. Cal. 2002); *In re Network Equipment Techs., Inc. Litig.*, 762 F. Supp. 1359, 1363 (N.D. Cal. 1991) (courts should not use notice to generate an evidentiary record and weigh evidence when plaintiffs cannot challenge that evidence). Defendants offer Exhibits 5-7 and 10 in support of their contention that the FDA's purported "flexibility" meant that Defendants genuinely believed BOT/BAL's case for Accelerated Approval (*see* Mot. at 17), even though Agenus's clinical studies were not powered appropriately, *i.e.*, designed to demonstrate durability and overall survival (¶¶95, 99-101), its VP of Clinical Science told Armen and others—correctly—that the FDA would reject the Company's approach to Phase 2 data (¶98), its FDA submission team directly advised Armen against seeking Accelerated Approval (¶102), and Armen admitted that the Company attended the EOP2 meeting hoping that the FDA would disregard its own rules against considering post-submission data (¶130). If anything, FDA requirements are irrelevant because Armen was disregarding them and purging dissenters. ¶¶98, 102, 106 113, 129-30.

Finally, even if the Court does take judicial notice of Exhibits 5-7 and 10, it may not notice them "for the truth of their contents." *See Shash v. Biogen Inc.*, 627 F. Supp. 3d 84, 98 (D. Mass. 2022), *aff'd in part, rev'd in part on other grounds and remanded*, 84 F.4th 1 (1st Cir. 2023).

14

**B.    Plaintiff States a Section 10(B) Claim**

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). As with any averment of fraud, claims of this type must satisfy the heightened pleading requirements of Rule 9(b). *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 6 (1st Cir. 2021). In addition, the PSLRA requires that a plaintiff must specify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(1), (b)(2). Defendants dispute elements (1), (2), and (6), but, as explained below, these challenges are meritless.

1.    The AC Adequately Alleges Misstatements and Omissions of Material Fact

Rule 10b-5 prohibits not only statements of material fact that are "untrue" on their face, but the omission of any material facts needed to make statements that are made "not misleading." 17 C.F.R. § 240.10b-5(b). In other words, even statements that are "literally accurate" can still mislead. *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). In addition, once a company *chooses* to speak on a topic, it has a duty to tell the "whole truth." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987).

The PSLRA was enacted to filter out "frivolous strike suits" but not "not make meritorious claims impossible to bring." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002). As such, a plaintiff need only specify the "time, place and content" of each alleged misstatement, and supply "factual support for the claim that the statements…were fraudulent" to satisfy 15 U.S.C. § 78u-4(b)(1) and Rule 9(b). *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002).

         a.        *Defendants misrepresented that Agenus had data necessary for BOT/BAL to obtain accelerated approval.*

It is well-established that statements misrepresenting the extent of known risk are actionable. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022) (statement actionable because "failure to disclose…would cause a reasonable investor to make an overly optimistic assessment of the risk); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (same). This is also true where Defendants make "assurances regarding the completeness of the data and the likelihood of FDA approval." *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at \*5 (S.D. Cal. May 1, 2003). Here, after the FDA forced Agenus to "voluntarily" abandon balstilimab for ovarian cancer (¶66), Defendants knew the Company's future hinged on the FDA granting BOT/BAL Accelerated Approval given that competitors could beat Agenus to market again and the Company need to raise funds to complete Phase 2 trials and utterly lacked funds for Phase 3 trials. *See* ¶¶66-72, 131. Accordingly, throughout the Class Period Defendants assured investors that BOT/BAL's trials and data were sufficient to obtain Accelerated Approval. ¶¶133-65.

For example, Defendants responded to direct analyst questions regarding the BOT/BAL Phase 2 trial data for Accelerated Approval by claiming that they were "***strategic[ally]***" withholding that data (¶150) while still assuring investors that the data supported Accelerated Approval. Defendants touted: "do overall response rates translate to longer-term benefit[?] ***We know they do***" (¶146); "the durability and maturity of the data is ***stronger today than it's ever before***" (¶158); "we think are ***supported with safety, efficacy and clinical pharmacology to discuss with an accelerated pathway***" (¶160, *see* ¶156)[7]; "***we'd be able to demonstrate a point estimates for response, durability of response… and that is trending toward a survival benefit***" (¶¶144, *see* ¶¶142, 152).

These assurances communicated to investors that although they could not see the actual data

---

[7] Plaintiff uses "*see*" cites to address statements that use different phrasing but are substantively similar.

16

underlying the Phase 2 studies, that data supported an application for Accelerated Approval and thus reduced the risk of denial. The statements prevented investors from accurately assessing that risk, and thus were materially misleading, because they failed to disclose that the trials were not powered to support durability and overall survival because, among other things, they were too small, too short, and used heavily pre-treated patients (¶¶95, 99-100); Defendants were assuming the presence of a survival benefit and hoped to provide supplemental data the FDA was precluded from considering (¶¶129-30); and there was uniform opposition to using the data to seek Accelerated Approval to which Armen responded by saying "who cares about FDA, they can't stop us," and reassigning or firing dissenters (¶¶96, 98, 102). Indeed, as described by CW5, who attended the EOP2 Meeting, the FDA rejected BOT/BAL for *exactly* the reasons raised by CW3, FDA submissions team, and other Agenus executives. ¶125. Indeed, Armen admitted Agenus had hoped that new data would compensate for the submitted data's immaturity. ¶131. Accordingly, Defendants assurance that the FDA *would* consider post-submission data because "***the time of submission is not a moment in time that's frozen***" (144) was false, as Defendants knew the opposite was true (¶129 ("the FDA has very strict rules on not considering data post-submission of the package")).

These undisclosed facts would have materially changed investors' risk calculus, and by choosing to characterize data for the BOT/BAL submission, Defendants had to disclose them. *Noto*, 35 F.4th at 105 (omitted fact "would directly bear on the reasonable investor's assessment of the severity of the reported accounting weaknesses"); *Meyer*, 761 F.3d 245, 251 (2d Cir. 2014) (discussion of pollution abatement equipment required disclosure of regulatory violations); *Amylin*, 2003 WL 21500525, at *5 (discussion of trial data required disclosure of facts).[8]

---

[8] Defendants will no doubt seek to distinguish *Amylin* on the grounds that in that case the FDA allegedly had provided negative feedback to the defendants. *See* 2003 WL 21500525, at *4-5. The circumstances here are analogous, however, because the ACAC alleges that the Company's executives and FDA submission team uniformly advised Defendants that the FDA would consider BOT/BAL's data to immature and opaque for Accelerated Approval, and Defendants knew that the FDA would not accept post-submission data. *See* ¶¶95-102, 130. Accordingly, Defendants' disregard of this feedback

Defendants' other assurances regarding Accelerated Approval are also actionable, including that "the FDA has guidance that is based on historical precedents on the minimum follow [and] *we have had significant input from our regulatory advisers on what that minimum should be*" (¶162); Agenus's clinical programs for BOT/BAL were "designed to support regulatory pathways for accelerated development" (¶134, *see* ¶136), Agenus's "immediate efforts are directed towards ensuring that our development strategies align seamlessly with the FDA's rigorous standards" (¶148); "[b]y zeroing in on BOT/BAL, we expect to expedite regulatory approval" (¶138, *see* ¶¶140, 154, 164); and "we are in an optimal state of preparedness" (¶158). These statements communicated to investors that Agenus understood FDA requirements for Accelerated Approval and was following their advisers' counsel. They were misleading, however, because Defendants failed to disclose that they were ignoring, terminating, and/or reassigning those advisers, disregarding FDA requirements, and expecting the FDA to improperly consider post-submission data. ¶¶96, 98, 102, 129-30.

