**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BYRON OLSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AGENUS INC., GARO H. ARMEN, CHRISTINE M. KLASKIN,  STEVEN J. O'DAY, and TODD YANCEY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 24-CV-12299-AK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER ON MOTION TO DISMISS**

**ANGEL KELLEY, D.J.**

This putative federal securities class action lawsuit challenges statements and omissions concerning a biotechnology company's immuno-oncology product for colorectal cancer. Plaintiff alleges that Agenus Inc. ("Agenus") and individuals Garo Armen, Christine Klaskin, Steven O'Day, and Todd Yancey misled investors about the efficacy of Agenus' immunotherapy treatment, the combination of botensilimab and balstilimab ("BOT/BAL"), in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5. [Dkt. 16].  Defendants moved to dismiss for failure to state a claim, arguing that Plaintiff has failed to plead facts with particularity establishing false or misleading statements, a strong inference of scienter, or loss causation. [Dkt. 25].  After carefully reviewing the record and the briefs as well as hearing oral arguments on the Motion, Defendants' Motion to Dismiss [Dkt. 25] is **GRANTED**.

1

## I.    BACKGROUND

Except where noted, the following facts are drawn from Plaintiff's Amended Complaint. Agenus Inc. is a publicly traded, clinical-stage biotechnology company incorporated in Delaware with its principal place of business in Lexington, Massachusetts. [Dkt. 16 ¶ 4, 28].  Co-founded by Defendant Armen in 1994, the company specializes in immuno-oncology therapy treatments, which are cancer treatments based on the body's immune system. [Id. ¶¶ 4, 29, 49, 64, 65]. Relevant to this case is BOT/BAL, Agenus' combination immunotherapy product for colorectal cancer. [Id. ¶¶ 2, 46, 72, 73].  Eighty to eighty-five percent of colorectal cancer patients have microsatellite stable tumors, also known as "cold" tumors. [Id. ¶ 47-48].  In contrast to microsatellite instable tumors, or "hot" tumors, cold tumors typically do not respond to immunotherapy. [Id. ¶ 48].  Consequently, patients with cold colorectal tumors have few treatment options. [Id. ¶ 52].  Agenus' BOT/BAL product sought to address that unmet need. [Id. ¶ 71].

The FDA requires any drug to go through a series of clinical trials before it can be approved for sale in the United States.  There are four phases of clinical trials. [Id. ¶ 54].  Phase 1 trials test safety and dosage of a drug, last for several months, and are performed on 20 to 100 volunteers. [Id.].  Phase 2 trials test the efficacy and side effects of a drug, last from several months to two years, and are performed on up to several hundred volunteers. [Id.].  Phase 3 trials test the efficacy and adverse reactions to a drug, last between one to four years, and are performed on 300 to 3,000 volunteers. [Id.].  Phase 4 trials test the safety and efficacy of a drug on several thousand volunteers and take place after FDA approval. [Id.].

The FDA's standard process for approval of a drug or treatment can take over a decade. [Id. ¶ 60].  Recognizing that some patients with severe or life-threatening diseases would benefit from earlier access, the FDA created the Accelerated Approval Program in 1992. [Id. ¶ 53].  The

2

Program dramatically shortens the approval timeline by allowing products to be sold after just one clinical trial, provided the company also submits sufficient supporting evidence. [Dkt. 27-6]. The FDA has used Accelerated Approval for diseases where short-term effects can be observed quickly but demonstrating long-term or clinically meaningful benefits would require larger, longer trials due to the disease's typical duration. [Dkt. 27-7 at 4].

Companies seeking approval under the Accelerated Approval pathway must still meet the typical statutory standards for effectiveness and safety. [Dkt. 16 ¶ 61]. Specifically, companies must produce "substantial evidence" of effectiveness and ensure that all clinical trials are "of appropriate design and high quality." [Dkt. 27-6 at 2]. Endpoints are central to meeting this requirement. "Endpoints" are the specific outcomes researchers measure in a study to determine whether a treatment works. [Dkt. 16 ¶ 55]. Three endpoints are relevant to the case at hand: Survival, Durability, and Response. Survival measures the additional length of time patients who undergo a specific treatment live compared to those in a control group who receive no treatment. [Id. ¶ 56]. Durability is the length of time a tumor continues to respond to treatment and thus demonstrates whether a drug produces meaningful and long-term rather than temporary effects. [Id. ¶ 58]. Response measures the percentage of patients whose cancer shrinks or disappears after treatment. [Id. ¶ 57].

Endpoints are categorized based on the type of outcome they measure. For traditional approval, the FDA requires "clinical endpoints" or "validated surrogate endpoints," which are subject to more rigorous standards. [Dkt. 27-6 at 2]. For Accelerated Approval, the FDA requires only "surrogate endpoints" or "intermediate clinical endpoints," which are subject to less-exacting standards—specifically, that the endpoint is "reasonably likely to predict" a clinical benefit or endpoint. [Dkt. 27-7 at 6-8]. Whether an endpoint is "reasonably likely to predict" a

clinical benefit is "a matter of judgment," but the FDA expects the company to produce empirical evidence. [Id. at 9].

In addition to endpoints, the FDA also requires a certain quantity of evidence to support approval of a treatment. [Dkt. 27-6 at 8].  Typically, the gold standard is two clinical trials. [Id.]. However, for Accelerated Approval, the agency may accept one clinical trial plus some other supporting evidence, such as confirmatory evidence or a previous finding by the FDA for an approved drug. [Id. at 10-13].  The agency offers more flexibility when the disease is life-threatening, rare, or if conducting trials is infeasible. [Id. at 14-18].

The central events of this case revolve around this FDA process and span approximately a year and a half.  It began on January 23, 2023, when Agenus issued a press release announcing initial results from its 70-patient Phase 1b clinical trials for BOT/BAL. [Dkt. 16 ¶ 74].  The results were promising: a 23% Overall Response Rate, 69% Durability, and a 12-month Overall Survival Rate of 63%. [Id.; Dkt. 27-4 at 1].  Looking forward, the company announced that Phase 2 trials had commenced, and that Phase 3 trials would begin in 2023. [Dkt. 27-4 at 1].

Several months later, the FDA granted Agenus Fast Track status. [Dkts. 16 ¶ 75; 27-11 at 1].  Companies with this designation are granted increased interaction with the agency to guide their studies and prepare for a potential application. [See Dkt. 16 ¶ 76].  For example, the FDA may meet with companies at the end of clinical trial phases to discuss study design, address concerns, and provide advice. [Dkt. 27-12 at 9].  Fast Track status does not guarantee Accelerated Approval, but it does allow rolling review, meaning that companies can submit sections of their application as they are completed rather than waiting to submit the entire application at once. [See id. at 10].  By the time of its Fast Track designation, Agenus had expanded its Phase 1b trials to over 350 patients. [Dkts. 16 ¶ 75; 27-9 at 1].