The Motion's assertions as to why the statements are inactionable lack merit. *First*, even if Defendants' statements regarding Agenus's intent to seek Accelerated Approval were literally true (*see* Mot. at 16), it is well-established that a literally true statement "does not preclude liability." *See Lucia*, 36 F.3d at 175. Defendants' statements about their intent to seek Accelerated Approval (¶¶134, 136,138, 140, 148,156, 158, 160) thus are actionable because they omitted material facts that prevented investors from assessing the risk of a denial of Accelerated Approval (¶95-102, 129-30).[9]

*Second*, Defendants assert that their statements are inactionable because "the FDA applies broad flexibility and context-depended judgment in applying its evidentiary approval standards." *See*

---

and FDA rules is no different from ignoring warnings from the FDA itself, especially since Armen declared that that he did not care what the FDA thought, *i.e.*, about FDA requirements. *See* ¶¶102, 113, 129-30; *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 31 (D. Mass. 2004).

[9] Defendants' citation of *City of Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014), is inapposite, because in that case the defendants *had* disclosed the alleged omitted information, unlike here, where Defendants omitted material information, *see id.* at 237-38.

18

Mot. at 17. Not only could this argument be asserted in *every* securities fraud class action against a pharmaceutical manufacturer, but it also proves too much, because the FDA's flexibility would mean that a company could *never* misrepresent its chances of approval, and the securities laws provide for liability for statements made with a reckless disregard for their truth. *See In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 284 (D. Mass. 2022). It is difficult to imagine a more reckless disregard than Armen scoffing at FDA requirements, ignoring warnings, and terminating or reassigning advisers who raise concerns. ¶¶95-102. If anything, Defendants' approach of submitting incomplete data (¶124) and relying on the FDA to violate its own rules by considering post-submission data (¶¶129-30) is akin to *Sepracor*, where the defendants' "optimism" ignored the FDA's "zero tolerance" for a side effect present in the company's product. *See* 308 F. Supp. 2d at 31. At best, the reasonableness of Defendants' beliefs is a fact issue not suitable for resolution at this stage.[10] *See Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 2013 WL 5376023, at *4 n.3 (D. Mass. Sept. 24, 2013).

*Third*, even if analyzed as opinions, Defendants' statements are actionable because Armen's dismissive attitude toward FDA requirements indicates that these "opinions" were not honestly held. *See* ¶¶102, 113, 129-30; *Omnicare*, 575 U.S. at 186. Further, Defendants' omission of the overwhelmingly negative internal view of Accelerated Approval, reliance on an assumption and hope that the FDA would consider post-submission data, and Armen's termination of dissenters are undisclosed material facts related to Defendants' opinions.[11] *See* ¶¶95-108; *In re Merck & Co. Sec., Derivative & ERISA Litig.*, 2015 WL 2250472, at *21 (D.N.J. May 13, 2015) (belief "did not 'fairly align' with other information in their possession" based on data and "internal discussions revealing a very different assessment of the VIGOR data than that expressed to the public"). Accordingly,

---

[10] Defendants' citation of *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 39 (1st Cir. 2017), is inapposite because the ACAC's CW allegations, corroborated by the FDA's action and confirmed by Defendants' admissions, demonstrate why Defendants "knew that its efforts would suffer a setback." *Compare id.* with ¶¶105-12, 125-30.

[11] These allegations distinguish the ACAC from *Pizzuto*. *See* Mot. at 23, citing *Pizzuto*, 2024 WL 1436025 at *9.

Defendants had no basis for their opinions. *See City of Ft. Lauderdale Police & Firefighters' Ret. Sys. v. Pegasystems Inc.*, 683 F. Supp. 3d 120, 135 (D. Mass. 2023).

*Fourth*, Defendants' misstatements are *not* puffery. *See* Mot. at 23. Given that a competitor had recently beaten balstilimab to market and the Company was hemorrhaging money, Defendants and investors knew that Agenus's investment case hinged on Accelerated Approval. *See* ¶¶63-72; *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 342 (D. Mass. 2009) (no puffery because of importance to investors). In addition, Defendants' consistent touts regarding Accelerated Approval in response to direct analyst questions shows that their misstatements were not puffery. *See Sharma v. Rent the Runway, Inc.*, 751 F. Supp. 3d 82, 109 (E.D.N.Y. 2024).

*Fifth*, Defendants' misstatements are not protected by the PSLRA's "safe harbor" for forward-looking statements. *See* Mot. at 19-22. As an initial matter, these statements are misleading for *omitting* current material facts, and thus the safe harbor does not apply. *See* ¶¶133-64; *Dahhan v. OvaScience, Inc.*, 321 F. Supp. 3d 247, 254 (D. Mass. 2018). Moreover, the misleading portions of paragraphs 134 ("*have* designed to support"), 140 ("our *conviction*" and "our *top priority*"),144 ("we *have*"), 146 ("[w]e *know* they do"), 148 ("*demonstrating* promising activity"), 150 ("*made* a strategic decision"), 156 ("consistently *demonstrated*"), 160 ("*are* supported"), 162 ("*have* had significant input"), 164 ("*contribute* valuable insights") are statements of current or historical fact and not forward-looking. *See N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury Sys., Inc.*, 2025 WL 564194, at \*15 (D. Mass. Feb. 20, 2025).

Further, the safe harbor is not applicable because these statements were not accompanied by meaningful cautionary language.[12] *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282,

---

[12] The Motion does not assert that any of Defendants' alleged misstatements are protected by the safe harbor because of immateriality or no "actual knowledge" of falsity. *See* Mot. at 19-21; *Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 2d 384, 388 (E.D. Pa. 2007) (defining scope of safe harbor). Accordingly, these grounds are waived. *WNAC, LLC v. Verizon Corp. Servs. Grp., Inc.*, 2024 WL 778794, at \*7 (D. Mass. Feb. 26, 2024) (arguments not raised in opening brief are waived). Regardless, per Section IV.B.2.a, *infra*, Defendants knew their statements were false and material.