Over the next few months, Agenus allegedly experienced staff turnover and compressed internal timelines on the ongoing Phase 1b trials, driven by employee attrition as well as disorganization and pressure from management. [See Dkt. 16 ¶ 115].  On June 30, 2023, the company shared updated data from a 101-patient Phase 1b study. [Id. ¶ 77; Dkt. 27-5 at 1].  Like the initial results shared six months prior, the data was promising: a 74% 12-month Overall Survival Rate, median Overall Survival of 20.9 months, an Objective Response Rate of 23%, and Durability of 69%. [Dkt. 16 ¶ 77; Dkt. 27-5 at 1].

Two months later, Agenus announced it would focus exclusively on BOT/BAL, postponing all other programs in an effort to focus on Accelerated Approval. [Dkt. 16 ¶ 78]. Subsequently, the company laid off a quarter of its workforce. [Id.].  At that point, approximately 600 patients had been treated during the Phase 1 and Phase 2 trials. [Dkt. 27-21 at 2].  On October 22, 2023, Agenus announced that it planned to submit an application to the FDA for BOT/BAL in mid-2024. [Dkt. 27-28 at 2].  The company shared that the Phase 2 trials had approximately 230 patients and reported on various data points for different cohorts of the clinical trials. [Id. at 2-3].

By the end of 2023, Agenus' cash balance had fallen from $193 million in December 2021 to $76 million. [Dkt 16 ¶ 5].  And over the first half of 2024, various high-ranking employees were allegedly fired [id. ¶ 106], and the company had fallen behind on vendor payments [id. ¶ 120].

Despite these internal challenges, on April 12, 2024, the company announced updated Phase 1 data. [Dkt. 27-22 at 1].  As with its prior releases, the results were positive: a 12-month Overall Survival Rate of 71%. [Id.].  The following month, Agenus announced that Phase 2 trial data would be presented to the FDA in July 2024, marking the end of Phase 2 trials. [Dkt. 16

¶ 89]. By that point, approximately 900 patients had been treated with BOT/BAL in the Phase 1 and 2 trials. [Dkt. 27-15 at 2]. The company explained that during the meeting, the FDA would provide advice on "the path forward, including the Phase 3 study design and other elements needed to support" an Accelerated Approval application. [Dkts. 27-15 at 1; 27-16].

As planned, Agenus met with the FDA in July 2024 to review the company's Phase 1 and 2 data for BOT/BAL. At the meeting, the FDA ultimately advised Agenus against applying for Accelerated Approval, instead recommending parameters for the company's upcoming Phase 3 trials. [Dkts. 16 ¶¶ 124-26; 27-16 at 1-2]. Agenus issued a press release on July 18, 2024, reporting on the FDA's determination, along with the first public disclosure of the Phase 2 results. [See id. ¶¶ 124-26]. The data reported that a 75 mg dose of BOT/BAL given to patients resulted in a 19.4% Overall Response Rate, while an increased 150 mg dose resulted in 8.2%, or less than half. [Id. ¶ 19]. While these data points on Overall Response were positive, the FDA had expressed to Agenus that "objective response rates may not translate to survival benefit." [See Dkt. 27-16 at 1-2]. After the July 18 release, Agenus' stock price fell by 58.83%. [Dkt. 16 ¶¶ 124, 126].

Plaintiff initiated this action on September 6, 2024, in this Court on behalf of persons or entities who purchased or otherwise acquired Agenus securities between January 23, 2023, and July 17, 2024 (the "Class Period"). [Dkts. 1 at 1; 16 at 1]. Plaintiff alleges that Defendants misled investors on the efficacy of BOT/BAL, the company's operations, and the likelihood of Accelerated Approval, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5. [Dkt. 16 ¶¶ 224-39]. On February 7, 2025, Plaintiff filed a corrected Amended Complaint ("Amended Complaint"). [Dkt. 16]. Defendants moved to dismiss the Amended Complaint for failure to state a claim. [Dkt. 25]. In support of their Motion,

Defendants filed a declaration [Dkt. 27] with twenty-nine supporting Exhibits [Dkts. 27-1 through 27-32].  Plaintiff filed an Opposition to the Motion to Dismiss, which included objections to seven of these Exhibits. [Dkt. 33].  Defendants filed a Reply [Dkt. 34].  The Court held oral argument on the Motion on March 3, 2026. [Dkt. 38].

## II.    LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Reading the complaint "as a whole," the court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements. See id.  Factual allegations must be accepted as true, while legal conclusions are not entitled to credit. Id.  A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable. Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Second, the court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  Dismissal is appropriate when the complaint fails to allege a "plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Twombly, 550 U.S. at 559).

Claims alleging securities fraud, including claims under Section 10(b) of the Securities Exchange Act, are subject to heightened pleading requirements that supplement the general standards under Fed. R. Civ. P. 12.  Rule 9(b) requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake," specifying the time, place, and content of the alleged false or fraudulent statements. Fed. R. Civ. P. 9(b); Ponsa-Robell v. Santander Secs. LLC,

35 F.4th 26, 33 (1st Cir. 2022) (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94 (1st Cir. 1999)).  The Private Securities Litigation Reform Act ("PSLRA") imposes two additional "[e]xacting" pleading requirements. Tellabs Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 313 (2007).  First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); Shash v. Biogen, Inc., 84 F.4th 1, 11 (1st Cir. 2023) (citation omitted).  Second, with respect to scienter, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 (2011) (quoting 15 U.S.C.A. § 78u-4(b)(2)(A)).

## III.    DISCUSSION

### A.    Materials Outside Pleadings

The Court first addresses Plaintiff's objection to the judicial notice of seven out of twenty-nine Exhibits attached to a declaration in support of Defendants' Motion to Dismiss. [Dkt. 33 at 13].  Specifically, Plaintiff requests that the Court strike or decline to take notice of Exhibits 2, 5, 6, 7, 10, 15, and 16. [Id.].  Plaintiff contends that these Exhibits are improper because they are irrelevant, fall outside the Class Period, are too old to bear on the claims, or concern facts that are disputed and therefore more appropriately addressed through discovery. [Id. at 13-14].  Plaintiff takes no position on the remaining twenty-two Exhibits. [Id. at 13].  The Court agrees in part and disagrees in part.