297 (S.D.N.Y. 2018). Meaningful cautionary language "must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). For statements in paragraphs 136-64, Defendants cite boilerplate warnings read aloud on earnings calls or in press releases, or cross-references to lists of risk factors. *See* Mot. at 21-22; *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 251 (D. Mass. 2006) (boilerplate cautionary language not meaningful); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (general references to "public statements or SEC filings" not meaningful). Finally, Defendants risk warnings merely advised that the FDA could deny Accelerated Approval (*see* Mot. at 21), which does not address the risks created by Defendants' omissions. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) ("[c]autionary language must be extensive, and specific").

*Sixth*, Defendants' contention that CWs' statements do not "indicate that the Defendants knew that the FDA would discourage Agenus from seeking Accelerated Approval" does not withstand scrutiny. *See* Mot. at 24-29. CW6 explained how Agenus's ***VP of Clinical Studies*** informed Defendants (accurately) as early as spring 2023 that the FDA would reject their approach and Defendants ***immediately fired that VP*** (¶98). Further CW3 explains how BOT/BAL trials were not powered correctly (¶¶95, 99-101); and that the FDA submission team and multiple executives raised that the trials' were too short and too small for Accelerated Approval and Armen responded, "who cares about FDA" (¶102). These allegations recount historical facts, not opinions,[13] show Defendants ***ignoring*** the best data available to them, not basing their statements on that data (*see* Mot. at 28) and identify sources of each CW's knowledge (usually first-hand observations), are

---

[13] Defendants' authority is not to the contrary. *See* Mot. at 26. In *Biogen*, the First Circuit refused to credit a statement from a confidential witness because it was an unsupported "bald assertion," not because it was an opinion. *See New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 53 (1st Cir. 2008). Here, conversely, the CWs allegations are specific and mutually corroborative. *Cabletron*, 311 F.3d at 29–30 (crediting statements that "accumulated…detail" obtained from a "number of sources."

mutually corroborate, and must be accepted as ***true***. *See Cabletron*, 311 F.3d at 29–30; *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 71-72 (D. Mass. 2014). *See* Mot. at 26. And to the extent Defendants demand specific names of additional Agenus executives and the FDA submissions team and dates of confrontations, the First Circuit has expressly held that allegations will suffice even if "some questions remained unanswered," such as "the precise date of transactions…the identities of corporate personnel involved," or the like. *Cabletron*, 311 F.3d at 32-33.

Finally, as set forth above, Defendants' generic risk statements advise only that the FDA may decline to grant BOT/BAL Accelerated Approval and do not address the risks created by Defendants' omissions  and thus do not immunize Defendants' misstatements.[14] *See* Mot. at 28; *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *7 (N.D. Cal. July 29, 2022) (disclosures identified only generalized risk of rejection failed to disclose concealed risk); *Blue v. Doral Fin. Corp.*, 123 F. Supp. 3d 236, 262 (D.P.R. 2015) (generic disclosure inadequate); *see also Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) ("[g]eneric or boilerplate discussions do not tell the investors how the risks may affect their investment").

### b.    *Defendants misrepresented BOT/BAL's efficacy.*

Defendants repeatedly assured investors that BOT/BAL trial data demonstrated "durable clinical responses" (¶167, see ¶179), "robust, consistent, and durable efficacy signals"(¶169); "Unprecedented Survival" and "substantial survival benefits and long-lasting responses" (¶171, see ¶175); and "durable responses" that were "unprecedented" (¶173, *see* ¶177). These statements misrepresented BOT/BAL's durability and survival data over the objections of numerous C-suite

---

[14] Defendants' cases are distinguishable. *Simon v. Abiomed, Inc.*, held that a generic risk disclosure was *insufficient*. *See* 37 F. Supp. 3d 499, 518 (D. Mass. 2014), *aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015). Defendants other authority did not address the sufficiency of risk warnings. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 54 F.4th 42, 56 (1st Cir. 2022). To the extent Defendants intended to cite the First Circuit's affirmation of *Simon*, that case is distinguishable because a warning "explicitly" addressing a risk, while the risk statements Defendants point to do not warn of the issues Defendants concealed. *See Abiomed*, 778 F.3d at 243.

executives—who were terminated for dissenting—and thus are actionable. *See Dahhan*, 321 F. Supp. 3d at 253 (defendants had "no meaningful information supporting a claim of efficacy"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) (defendants "knew or should have known [results] were either so incomplete or so statistically flawed").

For example, CW3, corroborated by CW6, and CW7, described how BOT/BAL's trials did not have data mature enough to show durability or overall survival, let alone "unprecedented" results. ¶¶95, 99-102. In fact, CW9, who had reported directly to Armen, recalled that Armen's glowing language about BOT/BAL was based on a patient or two in 2022, not clinical evidence. ¶103. Further, O'Day's touts of BOT/BAL's long-term effectiveness, *i.e.*, durability, in May 2024 are actionable because Defendants had Phase 2 data in hand that contradicted those claims. ¶¶124-25, 179; *see Dahhan*, 321 F. Supp. 3d at 253; *In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, at *8–9 (E.D.N.Y. Mar. 31, 2007) (statements regarding "survival" misleading).

In addition, CW7, Armen's direct report, repeatedly told him that these statements were improper because they were not supported by evidence, as did Agenus's CLO, CPA, CBO, and CCO. ¶¶104-07. Rather than heed the warnings, Armen terminated those executives. ¶¶103, 106-08. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 470 (S.D. Tex. 2016), *amended on denial of reconsideration*, 2016 WL 3959164 (S.D. Tex. July 22, 2016) (falsity alleged where employee was fired and/or resigned after raising truth to executive); *Collier*, 9 F. Supp. 3d at 72 (employee fired after "raising the issue of revenue discrepancies"). Further, Armen effectively admitted that Defendants had assumed a survival benefit and hoped that the FDA would consider post-submission data. *See* ¶¶129-30. *See Avaya*, 564 F.3d at 264 (end-of-class period admission supports falsity).

In response, Defendants first assert that their statements are inactionable because they accurately report underlying trial data. *See* Mot at 19. As set forth above, however, literally true

statements may be actionable. *See Lucia*, 36 F.3d at 175. Here, Defendants statements gave investors the misimpression that BOT/BAL's trial data supported durability and overall survival, when that data did not, and omitted Defendants' underlying assumption of a survival benefit. ¶¶99-103, 130. *See Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (statements actionable where defendants concealed facts undermining a statement).

Defendants next assert they merely "cast trial results in a positive light" and expressed "corporate optimism." *See* Mot. at 14. But even Defendants' authority acknowledges that statements can "cross[] the line from optimistic to misleading." *See City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014). This is what happened here: by giving investors a misimpression of BOT/BAL's trials, Defendants' statements crossed from optimism to deceit, especially given that Defendants failed to disclose that their "evidence" of survival relied on an assumption.[15] ¶¶8, 56-58, 63, 73, 99-108, 129-30.