In ruling on a motion to dismiss, a court ordinarily does not consider materials outside the pleadings without converting the motion into one for summary judgment. See Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008).  There are, however, recognized exceptions; the court may

8

consider "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." Id. (quoting Colonial Mortg. Bankers Corp. v. Lopez-Stubbe, 324 F.3d 12, 20 (1st Cir. 2003)). When "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) (internal citations omitted). However, "[t]he exception for documents the authenticity of which is not disputed by the parties is narrow," and courts accordingly apply the exception with caution. OrbusNeich Med. Co., BVI v. Bos. Sci. Corp., 694 F. Supp. 2d 106, 111 (D. Mass. 2010). Additionally, a court "may, in its discretion, take judicial notice of [agency publications such as] FDA documents" that are publicly available. Leavitt v. Alnylan Pharms., Inc., 525 F. Supp. 3d 259, 266 n.1 (D. Mass. 2021) (citing Kader v. Sarepta Therapeutics, Inc., No. 14-CV-14318, 2017 WL 72396, at *2 n.3 (D. Mass. Jan. 6, 2017)).

The Court will not consider Exhibit 2. Exhibit 2 is an article discussing immunotherapy's purported ineffectiveness for microsatellite-stable tumors. [Dkt. 27-3]. The Amended Complaint neither references nor relies upon this article, and although its authenticity is not disputed, it is irrelevant to the legal and factual issues presented by the instant Motion to Dismiss. Defendants cite the article for general background about immunotherapies, but it does not bear on Defendants' representations about BOT/BAL's clinical trials or Agenus' operations. In addition, Plaintiff already alleges that immunotherapy is ineffective for treating microsatellite-stable tumors. [Dkt. 16 ¶ 48]. Thus, consideration of Exhibit 2 is unnecessary. See Kader, 2016 WL 1337256, at *10 ("Although these exhibits may have provided helpful [background] context,

9

they are not properly before the Court, nor are they essential to evaluating the sufficiency of the Complaint.").

The Court will take judicial notice of Exhibits 5, 6, 7, and 10.  These Exhibits consist of draft guidance published on the FDA's website concerning the agency's Accelerated Approval pathway and Fast Track Designation process. [Dkts. 27-6; 27-7; 27-8; 27-12].  Although not referenced in the Amended Complaint, these Exhibits are publicly available, their authenticity is undisputed, and they contain relevant FDA documents that the Court may properly consider at the motion to dismiss stage. Pizzuto v. Homology Meds., Inc., No. 23-CV-10858, 2024 WL 1436025, at *2 (D. Mass. Mar. 31, 2024); Leavitt, 525 F. Supp. 3d at 266 n.1 (stating that the court "may, in its discretion, take judicial notice of FDA documents").  The fact that the documents predate the Class Period does not preclude judicial notice, as the age of the materials may affect the weight investors could reasonably attribute to them but does not render them improper for consideration, particularly in the absence of any allegation that these draft guidance documents were rescinded or otherwise invalidated prior to the Class Period. See Kader, 2016 WL 1337256, at *11.  Where the judicially noticed Exhibits conflict with an allegation in the Amended Complaint, the Exhibit trumps the allegation. See Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000).

Finally, the Court will not take judicial notice of Exhibits 15 and 16.  Both Exhibits post-date the Class Period: Exhibit 15 is a Form 10-K filed with the SEC for the fiscal year ending on December 31, 2024 [Dkts. 27-17; 27-18], and Exhibit 16 is a Press Release issued by Agenus on January 22, 2025 [Dkt. 27-19].  Defendants contend that these Exhibits provide context for Agenus' July 2024 Press Release. [Dkt. 34 at 20].  However, neither Exhibit is referenced or relied upon in the Amended Complaint, and because they post-date the Class Period, they cannot

be considered when evaluating the allegations in the Amended Complaint. See Pizzuto, 2024 WL 1436025, at *2.

### B.       Count I: Section 10(b) and Rule 10b-5

Turning to the merits, Plaintiff first alleges that Defendants violated Section 10(b) of the Securities Exchange Act. [Dkt. 16 at 78].  Section 10(b) "forbids the 'use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device.'" Tellabs, 551 U.S. at 318 (alteration in original) (quoting 15 U.S.C. § 78j(b)).  SEC Rule 10b-5 implements this prohibition by rendering it unlawful to (1) make "any untrue statement of a material fact" or (2) omit any "material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5.  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

Defendants contend that Plaintiff has failed to adequately plead three of these elements: (1) the challenged statements were not false or misleading, (2) the Amended Complaint does not allege facts giving rise to a strong inference of scienter, and (3) Plaintiff has not established loss causation. [Dkt. 26 at 3-5].  As explained in detail below, the Court concludes that all but one of the challenged statements fail to satisfy the falsity requirements; that Plaintiff adequately pleads scienter as to Defendant Armen but not as to the other individual Defendants; and that Plaintiff fails to adequately plead loss causation.  Because the failure to plead any of these elements independently warrants dismissal, the Amended Complaint ultimately fails for lack of loss causation.

### 1.    Materially False Statements or Omissions

For the first element, the plaintiff must show that the defendant made a "false, or misleadingly omitted, statement of [material] fact." Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 7 (1st Cir. 2021).  Where a complaint pleads multiple statements, "falsity is judged statement by statement." Pizzuto, 2024 WL 1436025, at *7 (citing In re Bos. Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 56 (D. Mass. 1998)).  Defendants do not have an "affirmative duty to disclose any and all material information." In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 27 (1st Cir. 2012) (quoting Matrixx, 563 U.S. at 44).  Rather, a plaintiff must show that "there is 'a substantial likelihood' that a reasonable investor would have viewed [the omission] as 'significantly alter[ing] the total mix of information made available.'" Fire & Police Pension Ass'n v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015) (quoting City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 756 (1st Cir. 2011); Thant v. Karyopharm Therapeutics Inc., 43 F.4th 214, 223-25 (1st Cir. 2022).  Defendants are required to disclose only what is necessary to prevent affirmative statements from being "so incomplete as to mislead."  In re Bos. Sci. Corp., 686 F.3d at 27 (quoting Hill v. Gozani, 638 F.3d 40, 57 (1st Cir. 2011)).

Plaintiff alleges that thirty-two statements from twenty-six documents—comprising nine press releases, five earnings calls, and twelve SEC filings including 10-K and 10-Q forms—constitute actionable fraudulent or misleading statements or omissions. [Dkt. 16 ¶¶ 132-97]. With respect to each statement, Plaintiff advances one or more of the following overlapping grounds for why the statements were materially misleading: (1) Defendants lacked data necessary to obtain accelerated approval of BOT/BAL; (2) Defendants misrepresented BOT/BAL's efficacy and potential; and (3) Defendants lacked the ability to accelerate the development of their treatment candidates. [Id.].  Plaintiff also alleges that the company's 2022

12

and 2023 10-K and 10-Q certifications signed by Defendants Armen and Klaskin pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 are actionable because the forms failed to disclose the misrepresentations described above. [Id. ¶¶ 195-97].