Moreover, Defendants misstatements' are not opinions because they are not qualified by "we think," or "we believe." *Compare* Mot. at 22 *with* ¶¶167, 169, 171, 173, 175, 177, 179; *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *13 (E.D.N.Y. Sept. 27, 2019) (unqualified statements not opinions); *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020) (affirmative representations are not opinions). Regardless, even if analyzed as opinions, Defendants' misstatements are actionable because they were not honestly held and/or did not align with

---

[15] Defendants' cases are inapposite. *See* Mot. at 14. *Thant v. Karyopharm Therpeutics Inc.* held that it was not misleading to omit certain uncommon adverse events. *See* 43 F.4th 214 (1st Cir. 2022). aff'd, 868 F.3d 31 (1st Cir. 2017). Here, however, Defendants neither disclosed that BOT/BAL's trial data did not support durability or overall survival rate, nor did they disclose the assumption underlying their survival data. AC ¶¶ 95, 99-103, 130. *Corban v. Sarepta Therapeutics, Inc.* is distinguishable because there, the defendants disclosed their underlying assumption. *See* 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015). Defendants' other authorities are similarly inapposite. In *Pizzuto*, this Court held that there was no obligation to disclose study results from two patients where defendants delineated what they were disclosing. *See* 2024 WL 1436025, at *9 (D. Mass. Mar. 31, 2024). Here, Defendants omitted their underlying assumption (¶130) and affirmatively characterize studies without disclosing underlying data (¶¶80-89). Further, the ACAC uses multiple CWs to demonstrate how Defendants' statements were misleading, unlike *Pizzuto* and *Leung. See Pizzuto*, 2024 WL 1436025, at *9, *Leung*, 599 F. Supp. 3d at 67-68.

information in Defendants' possession as set forth in Section IV.B.1.a *supra*.

Nor are Defendants' misstatements puffery. *See* Mot. at 23. Since the FDA had rescinded Accelerated Approval of multiple drugs for failing to show overall survival or improved quality of life, Defendants knew proof of durability and overall survival were of particular importance to investors. *See* ¶¶8, 56-58, 63, 73; *Smith*, 604 F. Supp. 2d at 342; *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 558–59 (D.N.J. 2002) ("unprecedented" not puffery). Likewise, Defendants' statements are ***not*** forward-looking (*see* Mot. at 19-21) because they describe past events or present facts, including that the trial results "***have*** demonstrated" (¶167), "***have*** proven to be" (¶173), or are "demonstrating" (¶¶169, 175), or that the new data "***show***" (¶171). *See Dahhan*, 321 F. Supp. 3d at 254 (statements "suggesting that the AUGMENT treatment was effective" not forward-looking).

In addition, contrary to the Motion, the CWs' statements are relevant and particularized. *See* Mot. at 24-29. The CWs recount Armen firing high-ranking employees who warned him about misrepresenting trial data show that Armen understood that his statements were inaccurate (¶¶104-08) and CW3 explained how the trials did not gather sufficient information to support Defendants' claims. ¶¶95, 99-100. Nor are the CWs' accounts "opinions."[16] *See* Mot. at 26. The CWs offered overlapping first-hand, mutually corroborative accounts of how trial data did not support Defendants' touts (¶¶95, 99-100) and that Armen was repeatedly confronted with these facts (¶¶104-07). These allegations must be accepted as true. *See Cabletron*, 311 F.3d at 29–30. To the extent Defendants demand names and dates of conversations, they improperly demand that Plaintiff "plead evidence." *Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).

Finally, Defendants' generic risk statements advise only that the FDA may decline to grant BOT/BAL Accelerated Approval and did not address Defendants' mischaracterizations of data. *See*

---

[16] Defendants' authorities are inapposite for the reasons set forth in note 13 *supra*.

Mot. at 28. Accordingly, they do not immunize Defendants' misstatements.[17] *See* Mot. at 28; *Pardi*, 2022 WL 3018144, at \*7; *Blue*, 123 F. Supp. 3d at 262; *see also Silverstrand*, 707 F.3d at 103.

> c.   *Defendants misrepresented Agenus's ability to produce drug candidates on shortened timelines.*

Defendants also emphasized to investors that Agenus had the ability to obtain approval of BOT/BAL and other drug candidates on shortened timelines because of its "fully integrated, end-to-end capabilities," including an artificial intelligence platform, current good manufacturing practice compliance, and "clinical development capabilities" (¶¶182, 187, 189, 193), as well as that BOT/BAL's clinical programs were "designed to support regulatory pathways for accelerated development" and "a potential filing for…accelerated approval" (¶¶183, 185, 191). These statements were materially misleading because Agenus did not employ any "integrated, end-to-end capabilities," *see Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015) (statement actionable "if a reasonable person would have understood it to be inconsistent with the facts on the ground"), and by touting benefits of these purported capabilities, Defendants had duty to disclose that these systems did not exist or were unused. *See Meyer*, 761 F.3d at 250.

For example, C2 and CW8 described how Armen implemented impossibly short deadlines in an attempt to impress investors. ¶¶112, 115. In fact, CW8 recalled Armen insisting on an enrollment schedule for Phase 2 BOT/BAL trials that Agenus could not—and did not—meet, after which the FDA did not consider data from at least two late trial participants. ¶¶112, 124. Similarly, CW6 and CW8 described how Armen added new trial indications without heeding the advice of or even consulting Agenus's medical team (¶109-10), and CW2 and CW6 related the additions of hundreds of patients interfered the Company's ability to conduct Phase 1 studies (¶¶110, 115). Armen obviously was making these processes up as he went along because give that he pressured employees

---

[17] Defendants' cases are distinguishable for the reasons set forth in note 14 *supra*.

to add new indications even if they jeopardized trial compliance and increased the likelihood that the FDA would reject Agenus's data. ¶¶109-11. Further, CW1, CW4, CW6, and CW9 detailed Armen's practice of refusing to pay vendors, which cause the Company to shut down manufacturing. *See* ¶¶116-21. CW2 and CW8 also described how high attrition (directly caused by Armen, according to CW8) resulted in the Company  that the Company lacked the personnel to effectively apply for Accelerated Approval (¶¶114-15), and BOT/BAL processes neither supported "regulatory pathways for accelerated development" nor were they "designed for Accelerated Approval" (¶183) because of Armen's hostility to FDA requirements. ¶¶102, 113, 129.

Although Defendants assert that their touts of Agenus's capabilities are not actionable, Defendants are wrong. *First*, as set forth above, the ACAC sets forth each CW's term of employment, responsibilities, supervisor(s), and circumstances under which they came to know each fact alleged, including specific meetings and timeframes of events, and their allegations are mutually corroborative. *See, e.g.*, ¶¶37-45, 109-21; *see Cabletron*, 311 F.3d at 30.