In the interest of efficient resolution and because many of the challenged statements are largely duplicative, the Court evaluates the statements categorically rather than individually, grouping them according to the most relevant alleged basis for fraud and with some statements appearing in multiple categories. See Urman v. Novelos Therapeutics, Inc., 796 F. Supp. 2d 277, 282 (D. Mass. 2011) ("[S]tatements [that] are closely related [can] be grouped together for consideration without diminishing the individualized attention needed to be given to each. . . .").

### a.    Clinical Trial Design

Plaintiff contends that Defendants' representations regarding the outcomes of BOT/BAL's Phase 1 and 2 trials were misleading because the underlying trials were not "powered appropriately to capture survival or durability data." [Dkt. 16 ¶ 135]. Specifically, Plaintiff alleges that the trials were structurally flawed because they were "too small," "too short," and "used heavily pre-treated" patients. [Id. ¶¶ 14, 99; see also id. ¶¶ 129-30]. As such, claims that the Phase 1 or Phase 2 trial data demonstrated Survival, Durability, and Response were misleading because Defendants failed to disclose the underlying design flaws. Put simply, Plaintiff's theory is that if a thermometer is broken, its temperature readings are unreliable. Nine of the thirty-two statements fall in this category. [Id. ¶¶ 144 ("I certainly expect that we'd be able to demonstrate a point estimate[] for response, durability of response for patients with stable disease or better and that is trending toward a survival benefit."), 156 (stating that the BOT/BAL combination has "consistently demonstrated . . . durable responses"), 158 (similar), 167, 169, 171, 173, 175, 179].

Plaintiff's argument is foreclosed by the fact that Agenus publicly disclosed information regarding the size, length, and pretreatment of patients for both Phase 1 and 2. Thant, 43 F.4th at 224-25 (noting that it is "not a material omission to fail to point out information of which the market is already aware" (quoting Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004)). For example, in its January 21, 2023, press release, Agenus disclosed that its Phase 1b trials contained 70 patients, that the patients were "heavily pre-treated," and that there were over 300 patients enrolled as of that date. [Dkt. 27-4 at 1]. Likewise, its October 22, 2023, press release stated that the Phase 2 trials had approximately 230 patients [Dkt. 27-28 at 2], and its May 16, 2024, press release shared that it expected the end of Phase 2 would be in July 2024 [Dkts. 16 ¶ 89; 27-15 at 1]. Even if the press releases did not explicitly state the exact length of the trials, that information could be inferred from the timelines provided regarding trial initiation, progression, and anticipated completion. As the underlying data and study parameters were publicly disclosed, investors were free to draw their own conclusions about the significance and reliability of those results. Thus, Plaintiff does not plausibly allege that Defendants omitted material information on this ground.

On similar reasoning, Plaintiff challenges two statements asserting that Agenus designed its studies to align with the Accelerated Approval requirements. [Dkt. 16 ¶¶ 134 ("[O]ur lead program, [BOT], is advancing in multiple clinical programs which *we have designed to support regulatory pathways for accelerated development* . . . ." (emphasis added)), 148 (Defendants' "development strategies align seamlessly with the FDA's rigorous standards")]. According to Plaintiff, Agenus' clinical programs were not "designed to support regulatory pathways for accelerated development" because of the design flaws of the trials and because Defendants "disregard[ed] what the FDA required for Accelerated Approval." [Id. ¶¶ 134-35]. In support,

Plaintiff relies on two Confidential Witness statements: one asserting that "the company simply could not submit such small numbers to the FDA and expect to obtain Accelerated Approval" [id. ¶ 102] and another that "the FDA doesn't do that.  It's not going to happen.  You can't do it that way" [id. ¶ 98].

Plaintiff fails to adequately plead that Defendants' statements were false or misleading, as there are insufficient facts showing that Agenus' trial designs were incapable of meeting the requirements for Accelerated Approval.  As a threshold matter, the vague Confidential Witness statements lack sufficient specificity.  These statements merely assert that the trial numbers were "too small," that the FDA would not accept them, or that "the FDA doesn't do it that way." [Id. ¶¶ 98, 102].  Such conclusory assertions lack specific factual support.  Moreover, these claims are contradicted by the FDA's draft guidance on Accelerated Approval.[1]  That guidance explains that Accelerated Approval is a flexible process with no fixed rubric governing the type or quantum of evidence required, particularly for life-threatening diseases with unmet medical needs. [Dkt. 27-6].  By the Amended Complaint's own allegations, "cold" colorectal tumors fall within that category. [Dkt. 16 ¶¶ 47-52].  Unlike the traditional approval pathway, which generally requires rigorously validated endpoints and multiple clinical trials, the Accelerated Approval framework permits reliance on less-established surrogate or intermediate endpoints, which can be based on a single clinical trial with supporting evidence and are "matter[s] of [the agency's] judgment." [Dkt. 27-7 at 9].  At most, the Confidential Witness statements reflected

---

[1] As explained, when a judicially noticed document conflicts with an allegation in the complaint, the document trumps the allegation. See Clorox, 228 F.3d at 32.  Here, the Court has judicially noticed the FDA's draft guidance, so it supersedes contradictory claims in the Amended Complaint.

15

opinions about the likelihood of approval, not factual allegations about the FDA's actual practices. Thus, these statements are not shown to be materially false or misleading.

Relatedly, Plaintiff challenges one statement asserting that regulatory advisers provided input to Defendants on FDA strategy. [Dkt. ¶ 162]. Specifically, during an earnings call on May 7, 2024, Defendant Armen allegedly stated:

> [T]he FDA has guidance that is based on historical precedents on the minimum follow. But *we have had significant input from our regulatory advisers on what that minimum should be*. Of course, ideally, we can wait 5 years but we're not going to do that. But the minimum enrollment in the Phase 2 ended in October 2023. And based on that, you can sort of extrapolate what the follow-up period will be between now and the potential FDA meeting.