In addition, contrary to the Motion, the ACAC connects the CWs' statements to Defendants' misstatements and demonstrates how "Agenus lacked necessary staff or plans to accelerate developments." *See* Mot. at 30, 32. For example, CW8 described how Armen insisted on an unreasonable timeframe for Phase 2 patient enrollment, which the Company failed to meet, and the FDA ultimately did not consider data from two participants. ¶¶112, 124. In addition, multiple CWs described how Armen's insistence on adding indications and patients created problems and data that did not meet FDA requirements. ¶¶109-11. Further, Defendants' assurances that trials were designed to "support a potential filing for…accelerated approval" cannot be squared with testimony from multiple CWs regarding Armen's refusal to follow FDA guidance because "they can't stop us." ¶102. Multiple CWs also corroborate CW1's description of unpaid vendors and manufacturing

27

shutdowns, which undermine representations of clinical development capabilities.[18] ¶¶114-21.

*Second*, the portions of Defendants' statements regarding shortening timelines alleged to be misleading are statements of present fact, including that Agenus ***currently possessed*** "fully integrated, end-to-end capabilities" (¶¶182, 187, 189, 193) or "***have designed***"—*e.g.*, not "will design"—clinical trials to "support a potential filing for…accelerated approval" (¶183), and thus are ***not*** protected under the PSLRA. *See N.J Carpenters Pension & Annuity funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 n.13 (1st Cir. 2008).

In any event, certain of Defendants' risk warnings were insufficient given that they merely warned investors that no results were guaranteed and thus were too general to adequately apprise investors of the attendant risks. *Compare* ¶¶185, 191 *with Brumbaugh*, 416 F. Supp. 2d at 251 ("boilerplate disclaimer at the close of the press release was not sufficiently detailed"). Further, the other warnings identified in the Motion are insufficient because they fail to warn of Defendants' practice of not paying vendors and the risks of "insufficient quantities of drug candidates," and "manufacturing problems" had already happened and the Company was already facing shortages and later a manufacturing shutdown. *Compare* ¶¶111-18 *and* Mot. at 33 *with In re Virtu Fin., Inc. Sec. Litig.*, 2025 WL 847824, at *18 (E.D.N.Y. Mar. 17, 2025) (warnings "cannot insulate from liability the failure to disclose that the risk ha[d] transpired"). Finally, Defendants had actual knowledge of the truth because Armen personally caused employee turnover, rejected FDA requirements, insisted on unreasonable timelines, and refused to pay vendors. *See* ¶¶111-18.

*Third*, even if construed as opinions, Defendants' statements are still actionable. *See* Mot. at 31. As an initial matter, Defendants' statements in Paragraph 183 and that "we have assembled [or established] fully integrated end-to-end capabilities" in Paragraphs 187 and 193 are not modified by

---

[18] The specificity of the CWs' mutually corroborative allegations, which occur prior to or concurrently with Defendants' misstatements, distinguish the ACAC from *Biogen*. *See* 857 F.3d at 42 ("We emphasize that there is a significant timing problem" regarding CW allegations post-dating defendants' statements).

"we believe," and thus are expressions of fact, not opinion. *See Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 241 (D. Mass. 2011). In addition, it is well established that the use of the phrase "I believe" to characterize a statement "does not preclude the possibility that the statement as a whole may still mislead as to some fact." *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 7 (1st Cir. 2021). Here, Defendants' statements that they believe that "our fully integrated, end-to-end capabilities…will uniquely position us to produce novel therapies on accelerated timelines" and "these fully integrated capabilities enable us to produce novel candidates on timelines that are shorter than the industry standard" (¶¶182, 187, 189, 193) at a minimum conveyed both that Defendants actually had and used such systems. As alleged in the ACAC, these statements are thus actionable because Agenus had no "end-to-end capabilities," and Armen was simply making up unreasonable timelines to please investors, failing to pay vendors, and insisting on adding indications and patients that interfered with Phase 1 studies and reduced the likelihood of accelerated approval, facts known at least to Armen that directly contradicted the expressed "beliefs." ¶¶109-12, 116-20. Indeed, as in *Carbonite*, where an executive could not have believed his opinions about a product that never worked, 22 F.4th at 7-8, Defendants could not have believed their opinions about Agenus's capabilities when they were at best not using any such capabilities, and at worst actively working counter to them. *See* ¶¶109-21.

### d.     Defendants' misleading SOX certifications are actionable.

Defendants only argue that certifications attached to Agenus's quarterly and annual SEC filings during the Class Period (*see* ¶¶195-97) are not actionable "for the same reasons that the statements within the forms are not false or misleading." Mot. at 22. The ACAC, however, alleges that the reports misrepresented the Company's ability to obtain Accelerated Approval, BOT/BAL study results, and ability to accelerate drug development (¶¶134, 182-94), and that Armen and Kaskin had access to and actual knowledge of facts that contradicted their SOX certifications (*see*

29

Section B.2.a, infra). Accordingly, the certifications are actionable. *See, e.g., Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*12 (S.D.N.Y. Apr. 14, 2020).

        2.      <u>The ACAC's Allegations Support a Strong Inference of Scienter</u>

To plead scienter, a plaintiff may "show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness," and the knowing omission of material information is probative of scienter. *Carbonite*, 22 F.4th at 8-9. Recklessness is generally defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 198 (1st Cir. 1999). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The assessment weighs the totality of the circumstances, rather than scrutinizing each allegation individually. *See, e.g., Collier*, 9 F. Supp. 3d at 76 (a defendant may not "divide and conquer" complaint allegations). Here, the ACAC alleges facts that, viewed holistically, establish a strong inference of scienter.

        *a.*      *Defendants' knowledge of or access to information contradicting their public statements supports a strong scienter inference.*

The ACAC alleges that Defendants issued statements "when they knew facts suggesting the statements were inaccurate or misleadingly incomplete" which is "classic evidence of scienter." *See Aldridge*, 284 F.3d at 83. For example, Armen knew or recklessly disregarded that the FDA would deny Accelerated Approval, his clinical trial deadlines were unfeasible, and BOT/BAL trial data did not support durability and overall survival because he was confronted directly by Agenus's VP of Clinical Science and its FDA submissions team, CW7, CW8, and multiple Agenus executives, including the CBO, CLO, CPA, and CCO. ¶¶98, 102, 105-07, 112. *See Alaska v. Ryder Sys., Inc.*, 603 F. Supp. 3d 1229, 1240 (S.D. Fla. 2022) (problems conveyed directly to Defendants); *In re*

*StockerYale*, 453 F. Supp. 2d 345, 358 (D.N.H. 2006) (same); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (defendant "directly confronted by well-positioned Sunbeam employees"). Armen either understood the substance of these complaints or was willfully blind given that he retorted, "who cares what FDA thinks," and/or fired or laid off individuals raising issues. See ¶¶96, 98, 102, 106-08, 112. Armen also knew that Agenus lacked "fully integrated, end-to-end" acceleration capabilities because he personally added indications to trials, which reduced the likelihood of approval (¶¶110-11), insisted on timelines made up out of whole cloth (¶¶109, 112), caused massive attrition (¶¶114-15), dismissed FDA guidelines (¶113), and refused to pay vendors, resulting in shortages during BOT/BAL trials (¶¶116-21). *See Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) (defendants knew about conduct they directed).