[Id. (emphasis added)]. Plaintiff alleges that this statement was misleading because it omitted that Defendant Armen was ignoring and, in some instances, terminating those same advisors rather than following their advice. In support, Plaintiff relies on statements from three Confidential Witnesses claiming that Defendant Armen terminated Agenus' Chief Business Officer, Chief Communications Officer, Chief Legal Officer, Vice President of Clinical Science, and Chief of Patient Advocacy after they raised concerns about the BOT/BAL trials. [Id. ¶¶ 98, 106-07]. Here, the Court finds that Plaintiff has adequately pleaded a materially misleading omission. The Confidential Witness statements are reliable, as the witnesses had high-ranking positions within the company, some reported directly to Defendant Armen, and several of the allegations were based on personal knowledge. It is a reasonable inference that the alleged high-ranking employees were fired because Defendant Armen disagreed with their warnings about the FDA approval process. Defendant Armen's statement is thus misleading because it conveys that the company was relying on regulatory expertise to guide its FDA strategy. Omitting that the company was ignoring or removing those advisors could create a misleading impression about

16

the company's decision-making and reliance on expert guidance.  Accordingly, Plaintiff has plausibly alleged a materially misleading omission as to this statement.

Many of the remaining statements regarding clinical trial design fall into recognized exceptions.  First, six statements describe the clinical data generically without mentioning specific endpoints. [Id. ¶¶ 136, 140, 148, 160, 164, 177].  The Court finds that these statements are inactionable puffery.  Puffery consists of "upbeat statements of optimism" that are inactionable because a reasonable investor would not rely on such vague, generalized claims when making investment decisions. Thant, 43 F.4th at 223 (quoting Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 32 (1st Cir. 2020)).  The First Circuit has recognized the following phrases as examples of puffery: descriptions of study results as "an important milestone," "a significant step in establishing the efficacy and safety of [a treatment] as a new treatment option for patients," "breakthrough," "successful," "compelling," "lead[ing] the market," and "well received." Id. at 222-23.  Here, six statements identified by Plaintiff contain similarly broad and unverifiable optimistic vagaries, such as "very impressive outcomes" [Dkt. 16 ¶ 136], "positive trends" [id. ¶ 140], "crucial milestones," "rigorous testing," [id. ¶ 148], "valuable insights" [id. ¶ 164], "broad effectiveness," "immense promise," and "transform cancer care" [id. ¶ 177].  These statements are the kind of inactionable "rosy affirmation[s] heard from corporate managers" that are "numbingly familiar in the marketplace." Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 250-51 (D. Mass. 2006).

Second, six of the challenged statements are inactionable as forward-looking statements. [Dkt. 16 ¶¶ 137 (Defendants "expect[ed] to expedite regulatory approval"), 158 (Defendants "intend[ed] to utilize an accelerated approval approach"), 142 (similar), 152, 154, 191]. Forward-looking statements are statements concerning "plans and objectives of management for

17

future operations," and are excepted under the PSLRA so long as they are accompanied by meaningful cautionary language that is "substantive and tailored to specific future projections, estimates, or opinions." Leung v. bluebird bio, Inc., 599 F. Supp. 3d 49, 68 (D. Mass. 2022) (citing Isham v. Perini Corp., 665 F. Supp. 2d 28, 39 (D. Mass. 2009)).  Here, the challenged statements involve plans regarding future FDA submissions, predictions about data, or operational projections rather than statements of current fact. See Meyer v. Biopure Corp., 221 F. Supp. 2d 195, 203 (D. Mass. 2002) (forward-looking statement where company expressed plans to file application with FDA by certain timeframe and to enroll patients for clinical trials); Celano v. Fulcrum Therapeutics, Inc., No. 23-CV-11125, 2025 WL 928783, at *14 (D. Mass. Mar. 27, 2025) (forward-looking statement where company predicted that future trials would "provide sufficient data").

These statements were accompanied by specific and substantive cautionary disclosures. The press releases and earnings calls in which these statements were made expressly warned that any statements were "subject to risks and uncertainties that could cause actual results to differ materially," and that investors were cautioned "not to place considerable reliance on the forward-looking statements contained" therein. [E.g., Dkt. 27-18 at 3].  They also directed investors to Agenus' SEC filings "for more detail on these risks." [E.g., Dkt. 27-21 at 4].  In turn, the SEC filings warned that "there is no guarantee that [the company's] submissions, if any will be approved" by the FDA and that "[t]he FDA may disagree that our data and development program are sufficient to support BLA filing or approval." [Dkt. 27-8 at 18-19].  They also warned that even if the company saw positive initial results, "they may not necessarily be predictive of the final results of the trials or future clinical trials or otherwise be sufficient to support an approval." [Id. at 19].  Finally, the SEC filings explained that the clinical programs might "encounter safety,

18

efficacy, supply or manufacturing problems, developmental delays, regulatory or commercialization issues or other problems" that could "significantly harm[]" their plans. [Id. at 18-19].

### b. Assumption of Survival Benefit

Plaintiff next argues that Defendants failed to disclose that they were relying on an unproven assumption of Survival rather than collecting data to support such a finding. Four statements are most relevant to this theory. [Dkt. 16 ¶¶ 142 (noting that Defendants did not share Phase 2 trial results with investors "not because the rest of the data isn't satisfactory, but the rest of the data needs to be cleaned up and we need a little bit of work to do"), 146 ("[T]here are regulatory and other questions about do overall response rates translate to longer-term benefit. We know they do. We need to demonstrate that with numbers . . . ."), 152 ("[R]esponse and duration of response is what drives . . . the survival curve . . . ."), 150 (Defendants "made a strategic decision" to "wait until all the data mature" before presenting it to the FDA)]. In support, Plaintiff cites a post-Class Period statement from Defendant Armen explaining that, "[w]e are confident that in an immuno-oncology treatment setting, any trial that is [similar to the ones Agenus conducted for BOT/BAL] and shows significant overall response rates always translates to survival benefit . . . . [T]he FDA, I think, need[s] to be schooled in this phenomenon." [Dkt. 16 ¶ 21].

Even assuming as true that Defendants relied in part on such an assumption, Plaintiff has not shown this was the plan all along—that is, that the challenged statements were false or misleading when made. To plead falsity, a plaintiff must explain why a statement was materially false or misleading *at the time it was made*; a complaint cannot rely on a theory of "fraud by hindsight," which merely alleges fraud because of subsequent events. See Miss Pub Empls.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 90 (1st Cir. 2008); ACA Fin. Guar. Corp., 512 F.3d at 62.

19

Here, Plaintiff relies only on a post-Class Period statement and offers no particularized facts supporting the speculative conclusion that, during the Class Period, Defendants intended to rely on an assumption rather than provide Phase 2 Survival data.  To the contrary, the Amended Complaint acknowledges that the company conducted Phase 2 trials over several months in an effort to collect and analyze such data—however allegedly imperfectly. [See Dkts. 27-3, 27-5, 27-13, 27-18].  The July 18, 2024, press release itself included results on Phase 2 Survival data. [Dkt. 16 ¶ 19].  At most, the cited statement suggests that by the time of the FDA meeting, the company lacked sufficiently robust data and therefore also presented more general observations about the correlation between Response and Survival—an approach FDA ultimately declined to adopt.  But this is inactionable fraud by hindsight, as it essentially asserts that because its Phase 2 data did not turn out as positively as hoped, the company must have fraudulently described its intentions. See In re Genzyme Corp., No. 09-11267, 2012 WL 1076124, at *11 (D. Mass. Mar. 30, 2012) (concluding that the fact that FDA later concluded company did not adequately implement its corrective plans did not make earlier statements about drug approval process false or misleading).