O'Day also knew that Agenus's application for Accelerated Approval was doomed to fail because the Company's VP of Clinical Science, who reported directly to O'Day, advised attendees at a spring 2023 weekly safety meeting that the FDA would reject the Company's approach, and her concerns were then reported up to O'Day. ¶98. *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 389 (S.D.N.Y. 2022) (information escalated to defendant).

Further, according to CW6, O'Day knew the truth about BOT/BAL data because he received and reviewed reports of that data, and Armen also reviewed that data using CW9's "Interactive Patient Tracker." ¶94. *See Blue*, 123 F. Supp. 3d at 267 (access to and receipt of non-public contradictory information, confirmed by a former employee, is evidence of scienter); *see also In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 246-49 (S.D.N.Y. 2023). These first-hand corroborated accounts show knowledge of or reckless disregard of information undermining Defendants' public statements. *Galestan*, 348 F. Supp. 3d at 300–01; *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13–14 (2d Cir. 2011).

31

Finally, Armen himself admitted days after the Class Period ended that Agenus had been assuming the existence of a survival benefit and had gone to the EOP2 meeting hoping that the agency would consider additional data even though he knew the FDA "has very strict rules on not considering data post-submission." ¶¶129-30. *See City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc.*, No. 22-CV-10321-ADB, 2024 WL 1258149, at *17 (D. Mass. Mar. 25, 2024) (post-class period statements show Defendants knew statements were misleading).

Defendants ignore the bulk of these allegations and claim that Plaintiffs allege "fraud-by-hindsight." *See* Mot. at 31, 34. Courts, however, reject such incantations of fraud-by-hindsight where, as here, a complaint alleges that "the company failed to take into account information that was available to it" when defendants spoke. *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494-95 (S.D.N.Y. 2004). Here, Defendants knew information at the same time they made their false statements, which Defendants later admitted. ¶¶57-70, 72-82, 84-86, 110-113, 193; *see Aldridge*, 284 F.3d at 82 ("Cross essentially admitted to the 1998 contingencies in 1999"); *Sloman v. Presstek, Inc.*, 2007 WL 2740047, at *9 (D.N.H. Sept. 18, 2007) (company "essentially admitted" to knowing information in later disclosures). Further, while Defendants self-servingly claim that Armen "sincerely believed" his statements (Mot. at 36), the more plausible explanation, given his hostility to the FDA (¶¶69-70, 102, 113, 129-30) and termination of dissenters (¶¶96, 98, 106-07), is reckless disregard. *See In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *13–14 (M.D. Ga. Mar. 23, 2018) (defendants "refused to listen" to warning).

> b.      *Defendants evaded direct questions from analysts.*

The Court can also infer Armen, O'Day, and Yancey's from their misleading responses to analysts' questions. *See Avaya*, 564 F. 3d at 269–70 (misleading responses supports scienter); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (statements to "placate the market" support scienter). Over the latter part of the Class Period, from November 2023

to May 2024, analysts repeatedly asked pointed questions about Phase 2 BOT/BAL data, including whether trials showed sufficient overall survival rates. *See* ¶¶142, 144, 146, 150, 152, 160, 162. Rather than disclose the truth, including that Defendants had received massive internal pushback against the application, were assuming a survival benefit, and hoping the FDA would accept post-submission data (¶¶98-102, 120-30); at least two subjects' data would be delayed (¶79); and Phase 2 trials did not support durability and overall survival (¶¶98-108), Defendants placated investors with misleading touts of results while withholding trial data. *See* ¶¶142, 144, 146, 150, 152, 160, 162.

> c. *Defendants' Positions and Extensive Discussion of Accelerated Approval and BOT/BAL Supports a Scienter Inference.*

Defendants' positions as CEO and Chairman, VP Finance, CMO, and SGDA, bolster an inference of their scienter. *See In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (scienter established because defendants' high-level positions would have provided them access to crucial information that contradicted their public positions). In addition, Armen (¶¶84, 87, 136, 138, 140, 142, 146, 150, 152, 156, 158, 162, 169, 173, 175), O'Day (¶¶74, 76, 85, 152, 160, 164, 167, 177, 179), and Yancey's (¶144) public statements regarding Accelerate Approval, BOT/BAL data, and the Company's ability to accelerate approval support scienter because they gave investors the impression that they had "either inquired about [BOT/BAL and the Agenus's capabilities] before deciding to promote it to investors or were reckless in failing to do so." *See Carbonite*, 22 F.4th at 9–10; *Celestica*, 455 F. App'x at 14 (defendants "would have been alert to information concerning" key subject "about which investors and analysts often inquired"). Accordingly, CW3's statement that it was impossible for Defendants not to know the truth because they were "responsible for speaking with FDA representatives" bolsters an inference of scienter because Defendants would not have spoken to the FDA without educating themselves. *See* ¶101.

> ### d. Defendants' firing, laying off, or reassigning employees expressing concerns regarding misstatements supports scienter.

During the Class Period, Defendants reassigned BOT/BAL's creator in March 2023 (¶96) and fired the VP of Clinical Science after they raised problems with the Company's plan to obtain Accelerated Approval (¶98); fired the CBO, CLO, CPA, and CCO after they confronted Armen about his misrepresentations trial results (¶106-08); and fired CW8 after he confronted Armen about his utterly unsupported trial timeline (¶112). This bolsters a scienter inference. *See Carlton*, 184 F. Supp. 3d at 483 ("pattern of firing employees who came forward with concerns that his statements were misleading" supported scienter); *Collier*, 9 F. Supp. 3d at 72 (same).

> ### e. Defendants' SOX certifications support an inference of scienter.

In certifying Agenus's SEC filings, Armen and Klaskin represented that they familiarized themselves with or recklessly ignored the contradictory facts about Accelerated Approval, BOT/BAL trials, and Agenus's ability to accelerate drug development, bolstering their scienter. ¶¶195-97; *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020).

> ### f. Defendants' motive to commit the fraud.

While motive is not required to allege scienter, *see Tellabs*, 551 U.S. at 325, motive bolsters a scienter inference when combined with other allegations, *see Cabletron*, 311 F.3d at 40. Motive can be alleged where defendants seek to inflate a company's share price to maximize funds from **specific** secondary offerings. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) (motive to "enabl[e] the company to set the rights offering price somewhat higher"); *Noto*, 650 F. Supp. 3d at 46 ("potential increases in…revenue from specific stock offerings establishes" motive); *see also Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (maximize sale price).