### c.    End-to-End Capabilities

Plaintiff challenges five statements describing the company's "end-to-end capabilities." For example, a statement from the company's March 16, 2023, Form 10-K, asserts:

> We believe our fully integrated, end-to-end capabilities from our artificial intelligence-powered VISION platform for novel target discovery, antibody generation, and cell line development to our [Current Good Manufacturing Practices ("cGMP")] and clinical development and operations capabilities, together with a comprehensive and complementary portfolio will uniquely position us to produce novel therapies on accelerated timelines.

[Dkt. 16 ¶ 182; see also id. ¶¶ 183, 187, 189, 193 (similar)].  Plaintiff contends that these statements were materially misleading because Agenus allegedly lacked those capabilities and

was instead missing deadlines due to poor management.  Specifically, Plaintiff alleges that Defendants were adding new indications to clinical trials against advice from the medical team, failing to pay vendors and suppliers, experiencing manufacturing stoppages and supply shortages because of that failure, and struggling to complete projects because of employee attrition. [Id. ¶¶ 109-112, 114-16, 181, 184].

Plaintiff, however, fails to plead with particularity any facts showing that the statements were false or misleading.  As a preliminary matter, the Amended Complaint does not define what it or the company means by "end-to-end capabilities."  The Court therefore assumes the term refers to the referenced AI tools, cGMP manufacturing practices, clinical development capabilities, and operational capabilities.  Even so, Plaintiff alleges no specific facts—only conclusory assertions—that those AI tools, manufacturing practices, or clinical and operational capabilities did not exist.  The Amended Complaint's only factual support appears to be a single vague Confidential Witness statement claiming that Defendant Armen "came up 'with his own ridiculous plans that didn't make sense and weren't grounded in reality.'" [Id. ¶ 109].  This statement not only lacks specificity, but it is also contradicted by another Confidential Witness statement indicating that Agenus had contracts in place for technology and tools, including a gene database and an AI-based image analysis pipeline for cancer diagnosis. [Id. ¶ 116].  Although Plaintiff alleges that the company failed to pay some vendors, the Complaint does not allege facts demonstrating that Agenus failed to employ those tools.

Plaintiff fares no better under an omissions theory.  Companies do not have a broad affirmative duty to disclose any information that "might conceivably affect stock prices." In re Bos. Sci. Corp, 686 F.3d at 27.  Even where the omitted information is material, "there is no liability . . . unless there was a duty to disclose it." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26

21

(1st Cir. 1987).  Moreover, alleged omissions must be at least "sufficiently related to the quoted statement." <u>Gozani</u>, 638 F.3d at 62.  Here, the challenged statements largely concern the company's AI tools, its cGMP manufacturing capabilities, and clinical and operational capabilities; they say nothing specifically about vendor relationships, trial indications, payment practices, or staffing matters.  The Court finds that those subject matters are not sufficiently related to the statements at issue to give rise to a duty to disclose the alleged management shortcomings.

### d.      Sarbanes-Oxley Certifications

Plaintiff's claims concerning the company's Sarbanes-Oxley certifications fail for the same reasons set forth above.  Namely, Plaintiff fails to plead sufficient allegations demonstrating that the statements contained in the company's SEC filings were false or misleading.  As explained, the only potentially misleading statement is Defendant Armen's claim regarding regulatory advisers, which was made during an earnings call, not in an SEC filing.

### 2.      Scienter

The second Section 10(b) element that Defendants challenge is whether Plaintiff has sufficiently demonstrated a strong inference of scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." <u>Matrixx</u>, 563 U.S. at 48 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193-94 and n.12 (1976)).  It requires "a showing of either conscious intent to defraud or 'a high degree of recklessness.'" <u>ACA Fin. Guar. Corp.</u>, 512 F.3d at 58 (quoting <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 82 (1st Cir. 2002)).  While the statement-or-omission prong of the PSLRA must be analyzed by giving the plaintiff all reasonable inferences, the statute changes this standard for scienter. 15 U.S.C. § 78u-4(b)(2).  Instead, an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314.  Courts thus consider the complaint in its entirety, assess all

22

facts alleged, and weigh plausible opposing inferences. See Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 81 (1st Cir. 2016).  When there are equally strong inferences for and against scienter, "the draw is awarded to the plaintiff." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011).

There is no specific test for scienter; courts analyze on a case-by-case basis.  Plaintiffs may satisfy the requirement by providing direct evidence, such as "admissions, internal records or witnessed discussions" showing that at the time the statements were made, the defendants "were aware that they were withholding vital information or at least were warned by others that this was so." Shash, 84 F.4th at 15.  A plaintiff can also "combine various facts and circumstances" to show indirect evidence. Aldridge, 284 F.3d at 82; see also Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999) (collecting examples of the "many different types of evidence as relevant to show scienter").  Courts assess each of the plaintiff's proposed facts and then conduct a holistic analysis of all facts alleged.

Here, Plaintiff makes several allegations in support of an inference of scienter. Considered as a whole, the Amended Complaint adequately demonstrates scienter for Defendant Armen and Agenus but fails as to the other individual Defendants.

First, Plaintiff invokes the "core operations" doctrine.  Under a "core operations" theory, "[f]acts critical to a business's core operations . . . generally are so apparent that their knowledge may be attributed to the company and its officers." Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 19 (D. Mass. 2004).  Plaintiff alleges that BOT/BAL was Agenus' "most important product and essential to the Company's survival." [Dkt. 16 ¶ 209].  Plaintiff highlights that Agenus laid off 25% of its workforce and ceased all programs unrelated to BOT/BAL to focus on Accelerated Approval of BOT/BAL. [Id. ¶ 210].  The Court agrees and finds that BOT/BAL's centrality to

23

Agenus' operations "tips towards a finding for a strong inference of scienter." In re iRobot Corp. Sec. Litig., 527 F. Supp. 3d 124, 141 (D. Mass. 2021). Because the company focused exclusively on this product, it is reasonable to infer that executives would have knowledge of the associated clinical trials and development activities. Nonetheless, the core operations doctrine alone is insufficient to establish scienter; it may only contribute to the analysis when considered alongside other "plus factors." Id. The Court thus considers this as one relevant factor.