This is precisely what the ACAC alleges. Here, as in *Noto*, Defendants used their

34

misrepresentations to bolster Agenus's share price in advance of three successive ATM Offerings and obtain $149.8 million in capital Agenus desperately needed for Phase 2 BOT/BAL trials. *Compare* ¶¶13, 203 *with Noto*, 650 F. Supp. 3d at 41, 46 (misstatements to boost "multiple specific stock offerings were executed over the course of 2016" establish motive). Accordingly, the ACAC's allegations are distinguishable from *Boston Scientific*, where a notes offering was neither essential to the Company's survival nor directly tied to allegedly misrepresented subject matter. *See* 2011 WL 4381889, at *15 (D. Mass. Sept. 19, 2011) (subject matter of misstatements was "one of fifty one factors that could potentially cause actual results to differ materially"), *aff'd*, 686 F.3d 21 (1st Cir. 2012).[19] In addition, unlike *Boston Scientific*, Agenus had ceased all operations other than pursuit of Accelerated Approval of BOT/BAL, Defendants' misrepresentation were used to tout BOT/BAL's potential to investors, and without the funds the Company could not have continued trials. *See* ¶13. Indeed, after the FDA declined to grant BOT/BAL Accelerated Approval, Defendants acknowledge that the Company could not perform Phase 3 trials without additional capital. ¶131.

Armen's receipt of stock as compensation (*see* Mot. at 37) thus ***amplifies*** his scienter because his actions preserved capital for Agenus, and his livelihood depended on its survival. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1195 (D.N.M. 2010), *on reconsideration in part*, 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013) (defendant "inextricably financially intertwined" with company had motive to "increas[e] public confidence and giv[e] TMI the capital it needed to ride out the crisis").

Accordingly, the ACAC's allegations are consistent with cases where the First Circuit has found motive (and scienter) sufficiently alleged because "[t]his is more than the usual concern by executives to improve financial results; the executives' careers and the very survival of the company

---

[19] The First Circuit did not address whether the desire to bolster a specific stock offering could demonstrate motive when it affirmed the *Boston Scientific* court. *See In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31–32 (1st Cir. 2012).

35

were on the line." *See Cabletron*, 311 F.3d at 39; *see also ACA Fin. Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 67 (1st Cir. 2008) ("self-interested motivation" to save "salaries or jobs"). These facts also distinguish Defendants' cases. *See* Mot. at 37-38. For example, Defendants completely misrepresent *Corban v. Sarepta Therapeutics, Inc.*, which held that allegations that "the very survival of the company w[as] on the line" ***would be sufficient*** to allege motive, but, unlike the ACAC, that complaint lacked those allegations. *See* 868 F.3d 31, 41 (1st Cir. 2017). In addition, unlike *Sarepta*, Plaintiff allege that Agenus's cash plummeted from $307 million to $76 million by the end of 2023, six months prior to the end of the Class Period (¶72), Defendants had laid off 25% of Agenus's workforce to cut costs (¶78), and the ATM Offerings were for the express purpose of obtaining capital so Agenus's BOT/BAL efforts could continue (¶¶72, 124). The offerings' funds were plainly the only line of defense between developing BAT/BOL and shutting down because, after Defendants used essentially all of Agenus's funds—including the $148 million in ATM Offerings—on Phase 2, the Company acknowledged it had nothing left for Phase 3. *See id.* Further, in *Pizzuto*, this Court held that "***making deals*** to extend the company's financial runway…actually benefits the shareholders." *See* 2024 WL 1436025, at *18. Here, Defendants did not "make deals" with partners for capital that benefitted shareholders; rather, they made misrepresentations to induce investors to throw good money after bad to the ***detriment*** of existing and new shareholders. Indeed, Agenus is only now hoping to do what the *Pizzuto* defendants did: partner with a third party ¶129.

> g.  *BOT/BOL's importance to Agenus bolsters a scienter inference.*

The already-strong inference of scienter created by the above allegations is bolstered by the "core operations" doctrine, under which scienter can be imputed where, as here, "[f]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers." *See Crowell*, 343 F. Supp. 2d at 19; *see also Carbonite*, 22 F.4th at 10. For example, during the Class Period Defendants ceased all operations

36

unrelated to BOT/BAL and laid off 25% of Agenus's workforce to cut costs and focus on BOT/BAL. ¶78. Accordingly, would be it would be absurd to suggest that Defendants were not aware of the facts contradicting their public statements given that no other part of Agenus's business was active for the last 11 months of the Class Period. *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 527 (D. Md. 2022) (core operations supports scienter where misrepresentations concerned pharmaceutical company's leading vaccine candidate and company was running out of funds).

Defendants assert that the ACAC's does not allege that "anyone at Agenus knew or could have known how the FDA would view Agenus's BOT/BAL clinical data. *See* Mot. at 35-36. These assertions are easily contradicted by the "plus factors" alleged in the ACAC, including O'Day's receipt and review of patient data (¶94), executives' direct confrontations with Armen, and Armen's antagonism to the FDA and termination of employees raising concerns. ¶¶98-113.

### h.    The ACAC alleges Agenus's corporate scienter

The ACAC can allege "corporate scienter" by alleging (1) Armen, Klaskin, O'Day, or Yancey's scienter, which can be imputed to Agenus, or (2) other "appropriate corporate officers who had knowledge related to the alleged fraud." *See Paice v. Aldeyra Therapeutics, Inc.*, 2025 WL 815065, at *11 (D. Mass. Mar. 14, 2025). As set forth in Sections IV.B.2.a-f *supra*, the ACAC alleges each of Armen, Klaskin, O'Day and/or Yancey's scienter, which can be imputed to Agenus. *See Cabletron*, 311 F.3d at 40. Further, the ACAC alleges Grossman and Jaymin Patel's knowledge of facts contradicting Defendants' statements, and thus corporate scienter as well. *See* ¶94.

### i.    A holistic analysis supports an inference of Defendants' scienter.

Considered holistically, *see Tellabs*, 551 U.S. at 326, the ACAC's allegations support a strong inference of scienter, including that Defendants (i) knew or recklessly disregarded that Agenus lacked data necessary to obtain Accelerated Approval, despite numerous internal objections; (ii) made misrepresentations in response to analysts' questions to placate investors; (iii) knew or

37

recklessly disregarded that BOT/BAL trial data did not demonstrate sufficient durability or overall survival rates; (iv) reassigned, laid off, or fired employees who raised concerns; (v) and were motivated to inflate the returns of the ATM offerings. By contrast, Defendants' proffered inference of a good-faith belief (*see* Mot. 38-39) is implausible given the overwhelming internal pushback against Defendants, Armen's disregard for the FDA and admissions regarding assumptions and incomplete data, and his practice of firing dissenters. The stronger inference is that Defendants concealed the truth in pursuit of a reckless gamble and prevented investors from exiting the doomed enterprise before they lost their investments. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) (defendants "frequently attempt to conceal[] bad news in the hope that it will be overtaken by good news . . . like embezzling in the hope [of] winning at the track").