Second, Plaintiff alleges motive and opportunity, noting that Agenus' cash reserves declined from $307 million to $76 million between 2021 and 2023—a drop of more than seventy-five percent. [Dkt. 16 ¶ 203(a)]. While the "usual concern by executives to improve financial results" generally is not enough to support an inference of scienter, facts suggesting that "the very survival of the company w[as] on the line" can support such an inference. In re Cabletron Sys., Inc., 311 F.3d 11, 39 (1st Cir. 2002). Defendants argue that Plaintiff has not shown that the remaining $76 million was inadequate for continued operations. However, the company's cash reserves decreased to only a quarter in the span of two years, creating a clear downward trajectory. Extending that trend forward, it is reasonable to infer that the company would reach zero cash within roughly the next year absent some sort of intervention, such as additional financing. This illustrates that the company was at risk of "shutter[ing] its doors" in the foreseeable future. Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 42 (1st Cir. 2017). This allegation therefore supports scienter. However, as with the core operations doctrine, motive cannot independently establish of scienter. See Leung, 599 F. Supp. 3d at 66. The Court thus considers it in conjunction with other allegations.

Third, Plaintiff argues that the individual Defendants, as high-ranking executives, must have been aware of material information regarding the company's clinical trials, manufacturing

24

capabilities, and internal operations during the Class Period. [Dkt. 16 ¶¶ 203-13].  However, scienter cannot "rest on a bare inference that a defendant 'must have had' knowledge of the facts" solely because of his high-ranking position within a company. Maldonado v. Dominguez, 137 F.3d 1, 10 (1st Cir. 1998).  Accordingly, the Court does not find this fact alone persuasive and considers the individual Defendants' positions only in conjunction with other specific allegations.

Plaintiff's most detailed allegations concern Defendant Armen.  Plaintiff alleges that multiple high-ranking employees confronted Defendant Armen and warned him that the FDA would not approve of the company's Phase 1 and 2 data. [Dkt. 16 ¶¶ 98, 102, 105-07, 112]. Defendant Armen allegedly responded, "who cares about FDA, they can't stop us," and subsequently terminated these advisers. [Id. ¶ 102].  When an executive is warned by advisers about potentially unlawful practices, such allegations may weigh in favor of a finding of scienter. See Shash, 84 F.4th at 15.  On balance, the Court finds this fact persuasive for scienter.  Even assuming the employees may not have been terminated because of their dissenting views, as Defendants argue, Plaintiff plausibly alleges that Defendant Armen was repeatedly cautioned about the regulatory risks and responded dismissively.  These allegations are sufficient to support the inference that Defendant Armen was on notice that his statements could mislead investors.

Plaintiff also alleges that Defendant Armen added indications to the Phase 1 clinical trials despite advice from the medical team, insisted on aggressive timelines, and refused to pay vendors, which allegedly led to staff shortages, manufacturing stoppages, and reduced likelihood of FDA approval. [Dkt. 16 ¶¶ 96, 98, 102, 106-21].  Plaintiff asserts that Defendant Armen knew about these operational issues because he directly caused them.  However, even if true, Plaintiff has not shown that Defendant Armen knew that nondisclosure of these facts would mislead

25

investors. See Brennan v. Zafgen, Inc., 853 F.3d 606, 614 (1st Cir. 2017) ("The key question . . . is not whether defendants had knowledge of certain undisclosed facts, but rather whether the defendants knew or should have known that their failure to disclose those facts" risked misleading investors.). Operational challenges—such as manufacturing delays, staff shortages, and vendor disputes—are not uncommon for companies, particularly in the development of new products. Simply knowing they happened does not suggest intent to mislead the market. Similarly, with respect to adding indications, there is no allegation that Defendant Armen understood that failing to disclose these actions would mislead investors. The only support Plaintiff cites is a single Confidential Witness statement who allegedly "recalled that a consultant told Agenus's FDA Submission Team that the FDA would only accept data concerning four or so indicators." [Dkt. 16 ¶ 111]. This is vague, unverified hearsay from an unidentified consultant, not based on personal knowledge, and not directed to Defendant Armen (though it may have reached him).

Plaintiff further alleges that the Defendant Armen "evaded" questions about Phase 2 trial data during investor calls, instead "placat[ing] investors with misleading touts of results while withholding trial data." [See Dkt. 33 at 32-33]. This argument is undermined by the fact that the company provided explicit risk warnings during those calls. See In re Genzyme Corp. Sec. Lit., 754 F.3d 31, 42-43 (1st Cir. 2014) (noting that a corporation's informative disclosures "undercut any inference of fraudulent intent on the part of defendants"); Waters Corp., 632 F.3d at 760 ("[A]ttempts to provide investors with warnings of risks generally weaken the inference of scienter."). As noted above, the company's SEC filings—referenced during the calls—explicitly cautioned that the FDA could deny Accelerated Approval, might disagree with the company's interpretation of the data, and that Phase 2 results could be less favorable than earlier trials. [See

Dkt. 27-8 at 18-19].  Moreover, even if the allegations about investor calls could support an inference of scienter, that inference is not "at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.  Given the inherent uncertainty of clinical trial results and the FDA's approval process, a competing inference is that Defendant Armen exercised caution in giving an overly negative portrayal of the data, which would have also been misleading. Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 244 (1st Cir. 2015) ("Under plaintiffs' theory of the case, Abiomed should have affirmatively admitted widespread wrongdoing rather than stating that the outcome of its regulatory back-and-forth with the FDA was uncertain.  That would be a perverse result; such an admission would have been misleading . . . .").

As to Defendant O'Day, Plaintiff alleges that he reviewed clinical trial data using the company's internal dashboard, demonstrating knowledge of the data's faults. [Dkt. 16 ¶¶ 94, 203(e)].  However, the fact that Defendant O'Day had access to and reviewed clinical trial data does not indicate that he knew or should have known that the FDA would not ultimately accept it.  Plaintiff has not identified any specific error that would have been apparent on the face of such data that would have put Defendant O'Day on notice of its alleged inadequacy. Cf. Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 82-83 (1st Cir. 2016); Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 271 (3d Cir. 2009) (noting that a "steep decline" in operating margins creates inference that Chief Financial Officer, who "was paying close attention to these numbers," would investigate the cause).

For Defendants Klaskin and Yancey, Plaintiff alleges no specific facts beyond their corporate titles and concomitant responsibilities as well as Defendant Klaskin's signing of Sarbanes-Oxley certifications. [Dkt. 16 ¶ 203(j)].  The certifications are not persuasive because

27

they contained adequate risk disclosures. See Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 208 (1st Cir. 2020) (finding informative disclosures in Forms 10-K undercut a finding of scienter). Moreover, as explained above, the statements in the SEC filings are not material omissions, which further undermines a finding of scienter. Brennan, 853 F.3d at 616-17 (noting that "the materiality and scienter inquiries are linked," since "the marginal materiality of an omitted fact 'tends to undercut the argument that the defendants acted with the requisite intent . . . in not disclosing' it").