### 3.    The ACAC Alleges Loss Causation

"The element of loss causation will be satisfied with a showing that a plaintiff purchased shares at a price inflated by a defendant's fraud and that the share price "fell significantly after the truth became known." *Special*, 775 F. Supp. 2d at 244. In short, Plaintiff only must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *In re Credit Suisse–AOL Sec. Litig.*, 465 F.Supp.2d 34, 46 (D. Mass. 2006). To that end, Plaintiff can plead loss causation by alleging (i) a "corrective disclosure" that revealed the "pertinent truth that was previously concealed or obscured by the company's fraud" and that the "stock price dropped soon after," *Bos. Sci.*, 646 F. Supp. 3d 249, 291 (D. Mass. 2022); or (ii) "that misrepresentations concealed a zone of risk that, when it materialized, caused the plaintiff's loss," *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 95 (D. Mass. 2010).

The ACAC largely asserts the latter theory. Plaintiff alleges that Defendants' misstatements concealed (i) the extent of the risk that BOT/BAL would not receive Accelerated Approval; (ii) that BOT/BAL's clinical trials did not support durability and overall survival; and (iii) that Agenus could

38

not accelerate drug development timelines. ¶¶122-23, 199. These risks materialized when the FDA denied Accelerated Approval. ¶¶123-26, 198-99. Plaintiff further alleges that Defendants misstatements had both "propped up Agenus's share price and enabled the Company to reap $144 million in much-needed capital at the expense of unsuspecting investors" and the materialization of concealed risks was immediately followed by a stock decline of 58.83%. ¶¶122, 126. These are classic allegations of loss causation. *See, e.g.*, *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 2013 WL 5376023, at *21 (D. Mass. Sept. 24, 2013) (risk to adjustable-rate securities market materialized); *Special*, 775 F. Supp. 2d at 245 (materialization of the risk alleged where "misrepresentations materially misled investors and analysts in such a way as to impede assessments of the nature and gravity of the risk"); *Credit Suisse*, 465 F.Supp.2d at 46 (risk of decline in advertising materialized). The Motion does not address the ACAC's materialization of the risk allegations, and thus those arguments are waived.[20] *See, e.g.*, *WNAC*, 2024 WL 778794, at *7.

Instead, the Motion asserts that the EOP2 Release is not a corrective disclosure because it did not "reveal[] a 'truth' to the market that was previously concealed or constitute[] a corrective disclosure." The EOP2 release, however, disclosed that (i) Phase 2 data showed that a double-sized larger dose was less than half as effective as a 75mg dose, which suggested the treatment had limited-to-no long-term benefit, and (ii) data was incomplete because two class members had not participated in the trial for a sufficient length of time, and thus FDA would ***never*** credit that data. ¶¶124, 129, 199. Indeed, Armen admitted he knew the FDA would not consider that data, and that the Company had been assuming a survival benefit, not looking to data for that benefit. ¶¶129-30.

Setting aside that a corrective disclosure "need not be a 'mirror-image'" of a

---

[20] In any event, Defendants will surely assert in their reply that no concealed risk materialized because Agenus's SEC filings disclosed the risk of the FDA denying Accelerated Approval. This argument fails, however, because market awareness of risk in the context of loss causation is a fact issue not suitable for resolution at this stage. *Credit Suisse*, 465 F. Supp. 2d at 50. Regardless, Defendants' risk disclosures were boilerplate (*see* Sections IV.B.1.a-b *supra*), and thus were insufficient to apprise investors of the extent of the risks that caused losses. *See Special*, 775 F. Supp. 2d at 245.

misrepresentation, *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013), the EOP2 Release's disclosures contradicted Defendants' statements regarding the strength and quality of Phase 2 data (¶¶144, 146, 148, 150, 152, 154, 156, 160, 164, 179), including that "we should have a sustainable response rate, perhaps even an improving response rate" (¶142), "the durability and maturity of the data is stronger today than it's ever before" (¶158), and Phase 2 studies contribute valuable insights into the potential of this therapy" (¶164), which created the impression in investors that Phase 2 studies bolstered BOT/BAL's case for Accelerated Approval, when in reality the data undercut that case.[21] *See Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 878 (S.D. Cal. 2024) (announcement of FDA concerns revealed prior misstatements).

### C.     Plaintiff States a Section 20(a) Claim

Plaintiff pleads a Section 10(b) claim, as set forth above, thus he states a Section 20(a) claim. *See In re Brooks Automation, Inc. Sec. Litig.*, 2007 WL 4754051, at *13 (D. Mass. Nov. 6, 2007).

### D.     Plaintiff Respectfully Requests an Opportunity to Amend

Since this is the Court's first opportunity to formally assess any complaint in this action, if the Court grants any part of the Motion, Plaintiff respectfully requests the opportunity to amend to address any factual deficiencies identified by the Court. *See Guerra v. Teradyne Inc.*, 2004 WL 1467065, at *28 (D. Mass. Jan. 16, 2004).

### V.     CONCLUSION

For all the foregoing reasons, the Court should deny the Motion in its entirety.

---

[21] Defendants' cases are distinguishable. The court in *CVS* held that the complaint *did* sufficiently allege loss causation, *see* 716 F.3d at 240-42, and *Local No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharm., Inc.* did not address loss causation. *See* 838 F.3d 76, 81–82 (1st Cir. 2016). Further, *In re Nektar Therapeutics Sec. Litig.*, held that Phase 2 patient data did not "correct" Phase 1 data, while here Plaintiff alleges that Defendants' belated disclosure of Phase 2 data revealed misrepresentations and omissions regarding that data, which had *not* been disclosed. 34 F.4th 828, 833, 836 839 (9th Cir. 2022). Finally, while the plaintiffs in *Leung*, did not include specific facts undercutting Defendants' prior statements, the EOP2 release disclosed facts contracting Defendants' prior statements about Phase 2 data. *See* 599 F. Supp. 3d 49, 70.

40

Dated: June 6, 2025

Respectfully submitted,

**POMERANTZ LLP**

/s/ *Brian Calandra*
Brian Calandra (admitted *pro hac vice*)
Jeremy A. Lieberman (*pro hac vice* application
forthcoming)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com
jalieberman@pomlaw.com

*Counsel for Lead Plaintiff and Lead Counsel
for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* application
forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, a true and correct copy of the foregoing ***PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO  DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT*** was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Brian Calandra*
Brian Calandra

42