In sum, considering the cumulative allegations, the Court finds that Plaintiff has failed to plead a strong inference of scienter as to Defendants O'Day, Yancey, and Klaskin. Plaintiff's allegations as to these Defendants consist primarily of generalized statements about their corporate responsibilities as high-ranking executives, combined with references to core operations and motive. These vague and unspecific allegations do not demonstrate a "strong inference" that these individual Defendants had intended to or recklessly disregarded the risk of deceiving investors. By contrast, the allegations concerning Defendant Armen present a closer case. Defendant Armen was allegedly warned repeatedly by regulatory advisers, then responded flippantly before terminating or laying off those employees. When considered alongside the company's dependence on additional financing and the critical importance of BOT/BAL to its operations, it is a compelling inference that Defendant Armen knew or should have known that certain statements risked misleading investors. This inference is at least as compelling as alternative explanations such as poor business judgment or optimism regarding trial results. Accordingly, Plaintiff has adequately pleaded scienter as to Defendant Armen, and, by extension, the company itself. See Cabletron, 311 F.3d at 40 ("The scienter alleged against the company's agents is enough to plead scienter for the company.").

28

### 3.    Loss Causation

To plead loss causation, a plaintiff must allege facts establishing a "causal link between the alleged misconduct and the economic harm ultimately suffered." In re Alkermes Sec. Litig., No. CIV.A. 03-12091, 2005 WL 2848341, at *10 (D. Mass. Oct. 6, 2005) (quoting Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003)).  "A plaintiff commonly establishes loss causation by: (1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price drop." Shash, 84 F.4th at 19-20 (quoting Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 237-38 (1st Cir. 2013)).

Plaintiff alleges that Agenus' July 18, 2024, press release revealed two previously unknown facts constituting corrective disclosures: (1) that a 75 mg dose of BOT/BAL was more effective than a 150 mg dose, undermining prior representations about the treatment's effectiveness; and (2) two patients from the Phase 2 trials were not included in the data presented to the FDA. [Dkt. 16 ¶ 199].  However, a disclosure is only corrective if it "correct[s] some untruth" about previously disclosed information. Pizzuto, 2024 WL 1436025, at *19 (no loss causation where announcement of clinical trial results was limited to new data).  Here, Defendants had not previously reported the Phase 2 results, so the statements regarding dosage effectiveness did not correct, contradict, or revise any prior data.  Even if Defendants had previously made optimistic statements about the data, that does not equate to contradicting the new information.  Indeed, the July 18, 2024, data did report positive Survival results, even if not

29

as high as investors might have hoped.  Similarly, the disclosure concerning the two pending Phase 2 patients did not conflict with prior information.  Defendants' previous statements that the company would present Phase 2 data to the FDA during the July 2024 meeting are not incompatible or in conflict with the disclosure, as it is possible for the company to have presented data even if two of the hundreds of patients had not completed the full trial at the time of the meeting.

As an alternative ground for loss causation, Plaintiff invokes a "zone of risk" theory, alleging that Defendants concealed the extent of risk that the FDA would deny Accelerated Approval, that Agenus' clinical trials would be unreliable, and that the company would fail to meet accelerated timelines. [Dkt. 33 at 38-39].  Under this theory, a plaintiff can show loss causation where an economic loss was "caused by the materialization of [a] concealed risk." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 173 (2d Cir. 2005).  This theory originates in the Second Circuit and has not been expressly adopted by the First Circuit, leaving its applicability to this case "unresolved." Miller Inv. Tr. v. Morgan Stanley & Co., LLC, 308 F. Supp. 3d 411, 447-48 (D. Mass. 2018) (collecting cases).  Even assuming this theory applies, however, the press release at issue would not be actionable because the company had already disclosed the relevant risks.  In other words, the release constituted the materialization of a *known* risk, not a *concealed* one. See Pizzuto, 2024 WL 1436025, at *19.  As explained, Agenus disclosed the size and length of its trials, and Agenus' SEC filings expressly warned that the FDA might not agree with their interpretation of the BOT/BAL data, that Phase 2 results might not be as strong as Phase 1, that manufacturing and other logistical problems could occur, and that Accelerated Approval was not guaranteed. [E.g., Dkts. 27-18 at 3, 27-21 at 4].  Defendants did not conceal or obscure these risks from the public, rendering the zone-of-risk theory inapposite.

30

See Pizzuto, 2024 WL 1436025, at *19 (citing cases where no loss causation was found where companies disclosed risk of FDA disapproval).

### C.    Count II: Section 20(a)

A Section 20(a) claim is "dependent on the existence of an underlying securities violation," so for defendants against whom a Section 10(b) is inadequately pled, a Section 20(a) claim cannot survive. Shash, 84 F.4th at 10.  Because the Court finds that Plaintiff has not adequately pleaded a Section 10(b) claim, there is no viable Section 20(a) claim.

### D.    Request for Leave to Amend

In his Opposition, Plaintiff requests leave to "amend to address any factual deficiencies identified by the Court" in this Order. [Dkt. 33 at 40].  The First Circuit has generally discouraged granting leave to amend pleadings after a court has already ruled on a motion to dismiss, as doing so "impose[s] unnecessary costs and inefficiencies on both the courts and party opponents." ACA Fin. Guar. Corp, 512 F.3d at 57 ("The plaintiffs do not get leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate under the PSLRA.").  Particularly where a plaintiff "make[s] a 'bare request [to amend] in their response to a motion to dismiss" rather than filing a motion explaining in detail why such amendment would not be futile, a court need not grant such a motion. Fire & Police Pension Ass'n, 778 F.3d at 247.

At this juncture, the Parties have already submitted extensive briefing on the Motion, appeared for oral argument, and the Court has reviewed each of the allegations and has decided which ones meet the pleading standards.  Plaintiff requested leave to amend only in his Opposition to the Motion to Dismiss, and his request lacked any further explanation of the specific factual deficiencies he would amend or why such an amendment would not be futile.

31

The Court finds that restarting the process would not be an efficient use of the Parties' and Court's resources in light of this posture. Accordingly, Plaintiff's request is denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [Dkt. 25] is **GRANTED**. Plaintiff's request for leave to amend the Amended Complaint to rectify deficiencies identified in this Order is **DENIED**.

**SO ORDERED.**

Dated: March 24, 2026                                          /s/ Angel Kelley
                                                                       Hon. Angel Kelley
                                                                       United States District Judge